## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01091
DAVID E. BRODY,

     Plaintiff,

v.

MARC A. BRUNER,
THE BRUNER FAMILY TRUST, and
MARC E. BRUNER, AS TRUSTEE OF THE BRUNER FAMILY TRUST

     Defendants.

---

### DECLARATION OF DAVID E. BRODY

---

I, David E. Brody, am the plaintiff in the above-entitled action and the rightful holder of Claim No. 7, in the amount of $335,374.18, (the "Brody Claim") in *In re PetroHunter Energy Corporation*, United States Bankruptcy Court for the District of Colorado, Case No. 16-20197-KHT (the "Bankruptcy Case"). I have personal knowledge of the matters set forth herein, either through my own observations or my review of the sources described herein, and if called to testify, I would testify competently thereto.

### I.   Introduction

1.   Over the course of my 16-year relationship with Marc A. Bruner ("MAB"), his son, Marc E. Bruner ("MEB," collectively, "the Bruners"), other members of the Bruner family and of the Bruners' business enterprises, and their various businesses, themselves, I have had the opportunity to personally observe the Bruners' business practices, including the matters specifically addressed herein. I have also researched the proceedings in the Bankruptcy Case and publicly available sources of information that support my declaration.

2.    The Bruners' business practices that are described in this declaration are specifically relevant to this case because they inform why MAB approached me and requested that I assign the Brody Claim to him and how and why both MAB and the Bruner Family Trust (the "BFT") have attempted to obtain tens of millions of dollars in value at the expense of the other creditors in the PetroHunter in the Bankruptcy Case through Bruner's and BFT's joint series of negotiations and motions (collectively, the "Bruner/BFT Strategies"). The Bruner/BFT Strategies began with, required, and included: (a) MAB's fraudulent acquisition of the Brody Claim to give himself personal standing and leverage in the Bankruptcy Case, which he would not have had in the absence of a personal claim, and (b) MAB, with the active assistance or acquiescence of MEB, the BFT trustee, taking direct or indirect control of the approximately $7,000,000 of claims held by the BFT (the "BFT Claims"), and then combining or consolidating the Brody Claim with the BFT Claims and other entities controlled by MAB for the purposes of the Bruner/BFT Strategies, as further described herein. But for each of these actions, MAB would have no position in the Bankruptcy Case, and would not have been able to represent to the Chapter 7 trustee, Jeffrey A. Hill, (the "Trustee") and the Trustee's counsel, Jeffrey L. Weinman, ("Trustee Counsel") that MAB had the authority and ability to use the personal Brody Claim and BFT Claims in connection with carrying out the Bruner/BFT Strategies.  In furtherance of such negotiations and motions, MAB sometimes acted in further combination with other companies owned by MAB, including MAB Resources, LLC ("MAB Resources"), and Paltar Petroleum Limited ("Paltar," collectively with the BFT the "Bruner-Controlled Entities"). The Bruner/BFT Strategies are described in the Trustee's Objection and Response in Opposition to the Motion to Convert the Case to Chapter 11, dated September 4, 2018 (the "Trustee's Response"), attached hereto as Exhibit A.

3.    MAB's fraud and conspiracy with MEB and the BFT has resulted in significant damage to me. I transferred the Brody Claim to MAB in exchange for his promise, which I now

believe he never intended to keep, to pay me $25,000 and transfer over $300,000 worth of freely

tradeable shares of Fortem Resoures, Inc. (the "Fortem Shares"), as described in more detail in the

First Amended Complaint. MAB failed to pay me any portion of the $25,000 or to transfer any of

the Fortem Shares, forcing me to take legal action in both this Court and the Bankruptcy Court. My

legal claims also include a right to punitive damages, as well as treble damages under Colorado's Civil

Theft statute, together with attorney's fees and costs.

4.     The amount of money I ask be held must be sufficient to compensate me for all

damages, fees, and costs, which I estimate to exceed $1,000,000.00. Thus, until said amount is

withheld from any proceeds otherwise intended to be paid on the Brody Claim and the BFT Claims,

and placed in a court-supervised account, no interim distributions should be made to MAB or the

BFT or the distributions should be attached or held in constructive trust.

## II.    Background on The Bruners and the BFT

5.     I was a partner in the firm of Patton Boggs LLP from 1999 through 2012, and I've

been Senior Counsel with Hogan Lovells US LLP since January 2013. Commencing in July 2004 and

continuing intermittently to March 2018, I represented several of MAB's oil and gas companies

primarily on upstream oil and gas property transactions.

6.     I have known both MAB and MEB since July 2004.

7.     For much of that time, and certainly for more than the past four years, MAB has

resided overseas, including in Canada, Switzerland, and Italy, and perhaps other countries. He owns

and manages businesses overseas, as well.  To the best of my knowledge, he does not reside in

Colorado, although he has in the past. MEB resides in Colorado.

8.     The Bruners' businesses have included the following entities: Galaxy Energy

Corporation ("Galaxy"); PetroHunter Energy Corporation ("PetroHunter"); Sweetpea Petroleum

Pty Ltd ("Sweetpea"); Paltar Petroleum Limited ("Paltar"); MAB Resources, LLC ("MAB

Resources"); Nation Energy, Inc. ("Nation"), the "Foreign Entities" (as defined in paragraph 37, below), among several others.

9.     In my capacity as an attorney with the firms of Patton Boggs LLP and Hogan Lovells US LLP, I have never represented MAB or MEB personally, and I have never represented the BFT. None of the information contained herein is or ever was subject to the attorney-client privilege.

10.     MAB formed the BFT in 2004 and appointed his son, MEB, as trustee. Although I believe there were and still are several Bruner children, cousins, and other Bruner family members named as the beneficiaries of the BFT, MAB and MEB used the substantial assets of the BFT from the outset of the BFT as if the BFT was an investor formed to make high risk investments in MAB's and MEB's companies, or a bank formed to make highly questionable loans to those companies.

11.     Two specific series of examples of such investments and loans are set forth in Exhibits B and C.   These publicly-filed SEC documents reflect that the BFT loaned Galaxy $16,149,728 between January 2004 and December 2007, and loaned PetroHunter over $3 million starting in 2007.  Despite the fact that the assets of the BFT at one time had a value of over $100 million, none of the investments or loans which MAB and MEB caused the BFT to make to other Bruner-Controlled Entities was repaid to the BFT or resulted in a return on investment for the BFT. Galaxy filed for bankruptcy in 2008 (Chapter 11; later converted to Chapter 7), and PetroHunter filed for bankruptcy in 2016.

12.     I have also seen evidence that one or more of the Bruners formed the Bruner Family Trust II ("BFT II") and perhaps other trusts, entities, accounts, or vehicles for holding and transferring funds in accordance with their own interests and needs. The BFT II was one of the Movants, along with the other Bruner-Controlled Entities, in the matter that is the subject of the Trustee's Response, described below.

III.     **MAB's fraudulent acquisition of the Brody Claim and/or breach of contract.**

13.     In or about August 2017, MAB approached me and asked me to sell him the Brody Claim, telling me that he planned to combine or consolidate it with the BFT Claims in the PetroHunter bankruptcy Case.

14.     We reached and memorialized an Agreement, dated August 16, 2017, which is attached hereto as Exhibit D. The Agreement required that MAB deliver the Fortem Shares to me within 10 days of the Agreement along with two payments of $12,500 each.

15.     As shown in Exhibit E, MAB signed and filed the transfer of the Brody Claim to himself on August 22, 2017.

16.     MAB never delivered any of the Fortem Shares despite multiple promises to do so, and he never paid any portion of the $25,000.

17.     In fact, shortly after transferring the Brody Claim to himself, MAB told me that he could not pay the $25,000 and that he did not have any freely tradable Fortem stock.

18.     I do not believe MAB intended to transfer the Fortem Shares because as Chief Executive Officer of Fortem and owner of millions of Fortem shares of stock, MAB could have easily done so at any time.

19.     I had no knowledge that MAB either could not or would not transfer the Fortem Shares or pay the cash consideration, though I relied on his promise in the Agreement that he would.

20.     The value of 150,000 Fortem Shares at the time of the Agreement was about $300,000.

21.     I also became convinced that MAB would never and did not intend to transfer the Fortem Shares to me when I heard from co-counsel who was representing one of the same MAB entities I had been representing (and who is a respected and reliable senior partner in a prominent

5

Denver-based law firm, hereinafter, "Counsel") that MAB stated to Counsel that MAB intends or intended to contribute $15 million in Fortem stock to Beetaloo Basin Partners, an Australian company controlled by MAB, and was planning to liquidate or otherwise use his Fortem stock for that purpose and other purposes.

22.    Upon hearing Counsel's statement, I filed this lawsuit.

23.    I have told MAB that I would accept other consideration in lieu of the Fortem Shares, but he has not given any.

24.    I have also made multiple efforts to contact MAB, both directly and through associates, in an effort to get him to either resolve the matter or accept service of process so we can resolve the matter in court, and he has done neither.

## IV.  The Bruners' use of the BFT to advance their personal interests, including MAB's and his companies' interests in the Bankruptcy Case.

25.    MEB was the Chief Executive Officer of, and MAB was a 20% shareholder in, Galaxy. On March 27, 2008, Galaxy declared bankruptcy in the United States Bankruptcy Court for the District of Colorado, Case No. 1:08-bk-13164. Among Galaxy's reported liabilities was a $145,000 loan from the BFT, made only 4 days before bankruptcy, and after GAX had already reported that it expected a $20 million loss, i.e., when it was well on its way to—and likely drafting the papers to file—bankruptcy. Prior to Galaxy's bankruptcy, the BFT made approximately $16 million in loans to Galaxy

26.    As part of the Galaxy bankruptcy, Galaxy entered into a contract to sell certain properties in the Powder River Basin of Wyoming and Montana to PetroHunter for $45 million. At the time, PetroHunter's controlling shareholder was MAB, and he remained so until PetroHunter's bankruptcy filing. It was MAB who directed PetroHunter to enter into the transaction with Galaxy.

27.    The day after it made the $143,000 loan to Galaxy, and only 3 days before Galaxy's bankruptcy, the BFT also loaned $100,000 to PetroHunter for "working capital." According to the

6

SEC filing recording this loan, MAB was then PetroHunter's largest shareholder and controlled the company with 43% ownership.

28.    By virtue of these transactions, which are by their nature intended to be secret (except when periodic SEC filings were required) and thus my visibility is limited, the BFT, an entity formed by MAB and whose nominal trustee was MEB, acquired convertible debt interests in Galaxy, in which MAB held a 20% interest at the time of its bankruptcy, and in PetroHunter, an entity in which MAB was the controlling shareholder at the time of its bankruptcy. MAB then used his interest in both Galaxy and PetroHunter to enter into the contract to acquire a share of the valuable energy assets in the Powder River Basin through the Galaxy bankruptcy case. MAB then attempted to use Paltar, his control over the BFT Claims, and the Brody Claim to acquire the shares of Sweetpea through the PetroHunter bankruptcy case.

29.    During the period relevant to this matter: (a) MAB was sole or controlling shareholder and Chairman of Paltar, an Australian corporation; (b) Paltar was controlling shareholder of Nation, a Wyoming corporation; (c) MAB, Paltar, and Nation were involved in several law suits in which they were adverse to two members of the Nation board of directors, John Hislop and David Siegel, (the "Other Nation Directors"); and (d) MAB was competing against the Other Nation Directors to acquire all or a portion of the shares of Sweetpea, which are owned by PetroHunter, through the Bankruptcy Case.

30.    Thus, it is clear that the Bruners have formed a multi-faceted relationship among—at a minimum—Galaxy, PetroHunter, Paltar, MAB Resources, LLC, and the BFT to create a personal presence in their own ends and to pursue the Bruner/BFT Strategies. To gain such presence and fully leverage the BFT Claims, MAB had to create personal standing in the Bankruptcy Case. He created such personal standing by fraudulently acquiring the Brody Claim and transferring it into his own name. Had he not done so, MAB would have been at a significant disadvantage trying to

implement the Bruner/BFT Strategies and competing against the Other Nation Directors, who have significantly greater financial resources than MAB, Paltar, or the BFT. Also, had he not done so, MEB, the BFT trustee—who was not sufficiently familiar with or involved in the business of Paltar or Nation—would have been forced to openly and directly negotiate with the Trustee using the BFT Claims as leverage to advance the Bruner/BFT Strategies and MAB's personal interests. Such conduct would have created a record of MEB's use of BFT assets for MAB's benefit, further compounding over $20 million in BFT losses between 2004 and the present, caused jointly by MAB and MEB. As stated above, the assets of the BFT at one time had a value of over $100 million. Therefore, there appear to be additional BFT losses and possibly other BFT transactions controlled by MAB and MEB jointly of which I am not aware.

31.    Other evidence of the collusion, the Bruner/BFT Strategies, and multi-faceted relationship of the various entities includes these facts: (a) MAB controlled and tried to use for his personal gain all the Movants in the motion that is the subject of the Trustee's Response, which include MAB, MAB Resources, the BFT, the BFT II, Carmen J. Lotito, Laura M. Lotito,[1] and BioFibre Technology International; (b) all such Movants as well as Paltar were represented by the same lawyer, Glenn Merrick ("Merrick"); and (c) Merrick reported to and took directions with respect to all Movants and Paltar only from MAB, personally.

32.    Finally, the following excerpts from the Trustee's Response describe the Bruner/BFT Strategies, and the Response is replete with proof of MAB's fraud and deceit, conflicts of interest, and the conspiracy between MAB and the BFT. The Trustee's Response further demonstrates and supports the need to enjoin either the transfer of assets from the PetroHunter bankruptcy estate to either MAB or the BFT, or prevent any of the Bruners and the BFT from transferring assets out of escrow accounts, pending resolution of this matter, as stated above:

---

[1] The Lotitos are related to MEB by marriage.

- Together the Movants [MAB, the BFT, BFT II, et al] own or control approximately 35% of the outstanding shares of PetroHunter…. In their capacity as the most significant holder of equity of the Debtor, the Movants are eager to consume the value otherwise belonging to creditors higher in the capital structure….

- The intentions of the Bruner Interests [MAB, the BFT, BFT II, et al] are conspicuous after years of machinations and litigation: Bruner wants control of Sweetpea and willing, if necessary, to circumvent the Debtor's ownership by any means necessary, no matter how invalid.

- Were it not for the diligent efforts of the Trustee and the professional[s] under the Trustee's direction, the Bruner Interests would have already taken an outsized percentage of the estate's assets for themselves, through either their fraudulent demands made by Bruner-controlled Paltar,…the litigation,…Paltar's questionable offers,…or by the efforts of Bruner in the adversary proceeding [involving the Brody Claim]—all of which were efforts to deprive the estate of any value and to benefit Bruner and Paltar individually.

- As another means of acquiring an interest in Sweetpea, Bruner purchased a claim against the PetroHunter estate [the Brody Claim] that he vigorously asserts is secured, despite the Trustee's possession and control of the certificated shares of the Sweetpea equity….

- When the attempt to litigate Sweetpea's assets away from the PetroHunter estate failed, Bruner did not quit and, through his control over Paltar, attempted an end run to force Sweetpea to release its interest in the JVOA by fraudulently charging Sweetpea for over $60 million of expenses that had not yet been incurred….

Trustee's Response, at 4-5; 20-22.

33.    Thus, the BFT, as a claimant, as a collaborator with MAB as owner of the Brody Claim, and as one of the Movants, worked with MAB in his efforts to strip the value of the PetroHunter estate for himself.  Comparing MAB to a "fox who thinks he can simply walk into the front door of the chicken coop and assume control[,]" *id.* at 2, the Trustee went on to express his deep concern of Bruner being a purchaser of estate assets, by pointing out that Bruner had been sued for fraud, racketeering, and undercapitalization in *Hislop et al. v. Paltar Petroleum Limited et al.*, Case No 17-cv-2371-RBJ-SKC, *Id.* at 22.

**V.    It will be impossible for me to collect any judgment from Defendants.**

34.    Unless this Court construes a trust and/or attaches the bankruptcy distributions to MAB and the BFT, I am certain that I will never be able to recover anything from the Defendants.

35.    The Trustee's Response – including its references to Marc A. Bruner's "fraudulent demands", "questionable offer", "fraudulent charges", "sham demand", "bad faith", "abuse of the bankruptcy system", and third parties' allegations of "fraud and racketeering" -- further describes and confirms that MAB cannot be trusted to comply with any court order in my favor related to proceeds paid to him personally under the Brody Claim, or paid to the BFT in relation to the BFT Claims.

36.    Therefore, in order to preserve my ability to collect on any judgment in my favor in this Court and to protect my rights, in light of MAB's foreign residency, offshore bank accounts, lack of ownership of any real or personal property in the U.S., and history of secreting assets, it is critical that this Court enjoin either the transfer of assets from the PetroHunter bankruptcy estate to either MAB or the BFT, or prevent any of the Bruners and the BFT from transferring assets out of escrow accounts, pending resolution of this matter.

37.    The following facts are provided to demonstrate the existence of MAB's offshore bank accounts and his history of secreting assets:

(a) During the period of time when I represented Marc A. Bruner's companies (from 2004 to 2011), I traveled with him on numerous occasions for business meetings at his residences in Vancouver and Zurich, and with him to the offices of various financial institutions and other companies located in numerous cities in Canada, Hungary, Switzerland, and England.

(b) For the majority of at least the past 16 years, and continuing to the present, MAB owned and resided for extended periods of time in homes in Italy, Switzerland, and Canada, and conducted business from those locations;

(c) MAB has had extensive business relationships and financial interests, including personal bank accounts, outside of the U.S. for decades, continuing to the present, and had or has partial ownership of the following companies, all of which are Hungarian, Australian, German, or Swiss entities (collectively, the "Foreign Entities"), and some of which are shareholders and creditors of PetroHunter: Global Project Finance AG, Paltar Petroleum Limited, Sweetpea Petroleum Pty Ltd, Falcon Australia Oil and Gas, Ltd., Mako Hungary, TXM Oil and Gas, JTE Finanz AG, CR Innovations, Hapi GmbH;

(d) The Foreign Entities maintained foreign bank accounts, several of which MAB controlled;

(e) MAB represented to me on several occasions, advised his counsel (J. Barry Meinster), and disclosed publicly during the pendency of the case of MAB Resources, LLC v. PetroHunter (referenced in the Trustee's Response) that MAB owned an undivided interest in Global Project Finance AG;

(f) MAB's administrative assistant (James King) with whom MAB asked me to work at the time of entering into the Agreement was located in Vancouver;

11

(g) MAB's Fortem Shares that were to be delivered pursuant to the Agreement were held by a Swiss entity;

(h) The designated agent (Jorge) to whom MAB referred me to supposedly assist in obtaining the Fortem Shares held by the Swiss entity was a citizen of Switzerland;

(i) Another account owned by MAB and holding MAB's Fortem Shares is located in Vancouver, B.C., Canada;

(j) MAB's securities counsel representing him in 2018 and 2019 on issues related to Fortem Shares in the above-referenced account in Vancouver is Cam McTavish with Clark Wilson LLP, located in Vancouver.

38.    According to statements recently made to me by Ghislaine Bruner (MEB's wife), the BFT currently has no assets except for the $6.8 million account receivable represented by the BFT Claims.  Therefore, if MAB immediately removes such proceeds and the proceeds from the Brody Claim from the reach of the Court and creditors after each interim Distribution proposed by the Trustee, BFT would be incapable of satisfying any judgment against it in this case.  As stated, I'm certain all such proceeds will "disappear" as soon as they are paid by the Trustee.

I certify under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

_____

David E. Brody

# UNITED STATES BANKRUPTCY COURT
### District of Colorado

|  |  |  |
|---|---|---|
| In re: PETROHUNTER ENERGY CORPORATION | &#124; | Case No. |
|  | &#124; | 16-20197-KHT |
| Debtor. | &#124; |  |
|  | &#124; | Chapter |
| Address:    910 16th Street, Ste. 208 | &#124; | 7 |
|               Denver, CO 80202-2931 | &#124; |  |
|  | &#124; |  |
|  | &#124; |  |
| EIN:        98-0431245 | &#124; |  |
|  | &#124; |  |

---

### CHAPTER 7 TRUSTEE'S OBJECTION AND RESPONSE IN OPPOSITION TO THE MOTION TO CONVERT THE CASE TO CHAPTER 11

Jeffrey L. Hill, the Chapter 7 Trustee (the "Trustee") for the bankruptcy estate of PetroHunter Energy Corporation ("PetroHunter" or "Debtor"), by and through his Attorneys, Allen Vellone Wolf Helfrich & Factor P.C. and Weinman & Associates, P.C., submits the following Objection and Response in Opposition to the Motion to Convert Case to Chapter 11 filed by Mark A. Bruner as assignee of David E. Brody, Mark A. Bruner, MAB Resources, LLC., Brunner Family Trust, Brunner Family Trust, II, Carmen J. Lotito, Laura M. Lotito and BioFibre Technology International, (collectively, the "Movants" or "Bruner Interests" or "Bruner").

## A.    INTRODUCTION

Bruner's motion to convert PetroHunter' s bankruptcy case to Chapter 11 is a thinly veiled attempt to take from the estate, for himself, the estate's sole and most valuable asset, i.e. the estate's ownership of the Debtor's wholly owned subsidiary and non-debtor entity, Sweetpea Petroleum Pty Ltd. ("Sweetpea"). Sweetpea owns

**EXHIBIT A**

two primary assets that comprise the value of Debtor. Bruner's intention from the beginning has been to defeat Debtor's interests in Sweetpea and thereby deprive this estate of those valuable assets. At great administrative expense, and for the benefit of all other creditors and interested parties, the estate has secured, defended and preserved those two key assets of Sweetpea, and thus of the Debtor's estate— (1) shares of Falcon Oil & Gas and (2) a 50% interest in an Australian gas exploration joint venture. Now, in his most brazen approach to date, Bruner is like a fox who thinks he can simply walk into the front door of the chicken coup and assume control.

Even if the attempt to convert this case to Chapter 11 was made in good faith—given the objective facts it was not—this case is not appropriate for conversion. The prospect of confirming a plan of reorganization for an entity that has been in Chapter 7 liquidation for nearly two years, and had functioned merely as a non-operating holding company for years before that, is, at best, highly unlikely. Furthermore, the Trustee is quite far along in his efforts to monetize assets for the benefit of all of the estate's creditors. The work the Trustee has performed to date has been significant, including a strategic, measured, and balanced sale of the shares of Falcon Oil & Gas that is ongoing. The Trustee is also well down the road in negotiating a transaction for the sale of Sweetpea's interest in Australian gas exploration joint venture. The Court should not countenance the Movants' attempt to derail the Trustee's efforts for the limited benefit of the Movants, who, while putative creditors and equity holders, represent only small

**EXHIBIT A**

percentage of the creditors and interested parties as a whole. The Bruner Interests are objectively adverse to the estate and granting their Motion would be unjust to the creditor body as a whole, as it would drain value and not inure any benefit to the majority of creditors and other parties-in-interest.

### B.    BACKGROUND

#### I. PetroHunter's Ownership of Assets

1.    On October 29, 2007, PetroHunter acquired the entirety of the outstanding shares of an Australian company, Sweetpea Petroleum Pty Ltd., thereby making Sweetpea and its Australian operations a wholly-owned subsidiary of Debtor PetroHunter.

2.    Sweetpea is the primary and nearly sole asset of PetroHunter's bankruptcy estate and was the primary and nearly sole asset of PetroHunter in the last several years before the bankruptcy petition was filed.

3.    Sweetpea owns two primary assets:

    a.    Approximately 80 million shares of Falcon Oil & Gas, Ltd., a publicly traded Canadian company. At the time of the bankruptcy petition Sweetpea owned approximately 89 million shares, 9 million of which have been liquidated and sold under the direction of the Trustee. These shares, if sold carefully, are likely to net Sweetpea and, through to its equity-holder Debtor, several millions of dollars to distribute to its creditors. The Trustee believes, in good faith, that the value of these shares is unencumbered by any liens or mortgages.

**EXHIBIT A**

b.      A 50% participating interest in a Joint Venture and Operating

Agreement with Australian company Paltar Petroleum Limited

(Paltar), dated September 16, 2011, which includes certain oil

and gas assets and leasehold interests in Northern Australia.

The joint venture is for the purpose of gas exploration activities

in the Northern Territories in a field that has not yet been

developed and is many years from flowing production to the

markets. (The Trustee has been engaged in efforts to sell the

JVOA agreement to third parties and is presently negotiating

the terms of an asset purchase agreement, by which the

Australian Assets will be sold by Sweetpea to an arm's length

third party.

## II. PetroHunter's Bankruptcy

4.      Almost two years ago, on October 17, 2016, PetroHunter filed its

Voluntary Petition under Chapter 7 of the Bankruptcy Code and Jeffrey L. Hill was

appointed interim Chapter 7 Trustee by the United States Trustee's Office. The

appointment of Jeffrey L. Hill at Trustee was confirmed as permanent on December

1, 2016.

## III. The Untenable and Irreconcilable Conflicts of Interest of the Bruner Interests

### a.      Bruner Interest's Ownership of the Debtor

5.      Together the Movants own or control approximately 35% of the

outstanding shares of PetroHunter, a percentage of ownership greater than any

**EXHIBIT A**

other individual shareholder of the Debtor. Thus, when the Bruner Interests argue
that a "chapter 11 liquidation will likely produce more net value for distribution to
parties in interest if it is accomplished by an experienced and capable management
team" and that "[PetroHunter's] equity interest holders [should] be afforded an
opportunity to select a board of directors and management team," their true
intentions to seize control themselves is made manifest. Motion to Convert ¶ 18, 23.
In their capacity as the most significant holder of equity of the Debtor, the Movants
are eager to consume the value otherwise belonging to creditors higher in the
capital structure from the sale of the Falcon Oil & Gas shares to pay the heavy
expenses the Debtor faces and to delay any sale of the Australian oil and gas assets,
presumably seeking to substitute their business judgment for that of the Trustee's,
until many years down the road when those assets might somehow have greater
value.[1]

### b.    Bruner's Conflicts Relating to Paltar

6.    Movant Marc Bruner is the founder and chairman of Paltar and
movant Carmen Lotito is the Executive Vice President of Paltar.

7.    On January 30, 2017, Paltar served on the Trustee a demand notice for
payment or contribution of approximately $60 million as Sweetpea's 50% share of
the purported total of approximately $120 million in 2017 and 2018 expenses under

---

[1] Putting aside whether such decision to delay liquidation in order to speculate as
an investor with estate assets is tantamount to a new business plan which should
only be approved and implemented through a plan of reorganization, lest it be
labeled a *sub rosa* plan. There is, however, no resources and none are offered by the
Movants to justify pursuing this prognostication and speculation with a bankrupt
entity's indirect assets.

**EXHIBIT A**

the Joint Venture and Operating Agreement between Sweetpea and Paltar. However, such work expenses were never approved by a management committee as required by the JVOA and are not in fact expenses for the purpose of the JVOA.

8.    Paltar's $60 million demand was a sham. The demand was based entirely on fraudulent documents, falsified materials that Paltar attempted to portray as invoices for work *already performed*. In fact, the documents were mere quotes for future work to be performed—which was also work that had not been authorized under the JVOA. Indeed, there were no expenses incurred by the field operator, Paltar, that were being reimbursed pursuant to the JVOA's terms; rather, it was to disadvantage Sweetpea and provide a vehicle for seizing Sweetpea's 50% interest in the JVOA. It is likely no coincidence that the $60 million amount that Paltar fraudulently demanded of Sweetpea was just slightly greater than the exact amount that Sweetpea's approximately 89 million shares of Falcon Oil & Gas were worth at the time of the demand.

9.    The Trustee responded to Paltar's $60 million demand under the JVOA with a notice of wrongful demand. If the Trustee had not employed counsel who responded promptly to this demand, then Sweetpea would have defaulted on this alleged indebtedness to Paltar in the amount of $60 million, and Sweetpea would have suffered one of two significant losses of value as a result of this specious demand from Paltar. Sweetpea would have had to, either: (1) turn over control of its approximately 89 million shares of Falcon Oil & Gas to Paltar and Bruner worth many millions of dollars, or (2) allowed default and seizure mechanics under the

**EXHIBIT A**

JVOA to occur which would have cost Sweetpea its 50% interest in the JVOA and the properties related thereto.

10.    On October 2, 2017, Paltar sent the Trustee a putative letter of intent whereby Paltar would agree to purchase the equity in Sweetpea (owned by Debtor PetroHunter) for $500,000 plus a 2% overriding royalty interest in the hydrocarbon fields produced under three permits held by the JVOA. On October 4, 2017, counsel for the Trustee respectfully declined Paltar's letter of intent, noting that the then-recently-filed lawsuit against Paltar, Bruner, Lotito, and others in the United State District Court of the District of Colorado[2] created significant risk and conflict for pursuing a transaction when other third parties, perhaps willing to pay greater amounts, were interested in direct asset purchases and would not seek to take the Falcon stock. Specifically, counsel for the Trustee then stated, in relevant part:

> Thank you for your proposal to enter into an LOI between Paltar and Sweetpea.... [T]he proposal has merit and would be worth negotiating further.

---

[2] The United States District Court action filed against Paltar, Bruner, Lotito, et al. (*Hislop et al. v. Paltar Petroleum Limited et al.*, Case No.17-cv-2371-RBJ-SKC) by Nation Energy, Inc. and other plaintiffs contained allegations relating directly to Paltar's conduct regarding its "interest in a number of oil and gas exploration permits issues by the Northern Territory of Australia." Generally, the allegations related to "massive fraud and racketeering, breaches of fiduciary duties and other violations of" the Plaintiffs' legal rights. Specifically the Plaintiffs alleged that "Paltar...did not have sufficient funds or the ability to raise funds for the exploration and development of these permits" and that "Bruner and his co-conspirators planned to declare a fraudulent default by Nation Australia under the earnings agreements and cause Nation Australia to surrender its interests to Paltar," meaning that "Bruner and his co-conspirators would personally gain financially, at the expense of Nation Energy and Nation Australia, from shifting the future petroleum licenses and royalty away from Nation Australia and its investors to Paltar and Fortem."

**EXHIBIT A**

The foregoing notwithstanding, we have been presented with a copy of the Complaint filed...against Paltar, Bruner, and others filed in the U.S. District Court in Denver. Irrespective of the truth of the allegations or the merits of the case, the litigation places in jeopardy any agreement Trustee Hill might enter into....[U]ncertain agreements and litigation are extremely unattractive to Bankruptcy Trustees and, Jeffrey Hill is no different.

In the event that the litigation is resolved and Mr. Bruner is the prevailing party, we would be happy to recommence discussions.

11.    On April 25, 2018, Paltar re-advanced a proposal to counsel for the Trustee, whereby Paltar would acquire from the bankruptcy estate of PetroHunter "free and clear of any competing liens and claims...all right, title, and interest...in the equity of Sweetpea." On April 27, counsel for the Trustee responded that the Trustee was in the process of re-valuing the estate's assets in light of the decision by the government in the Northern Territory of Australia to lift the previously-imposed moratorium on fracking, and that until that was completed the Trustee would be unable to accept Paltar's proposal "at this time."

12.    On August 27, 2018, Sweetpea, under the supervision of the Trustee, could not let the false demand for payment of the $60 million under the JVOA continue to linger. Sweetpea commenced litigation in Australia against Paltar asserting, among other things, that Paltar's $60 million demand notice was invalid and void under the JVOA, and that Paltar "failed to act in good faith" and "failed to act in a manner that was just and faithful."

**EXHIBIT A**

### c.    Bruner's Conflicts Relating to MAB Resources

13.    Movant MAB Resources, LLC, an entity controlled by Bruner, brought a civil action against PetroHunter and Sweetpea in Colorado state court on December 29, 2014 in Jefferson County, Case, No. 2014CV32487. On March 2, 2015 venue was changed to the City and County of Denver, Case No. 2015CV109. MAB claimed that, based on a January 2007 agreement (and amendments thereto) it had entered into with PetroHunter, it should receive a percentage of the shares of Falcon Oil & Gas PTY Ltd that Sweetpea acquired in May 2013 and that it was owed royalties on two specific permits held by Sweetpea.

14.    On April 12, 2016, the Denver District Court Judge granted the motion for summary judgment filed by PetroHunter and Sweetpea, finding all claims were barred by the statute of limitations which had long-since run. The court also made findings that even if the statute of limitations had not run, the unambiguous terms of the agreement between MAB and PetroHunter did not include the shares of Falcon Oil & Gas because they were acquired by Sweetpea and not by PetroHunter.

15.    On May 30, 2016, MAB filed its Notice of Appeal with the Colorado Court of Appeals. The Appeal was stayed by the filing of PetroHunter's chapter 7 bankruptcy petition.

16.    On February 7, 2018 MAB filed a motion with this Court for relief from the automatic stay to continue the appeal. The Court, after hearing proffers and argument from the parties, denied the motion, reasoning in part that MAB had never filed a proof of claim and that the deadline to do so had long since passed.

**EXHIBIT A**

### d.  Bruner's Conflicts Relating to Adversary Proceeding

17.    The Trustee has possession, custody, and control of the certificated shares of equity representing the outstanding shares of Sweetpea stock.

18.    Meanwhile, seven persons or entities[3] filed Proofs of Claim in PetroHunter's chapter 7 case which alleged that these seven persons held a perfected or partially perfected security interest in some or all of the outstanding shares of Sweetpea. This is a curious assertion since perfection of these intangible rights allegedly in the certificated shares of Sweetpea is already questionable due to the fact that the Trustee has possession, custody, and control of the shares. These allegedly secured interest in the Sweetpea equity are held by, among others, Movant Marc Bruner.

19.    Unsurprisingly, on August 2017, the Trustee filed an Adversary Complaint, Case No. 17-1337-KHT, against these persons and entities asserting secured rights to obtain declaratory relief that they do not possess perfected security interests which are superior to those of the Trustee who possesses the shares. One entity[4] never filed an answer and default judgment was entered on May 31, 2018. The Trustee objected to the entirety of the claim for one entity[5], and the claim was denied by the Court on July 27, 2018. Two other entities[6] entered into

---

[3] RENN Capital Group, Inc., RENN Fund Inc. and RENN Universal Growth Investment Trust PLC, each filed a separate proof of claim, but filed since filed their Answers and other filings with the Court as the "RENN Entities", which is how they shall be referred to herein.
[4] Wes-Tex Drilling Wealth Preservation Defined Benefit Plan
[5] Global Project Finance AG
[6] El Oro LTD and JTE Finanz AG

**EXHIBIT A**

stipulations with the Trustee on March 19, 2018 and May 25, 2018 for their claims to be reclassified as unsecured claims. The remaining three persons or entities include Movant Marc A. Bruner as assignee of Proof of Claim No. 7 filed by David E. Brody, the pre-trial deadlines for adversary matter were set by the Court on July 31, 2018[7] and that matter proceeds

20.     Proof of Claim No. 7 which David Brody assigned to Bruner is for $335,374.18 and purports to be secured, in part, by PetroHunter's "share of Sweetpea Petroleum Pty. Ltd." As noted by the Trustee, perfection of that secured interest seems highly doubtful.

### IV. The Trustee's Efforts to Preserve, Value and Liquidate Assets

21.     The Trustee has undertaken a multifarity of efforts to preserve, value and begin the process of liquidating the estate's assets, including:

  a.     On November 18, 2016, the Trustee engaged and sought Court approval to employ Weinman & Associates ("Weinman") as counsel pursuant to 11 U.S.C. § 327(a).

  b.     On December 12, 2016, the Trustee engaged and sought Court approval to employ Allen Vellone Wolf Helfrich & Factor, P.C. ("AVWHF") as counsel pursuant to 11 U.S.C. § 327(a).

  c.     On January 10, 2017, the Trustee, through AVWHF, engaged and sought Court approval to employ Forensic Pursuit to forensically image the Debtor's servers in order to assist

---

[7] The other two entities are Wealth Preservation Defined Benefit Plan and the RENN Entities.

**EXHIBIT A**

Weinman and AVWHF in investigating the assets of the Debtor
and its wholly owned subsidiary, Sweetpea. Through the efforts
of Forensic Pursuit and counsel, the Trustee was able to confirm
and possess documentary evidence of Sweetpea's assets,
including Sweetpea's fifty-percent ownership in the JVOA and
ownership of approximately 80 million shares of Falcon Oil &
Gas, Ltd.

d.    Sweetpea, under the direction of the Trustee, has employed
counsel in Australia to both respond to the fraudulent demands
made by Paltar and to pursue litigation against Paltar for its
fiduciary and contractual breaches to Sweetpea.

e.    Sweetpea's Australian counsel is supervising the permits held
by Sweetpea to ensure that they are renewed and extended in
advance of their expiration.

f.    The Trustee, through AVWHF continued his investigation of
assets through Court ordered production of documents possessed
by Debtor's pre-petition accountants and attorneys, which
culminated in a demand to the various stock agents to place a
hold on Sweetpea's Falcon Oil stock.

g.    The Trustee, through AVWHF on August 11, 2017, commenced
an adversary action against all parties claiming to be secured
creditors of the Debtor where the Debtor's Sweetpea stock was

**EXHIBIT A**

allegedly collateral for their otherwise unsecured loans to the
Debtor. At the outset of the adversary proceeding, the various
persons and entities claiming a perfected security interest in the
shares of Sweetpea stock totaled approximately $22.4 million.
Following the defaults, disallowances, and reclassifications of
the defendants in the Trustee's adversary proceeding, the
remaining entities (other than the Trustee and the estate itself)
claiming a perfected security interest in the shares of Sweetpea
now total approximately $6.6 million.

h.  In November 2017, the Trustee entered into an agreement with
an independent consultant to appraise the oil and gas rights
owned by Sweetpea, in order that the Trustee could market
those rights domestically and internationally appropriately and
maximize value.

i.  The Trustee has employed professionals and directed that the
proceeds from the sale of the shares of Falcon Oil and Gas be
invested with interest-earning Australian and U.S. institutions.

j.  The Trustee, through AVWHF, successfully resisted the Motion
for Relief from Stay filed by MAB Resources, LLC which sought
to continue its appeal of the summary judgment in favor of
PetroHunter and Sweetpea in the litigation filed by MAB.

**EXHIBIT A**

k.   Sweetpea reconstituted its board of directors which has been managing the affairs of the company under the direction of the Trustee.

l.   On June 12, 2018, the Trustee entered into agreement with an independent consultant to re-appraise the oil and gas rights owned by Sweetpea, given the expected increase in the value of Sweetpea's oil and gas rights following the decision by the Australian government in April 2018 to lift the moratorium on hydraulic fracking. Although the moratorium has been or is being lifted, the infrastructure of new laws to help these hydrocarbons to get to the market are not in place. Thus, it will be years before any of these assets are cash flowing.

m.   Under the direction of the Trustee, Sweetpea has employed Haywood Securities to value and craft a careful plan to sell, over time, the securities held in Falcon Oil & Gas, a closely held company. The approximately 80 million shares still held by Sweetpea will be liquidated in due course and under guidance intended to maximize value.

n.   Sweetpea, under the direction of the Trustee has employed an agent to market for sale Sweetpea's interest in the JVOA. The ability, as the shareholder, to consent to the sale of substantially all of Sweetpea's oil and gas assets would be subject to

**EXHIBIT A**

bankruptcy court approval to approve or authorize the exercise
of those rights as shareholder of Sweetpea.

o.    The Trustee engaged and sought Court approval for employment
of an accountant to prepare fiduciary income tax returns and
worked with Weinman to secure corporate authority from
Sweetpea to marshal and begin liquidating Falcon Oil & Gas
stock beginning in the Spring of 2017 and continuing through
the present. At the same time, the Trustee, with the assistance
of Weinman, began entertaining offers for the sale of Sweetpea's
fifty (50%) percent in the Northern Territories Joint Venture
Operating Agreement and directed Australian counsel in
conjunction with the ongoing litigation between MAB Resources
and Sweetpea in Australia. *See*, e.g., timesheet report [Doc.
#149].

p.    The Trustee, through Weinman has been negotiating with
interested parties over the course of the bankruptcy for the
acquisition of Sweetpea's interests in the JVOA. The estate is on
the verge of entering a Purchase and Sale Agreement for the
interests.

## C.   LEGAL STANDARDS

The Bankruptcy Code provides that "On request of a party in interest and
after notice and a hearing, the court may convert a case under this chapter to a case
under chapter 11 of this title at any time." 11 U.S.C. § 706(b). However, a case

**EXHIBIT A**

under Chapter 7 "may not be converted to a case under Chapter 11 unless the
debtor may be a debtor under Chapter 11" *In re Quinn*, 490 B.R. 607, 621 (Bankr.
D.N.M. 2012) (citing § 706(d)). "The decision whether to convert is left to the sound
discretion of the court, based on what will most inure to the benefit of all parties in
interest." *In re Gordon,* 465 B.R. 683, 692 (Bankr. N. D. Ga. 2012) (quoting S.Rep.
No. 95–989, at 940 (1978)).

> Courts have relied on various factors in determining
> whether a section 706(b) conversion would be appropriate:
> (1) the debtor's ability to repay debt; (2) the absence of
> immediate grounds for reconversion; (3) the likelihood of
> confirmation of a Chapter 11 plan; and (4) whether the
> parties in interest would benefit from conversion.

*In re Hardigan*, 517 B.R. 379, 383–84 (S.D. Ga. 2014) (citing Gordon, 465 B.R. at
692–94; *In re Schlehuber*, 489 B.R. 570 (8th Cir. BAP 2013)). "The burden is on the
moving parties to show that the case should be converted." *In re Hardigan*, 490 B.R.
at 445.

   Conversion of a case from Chapter 7 to Chapter 11 is not appropriate unless
the movant has shown the requisite grounds for the Chapter 7 case to be dismissed.
*See Quinn*, 490 B.R. at 621–22 ("Under these circumstances, it is not appropriate to
compel the same end result through conversion to Chapter 11 when it is not
appropriate to dismiss the Chapter 7 case to compel a re-filing under Chapter 11 by
necessity.").

   A movant's conduct and motivations are grounds for the denying a motion to
convert a case under 11 U.S.C. § 706. *See Marrama v. Citizens Bank of
Massachusetts*, 549 U.S. 365, 371 (2007) (holding the debtor forfeited his right to

**EXHIBIT A**

convert the case pursuant to 11 U.S.C. § 706(a) based on his bad faith conduct); *In re Willis*, 345 B.R. 647, 655 (B.A.P. 8th Cir. 2006) (Bankruptcy Appellate Panel of the Eighth Circuit affirmed the bankruptcy court's denial of the debtor's request to convert the case from chapter 7 to chapter 11 under 11 U.S.C. § 706(b) based on the debtor's "fraudulent, evasive, and uncooperative behavior"); *In re First Connecticut Consulting Grp., Inc.*, 579 B.R. 673, 683 (Bankr. D. Conn. 2018) ("Conversion [under 11 U.S.C. § 706(b)] may…be denied to prevent an abuse of the bankruptcy system."). The United States Supreme Court, in *Marrama*, reasoned that

> the broad authority granted to bankruptcy judges to take any action that is necessary or appropriate "to prevent an abuse of process" described in § 105(a) of the Code, is surely adequate to authorize an immediate denial of a motion to convert filed under § 706 in lieu of a conversion order that merely postpones the allowance of equivalent relief and may provide a debtor with an opportunity to take action prejudicial to creditors.

*Marrama*, 549 U.S. at 375.

## D.   ARGUMENT

### I. Conversion Would Hinder PetroHunter's Ability to Repay Its Debts

PetroHunter is not operational and has not been for years. It has effectively been a holding company since well before the chapter 7 petition was filed. PetroHunter's solely-owned subsidiary, Sweetpea, has also effectively been a holding company for some time. PetroHunter through Sweetpea has substantial assets that can be liquidated and paid to the estates creditors, and the Trustee has made substantial progress towards this end, but making either company fully-operational and revenue-generating would be prohibitively time intensive, costly,

**EXHIBIT A**

and laden with risk. It would cost the estate substantial time and money to become operational, and substantially more still before the Debtor was generating meaningful revenue.

The Motion to Convert provides scant detail on how the Movants anticipate returns would be realized, except the Movants represent that they "conferred with [an undisclosed,] nationally recognized and publicly traded investment bank and restructuring firm," which suggested the option of combining the interests in the JVOA "held by the Debtor and Paltar" into one undivided exploration block, operated by Paltar, which would present a "vastly more attractive acquisition target for an acquiring party." Mot. To Convert ¶¶ 16–17 (emphasis added). However, the interest in the JVOA is held jointly with Sweetpea, not with PetroHunter. Thus, even in chapter 11, Petrohunter would not have the ability to operate the Sweetpea assets or interests in the joint venture.

Furthermore, even if this one option suggested by the Movants and their unnamed, nationally-recognized investment bank was possible or could be authorized under the bankruptcy code, the uncertain prospect of this plan somehow generating or providing additional value in any meaningful time frame is simply not worth the added risk and expense to the estate, especially when there is every indication that the Trustee's liquidation efforts will provide significant, non-speculative and material payments to the estate's creditors.

## II. Immediate Grounds for Reconversion Exists Given That a Confirmed Chapter 11 Plan Is Not Feasible

Pursuant to the bankruptcy code, "on request of a party in interest, and after

**EXHIBIT A**

notice and a hearing, the court shall convert a [chapter 11 case] to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause." 11 U.S.C. § 1112(b)(1). The bankruptcy code enumerates a list for "the term 'cause'" in section 1112(b)(4), beginning with the "**substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation**." § 1112(b)(4)(A) (emphasis added).

Here, it is difficult to fathom how the bankrupt estate of a holding company, that has long been bereft of cash, employees, and other assets, might reasonably have a feasible, non-speculative plan of reorganization confirmed.

The confirmation of a plan, under the bankruptcy code, requires that "[t]he plan has been proposed in good faith." 11 U.S.C. § 1129(a)(3). Given the Movant's irreconcilable conflicts of interest that would place in jeopardy and create the appearance of conflict as to any resolution of the pending litigation in which Bruner and Lotito could be found on both sides of the lawsuit, it is inconceivable that the Movants could propose a feasible plan that complied with the good faith requirement which would be likely to be confirmed.

### III. Conversion Would Not Benefit the Creditors, the Estate, or Other Parties in Interest

The creditors are benefiting and will continue to benefit from the Trustee's diligence, hard work, and efficient and effective actions in marshalling, preserving, valuing and liquidating the estate's assets. Nearly two years into the chapter 7 case, due to the active efforts of the Trustee during that time, the estate's ability to pay

**EXHIBIT A**

substantial amounts of money to the estate's creditors seems highly likely. By contrast, the risk and expense the estate would have to undertake in chapter 11 to restart the Debtor to becoming operational would likely deplete the estate's assets significantly. As well, the return on those expenditures is speculative at best and benefits, if anyone at all, only the current equity holders, while at worst the efforts to operationalize the Debtor could cause numerous debts to go unpaid at all and prefer insider treatment to that of arm's-length creditors.

The estate itself would not benefit from conversion given the Movant's self-interest for the conversion. Were it not for the diligent efforts of the Trustee and the professional under the Trustee's direction, the Bruner Interests would have already taken an outsized percentage of the estate's assets for themselves, through either the fraudulent demands made by Bruner-controlled Paltar, the litigation brought by MAB Resources in Colorado state court, Paltar's questionable offers and available funding necessary to purchase PetroHunter's interests in Sweetpea, or by the efforts of Bruner in the adversary proceeding—all of which were efforts to deprive the estate of any value and to benefit of Bruner and Paltar individually.

### IV. The Bruner Interests Are Irreconcilably Conflicted from Operating or Controlling PetroHunter and Their Use of the Motion to Convert Is an Abuse of the Bankruptcy System

The intentions of the Bruner Interests are conspicuous after years of machinations and litigation: Bruner wants control of Sweetpea's assets and is willing, if necessary, to circumvent the Debtor's ownership by any means necessary, no matter how invalid. First, an entity whose name is Bruner's initials, MAB Resources, attempted to obtain portions of Sweetpea's assets thought litigation

**EXHIBIT A**

against PetroHunter and Sweetpea in Colorado courts. However, PetroHunter and Sweetpea prevailed on a motion for summary judgment against MAB Resources given that the statute of limitations had long-since run. The court went on to make findings as to the agreement between PetroHunter and MAB Resources, concluding that by its unambiguous terms, MAB Resources had no legal rights to the interests in which it claimed.

As another means of acquiring an interest in Sweetpea, Bruner purchased a claim against the PetroHunter estate that he vigorously asserts is secured, despite the Trustee's possession and control of the certificated shares of the Sweetpea equity. This dispute is the subject of an ongoing adversary proceeding before the Court.

When the attempt to litigate Sweetpea's assets away from PetroHunter failed, Bruner did not quit and, through his control over Paltar, attempted an end run to force Sweetpea to release its interest in the JVOA by fraudulently charging Sweetpea for over $60 million of expenses that had not yet been incurred. Paltar was not successful in getting Sweetpea to release its interests in the JVOA, and this dispute is currently being litigated in Australia. At worse, this Court should be concerned that Bruner could cause Debtor to dismiss such a lawsuit in order to assist Paltar in wrongfully obtaining the oil and gas interests.

Paltar next attempted to purchase PetroHunter's interest in Sweetpea. The offer included an amount upfront with an ongoing Overriding Royalty Interest. Overtime, the Overriding Royalty Interest will represent the majority of the value

**EXHIBIT A**

of the sale. Therefore, a purchaser on whom the Trustee can rely in good faith who may actually succeed in developing the oil production in these Australian assets is a key consideration for the Trustee. Thus, he is looking for reliability in the certain future performance as a necessary criterion for the Trustee's selection of any purchaser. Given the allegations against Paltar and Bruner of fraud, racketeering, and undercapitalization in *Hislop et al. v. Paltar Petroleum Limited et al.*, Case No.17-cv-2371-RBJ-SKC, which the Trustee learned about around the time of Paltar's first Letter of Intent, the lawsuit (and the potential truthfulness of the allegations) caused the Trustee to doubt that Paltar could be relied on for the future performance relating to the Overriding Royalty Interest. The Trustee also had concerns about Paltar and Bruner given the efforts made by Paltar and Bruner in January 2017 to defraud Sweetpea with the purported invoices that in fact were quotes for future work to be performed. All of these issues reflect the valued business judgment of the Trustee, a judgment which apparently thwarts Paltar and Bruner and, unsurprisingly, motivated the filing of the Motion to Convert.

Following the decision by the government in Australia's Northern Territory to lift the moratorium on hydraulic fracking, Paltar made another offer to PetroHunter for its interest in Sweetpea, but in addition the the Trustee initial reasons for declining Paltar's first offer, the Trustee now also needed to complete an appraisal of the assets given the change in regulatory policy before he would be able to determine an appropriate price.

When the Bruner Interests were unable to get control of the Debtor's primary

**EXHIBIT A**

asset, Sweetpea, by other means, they filed their motion to convert the case to chapter 11, whereby their intentions are manifestly for the Bruner-controlled Paltar to take control of Sweetpea from the estate. This self-interested approach, in the form of a rarely-asserted motion, to do in the bankruptcy court what could not be done outside of the bankruptcy court, is the archetypical definition of bad faith and abuse of the bankruptcy system. At a minimum, the Court should be highly suspect of the motivation of the Movants.

To grant the Motion to Convert and give the Bruner Interests control of the Debtor's principal asset, Sweetpea, would unfairly benefit one small set of creditors and interested parties whose interests are largely junior to the remainder of the creditor body, and whose claims represent only a fraction of those filed in the case, over all of the other creditors.

Given the claims and the personally vested interests held by the Movants, the Movants would be unable to uphold the attendant fiduciary duties they would have if the Motion were granted and they controlled the Debtor. Given no income is being presently generated (other than liquidating the actual assets held on the Petition Date), this motion, in effect, suggests to this Court that Movants would cannibalize the liquidated assets of the estate for the remote possibility of somehow gaining a higher return many years down the road. This is an unsustainable argument.

E.    CONCLUSION

The benefits to this estate of chapter 11, if they ever existed have long since eroded. The Debtor's selection of chapter 7 should be given a degree of deference,

**EXHIBIT A**

the factors to determine whether conversion would be appropriate all weigh against

conversion, the Trustee's active efforts to liquidate the estate will result in the

estate paying a significant portion of its debts, and the conversion would create

untenable and unworkable conflicts of interest. For these reasons and the others

stated herein, the Trustee respectfully requests that the Motion to Convert be

denied.

Dated this 4th day of September 2018.

Respectfully submitted,

Allen Vellone Wolf Helfrich & Factor P.C.

/s/ Lance Henry
Patrick D. Vellone, #15284
Lance Henry, #50864
1600 Stout Street, Suite 1100
Denver, Colorado 80202
(303) 534-4499
pvellone@allen-vellone.com
lhenry@allen-vellone.com

Weinman & Associates, P.C.

/s/ Jeffrey A. Weinman
Jeffrey A. Weinman, #7605
730 17th Street, Suite 240
Denver, Colorado 80202
(303) 572-1010
jweinman@weinmanpc.com

**EXHIBIT A**

## CERTIFICATE OF SERVICE

I certify that on the 4th of September 2018, I served a true and correct copy of the foregoing via CM/ECF or by email to the following:

Matthew R. Silverman, 621 17th Street, Ste. 2300, Denver, CO 80293 (by email)

Jeffrey L. Hill, P.O. Box 1720, Parker, CO 80134

Theodore J. Hartl, 600 17th Street, Suite 1800 South, Denver, CO 80202

Barry Meinster, 28365 Little Bighorn Drive, Evergreen, CO 80439

Jeffrey Weinman, 730 17th Street, Suite 240, Denver, CO 80202

Alice A. White, 1801 Broadway, Suite 900, Denver, CO 80202

United States Trustee,1961 Stout Street, Suite 12-200, Denver, CO 80294

Matthew D. Skeen, Jr., 217 E. 7th Ave.,Denver, CO 80203

John J. Kane, 1601 Elm St., Ste. 3700, Dallas, TX 75201

Charles Kelley, 700 Louisianan Street, Suite 3400, Houston, TX 77002

/s/Lance Henry

**EXHIBIT A**

# SECURITIES AND EXCHANGE COMMISSION

# FORM PRE 14A

Preliminary proxy statement not related to a contested matter or merger/acquisition

Filing Date: **2007-10-18** | Period of Report: **2007-12-21**
**SEC Accession No.** 0000949353-07-000610

(HTML Version on secdatabase.com)

## FILER

**GALAXY ENERGY CORP**

CIK:**1132784**| IRS No.: **980347827** | State of Incorp.:**CO** | Fiscal Year End: **1130**
Type: **PRE 14A** | Act: **34** | File No.: **001-32682** | Film No.: **071179180**
SIC: **1311** Crude petroleum & natural gas

Mailing Address
*1331 17TH STREET*
*#730*
*DENVER CO 80202*

Business Address
*1331 17TH STREET*
*#730*
*DENVER CO 80202*
*(303) 293-2300*

Copyright © 2012 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**EXHIBIT B**

In connection with convertible debentures and the warrants, the Company registered the resale of the shares of Common Stock issuable upon conversion of the convertible debentures and exercise of the warrants.

*PetroHunter Subordinated Debt*. On December 29, 2006, the Company entered into a Purchase and Sale Agreement (the "PSA") with PetroHunter, a related party, whereby the Company agreed to sell all of its oil and gas interests in the Powder River Basin of Wyoming and Montana (the "Powder River Basin Assets"). Pursuant to the terms of the PSA, PetroHunter made an earnest money deposit of $2,000,000. PetroHunter became the contract operator of the Powder River Basin Assets beginning January 1, 2007. The sale of the Powder River Basin Assets did not occur according to the terms of the PSA and thus, the earnest money and operating expenses paid by PetroHunter were converted into a subordinated note for $2,493,778 upon expiration of the PSA on August 31, 2007. The note accrues interest at the rate of 8% per annum and is due on the later of (i) the date upon which all of the senior indebtedness has been paid in full and (ii) December 29, 2007.

*Bruner Trust Subordinated Debt*. In order to satisfy the Company's obligations under other outstanding debts and to cover general working capital needs, the Company has issued 16 separate subordinated unsecured promissory notes for a total of $12,600,000 to the Bruner Trust, a related party. One of the trustees of the Bruner Trust is Marc E. Bruner, the president and a director of the Company. The Company anticipates that it will borrow an additional $1,500,000 from the Bruner Trust prior to completing the conversion of the Subordinated Debts into Common Stock. Interest accrues at the rate of 8% per annum and the notes mature as summarized below or the time at which the Company's senior indebtedness has been paid in full. In October 2006, the Bruner Trust acquired the remaining balance, together with accrued interest, of a promissory note originally issued to DAR LLC. The note, in the amount of $2,049,728 accrues interest at the rate of 12% per annum.

The following table details the issue dates, due dates, and principal amounts of the Bruner Trust Subordinated Debts, including the anticipated additional borrowings that the Company may undertake:

| Issue Date | Due Date | Amount |
| --- | --- | --- |
| January 14, 2004 | June 30, 2007 | $ 2,049,728 |
| September 28, 2006 | January 26, 2007 | 2,500,000 |
| November 1, 2006 | March 1, 2007 | 1,000,000 |
| November 13, 2006 | March 13, 2007 | 500,000 |
| November 30, 2006 | March 30, 2007 | 1,500,000 |
| January 31, 2007 | May 31, 2007 | 500,000 |
| February 28, 2007 | June 28, 2007 | 900,000 |
| March 30, 2007 | July 28, 2007 | 1,350,000 |
| April 26, 2007 | August 24, 2007 | 1,200,000 |
| May 4, 2007 | September 1, 2007 | 450,000 |
| May 31, 2007 | September 28, 2007 | 600,000 |
| June 29, 2007 | October 27, 2007 | 750,000 |
| August 22, 2007 | December 20, 2007 | 125,000 |
| August 29, 2007 | December 27, 2007 | 250,000 |
| September 12, 2007 | January 10, 2008 | 125,000 |
| September 28, 2007 | January 26, 2008 | 600,000 |
| October 11, 2007 | February 8, 2008 | 250,000 |
| *November 15, 2007* [1] | *March 14, 2008* [1] | *750,000* [1] |
| *December 15, 2007* [1] | *April 13, 2008* [1] | *750,000* [1] |
| | | $16,149,728 |

_____

(1)    The Company anticipates that it will borrow these additional funds from the Bruner Trust upon the same terms as the previous notes.

Copyright © 2012 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**EXHIBIT B**

*__Accrued Interest__*.  The Subordinated Debts have accrued interest that will also be converted into Common Stock in lieu of cash payments.  The following table summarizes the Subordinated Debts and the accrued interest calculated through December 31, 2007.

Galaxy Energy Corporation Proxy Statement

Page 11

Copyright © 2012 www.secdatabase.com. All Rights Reserved.
Please Consider the Environment Before Printing This Document

**EXHIBIT B**

7/20/2020                    Petrohunter Energy Corp 10K Annual Reports & 10Q SEC Filings | Last10K

© 2012 – 2020 Last10K.com. All Rights Reserved.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

☒ You're Signed Out
Sign in for the full experience
Sign in
(Sign Up)

Form 10-K

☒
Never Miss A New SEC Filing Again

ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended September 30, 2012

☐    TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from _____ to _____

📧 Real-Time SEC Filing Notifications
Commission file number: 000-51152

Screenshot taken from Gmail for a new 10-K Annual Report

PETROHUNTER ENERGY CORPORATION

Last10K.com Member Feature
(Exact name of registrant as specified in its charter)

Receive an e-mail as soon as a company files an Annual Report, Quarterly Report or has new 8-K corporate
news.

| Maryland | 98-0431245 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

Continue

| 910-16th Street, Suite 208 | 80202 |
|---|---|
| Denver, Colorado | (Zip Code) |
| (Address of principal executive offices) | |

We Highlighted This SEC Filing For You

Registrant's telephone number, including area code:

(303) 859-6666

📧 SEC Filing Sentiment Analysis - Bullish, Bearish, Neutral
Securities registered pursuant to Section 12(b) of the Act:
Screenshot taken from Wynn's 2018 10-K Annual Report
None

Last10K.com Member Feature

Securities registered pursuant to Section 12(g) of the Act:

Read positive and negative remarks made by management
Common Stock, $0.001 par value
(Title of class)

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.    ☐ Yes ☒ No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act.

Widen Your SEC Filing Reading Experience

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.

📧 Enhanced Reading Area For SEC Filings
☐ Yes    ☒ No
Screenshot taken from Adobe Inc.'s 10-Q Quarterly Report

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).
Last10K.com Member Feature
Remove data columns and navigation orders to see much more filing content and tables in one view
☒ Yes    ☐ No
Continue

Uncover Actionable Information Inside SEC Filings

📧 SEC Filing Disclosures

EXHIBIT C

## PETROHUNTER ENERGY CORPORATION
## NOTES TO CONSOLIDATED FINANCIAL STATEMENTS

("COGCC"). The remaining tests were not performed due to cash constraints. In June 2013, the Company was notified that it had been levied fines with a maximum potential fine of $120,000 related to the failure to perform the MIT's. Included in the liability above is the $120,000 maximum penalty and the anticipated costs of performing the required MIT's on the three wellbores. These amounts have been recorded as components of Other Accrued Liabilities on our consolidated balance sheet as of September 30, 2012.

Subsequent to September 30. 2012, the Company commenced the mechanical integrity tests.

### Note 10 — Notes Payable

Notes payable as of September 30, 2012 and 2011 are summarized below:

|  | 2012 | 2011 |
|---|---|---|
| Convertible notes payable | $ 417,873 | $ 717,873 |
| Convertible notes payable | $ 417,873 | $ 717,873 |
|  |  |  |
| Notes payable – related party – short-term |  |  |
| Bruner Family Trust | $ 2,722,060 | $ 2,722,060 |
| Notes payable – related party, short term | $ 2,722,060 | $ 2,722,060 |
|  |  |  |
| Convertible notes payable | $ 6,538,419 | $ 6,238,419 |
|  | $ 6,538,419 | $ 6,238,419 |

|  | 2012 | 2011 |
|---|---|---|
| Long-term notes payable – related party |  |  |
| Global Project Finance AG | $ 40.650.000 | $ 40.650.000 |
| Bruner Family Trust | 109,000 | 109,000 |
| Long-term notes payable – related party | $ 40,759,000 | $ 40,759,000 |

A description of our notes payable as of September 30, 2012 and 2011 is as follows:

**Bruner Family Trust** – At various times during 2008, we entered into five promissory notes with the Bruner Family Trust, a related party. Each note accrues interest at LIBOR plus 3% per annum and was originally due 12 months from each note's respective date of issuance. A note for $2,408,060 was originally due on November 13, 2008, but was extended by the lender. The remaining four notes were originally due in February, March (2) and August 2009. We continue to receive waivers from the lender on a periodic basis related to our covenant violations and in relation to our default and failure to make scheduled principal and interest payments. The possibility exists that the lender will call all amounts due at the end of each waiver period. As of September 30, 2012, accrued interest relating to these notes was $527,187. and the total note balance was $2,828,060 of which $2,722,060 is classified as a short term liability.

### Convertible notes payable

Convertible notes payable as of September 30, are summarized below:

|  | 2012 | 2011 |
|---|---|---|
| Convertible debentures – face value at issuance | $ 6,956,292 | $ 6,956,292 |
| Relative fair value assigned to warrants | (3,532,000) | (3,532,000) |
| Relative fair value of beneficial conversion feature | (3,424,292) | (3,424,292) |
| Net book value of convertible debentures at issuance |  |  |
| Accumulated accretion | 6,956,292 | 6,956,292 |
| Net book value | $ 6,956,292 | $ 6,956,292 |

29

**EXHIBIT C**

| | OUTSTANDING EQUITY AWARDS AT FISCAL YEAR-END | | | | |
|---|---|---|---|---|---|
| | OPTION AWARDS | | | | |
| Name | Number of Securities Underlying Unexercised Options (#) | Number of Securities Underlying Unexercised Options (#) Unexercisable | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date |
| | 4,500,000 | -- | -- | $0.15 | 09/14/2017 |
| | 4,500,000 | 4,500,000[1] | -- | $0.15 | 09/14/2018 |
| Paul Maniscalco | 150,000 | -- | -- | $0.22 | 08/25/2013 |
| | 1,250,000 | -- | -- | $0.15 | 06/15/2015 |
| | 1,000,000 | -- | -- | $0.15 | 07/12/2016 |
| | 1,000,000 | -- | -- | $0.15 | 07/12/2017 |
| | 1,000,000 | -- | -- | $0.15 | 09/14/2017 |
| | 1,000,000 | 1,000,000[1] | -- | $0.15 | 09/14/2018 |

[1]      These stock options vest on September 14, 2013.

**Compensation of Directors**

Each director was entitled to reimbursement for reasonable travel expenses incurred in connection with such director's attendance at Board of Directors and Committee meetings. Vesting schedules are determined by the Board; however, most initial grants to directors vest 50% on grant date and 50% on the one-year anniversary of the initial grant date. The following table sets forth the compensation paid to our non-employee Directors for services rendered during the year ended September 30, 2012.

| | DIRECTOR COMPENSATION | | | |
|---|---|---|---|---|
| Name | Fees Earned or Paid in Cash ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
| Carmen J. Lotito | $60,000 | $20,150[1] | - | $80,150 |
| Matthew R. Silverman | $60,000 | $47,016[1] | - | $107,016 |

[1]      The Company granted non-Plan options on September 14, 2012 that were valued at $0.0067 per share which represents the *ASC 718* value of the option on that date. Under *ASC 718*, the grand date fair value of each stock option award is calculated on the date of grant using the Black-Scholes option valuation model. The Black-Scholes model was used with the following assumptions: volatility rate of 145.55%; risk-free interest rate of 0.35% based on a U.S. Treasury rate of three years; and a 2.75-year expected option life. The options vest 50% at grant date and 50% on the one-year anniversary of the grant date. The options are exercisable at $0.15 per share and expire five years from their respective vesting dates.

**ITEM 12.      *SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS***

The following table indicates the beneficial ownership, as of December 10, 2013, of the Company's Common Stock by: (i) each director and director nominee; (ii) each officer; (iii) each person known by the Company to own more than 5% of the outstanding shares of the Company's Common Stock; and (iv) all directors and executive officers of the Company as a group. Except as otherwise indicated below, all shares indicated as beneficially owned are held with sole voting and investment power.

| Name and Address of Beneficial Owner [1] | Amount and Nature of Beneficial Ownership | Percent of Class [2] |
|---|---|---|
| Christian Russenberger<br>Meierhofrain 36<br>Wadenswil 8820, Switzerland | 137,352,517[3] | 27.2% |

42

**EXHIBIT C**

| Name and Address of Beneficial Owner [1] | Amount and Nature of Beneficial Ownership | Percent of Class [2] |
|---|---|---|
| Global Project Finance AG<br>Sunnaerai 1<br>Sachsein 6072, Switzerland | 132,352,517[4] | 26.2% |
| Bruner Family Trust II<br>8484 Westpark, Suite 900<br>McLean, VA 22102 | 43,700,000 | 9.9% |
| Marc A. Bruner<br>29 Blauenweg<br>Metzerlen, Switzerland 4116 | 39,725,000[5] | 9.0% |
| HapiHandels und Beteiligungs GmbH<br>Esslinggasse2A-1010<br>Wien, Switzerland | 39,648,580[6] | 8.7% |
| MAB Resources LLC<br>1875 Lawrence Street, Suite 1400<br>Denver, CO 80202 | 37,725,000 | 8.6% |
| Martin B. Oring | 38,080,111[7] | 8.1% |
| Nobu Ventures, Inc.<br>Austrasse 15<br>Vaduz 9490, Switzerland | 30,000,000 | 6.8% |
| Bruner Family Trust<br>8484 Westpark Drive, Suite 900<br>McLean, Virginia 22102 | 25,000,000 | 5.7% |
| Matthew R. Silverman | 15,700,000[8] | 3.5% |
| Carmen J. Lotito | 9,700,000[9] | 2.2% |
| Paul Maniscalco | 5,250,000[10] | 1.2% |
| All officers and directors as a group  (4 persons) | 68,730,111[11] | 13.7% |

[1]    To our knowledge, except as set forth in the footnotes to this table and subject to applicable community property laws, each person named in the table has sole voting and investment power with respect to the shares set forth opposite such person's name.

[2]    This table is based on 439,373,853 shares of Common Stock outstanding as of December 10, 2013.  If a person listed on this table has the right to obtain additional shares of Common Stock within sixty (60) days from December 10, 2013, the additional shares are deemed to be outstanding for the purpose of computing the percentage of class owned by such person, but are not deemed to be outstanding for the purpose of computing the percentage of any other person.

[3]    Includes 5,000,000 shares held of record by Mr. Russenberger, 66,052,517 shares held of record by Global Project Finance AG, an entity controlled by Mr. Russenberger, 1,300,000 shares issuable upon exercise of warrants held by Global Project Finance AG, and 65,000,000 shares issuable upon conversion of a promissory note.

[4]    Includes 66,052,517 shares held of record by Global Project Finance AG, 1,300,000 shares issuable upon exercise of warrants held by Global Project Finance AG, and 65,000,000 shares issuable upon conversion of a promissory note.

43

**EXHIBIT C**

(5)    Included in Mr. Bruner's share ownership are 37,725,000 shares owned of record by MAB Resources LLC and 2,000,000 shares owned of record by BioFibre Technology International, Inc. Mr. Bruner is a control person of both these entities.

(6)    Includes 10,500,000 shares issuable upon conversion of debentures and 7,840,000 shares issuable upon exercise of warrants.

(7)    Includes 28,500,000 shares issuable upon exercise of vested stock options, 2,500,000 shares issuable upon conversion of debentures and 1,866,667 shares issuable upon exercise of warrants.

(8)    Includes 154,000 shares held of record by Mr. Silverman's IRA, 46,000 shares held of record by Mr. Silverman, and 15,500,000 shares issuable upon exercise of vested stock options.

(9)    Includes 200,000 shares held of record by Mr. Lotito's wife and 9,500,000 shares issuable upon exercise of vested stock options.

(10)   Includes 5,250,000 shares issuable upon exercise of vested stock options.

(11)   Includes 5,613,444 shares held of record or on account, 58,750,000 shares issuable upon exercise of vested stock options, 2,500,000 shares issuable upon conversion of debentures, and 1,866,667 shares issuable upon exercise of warrants.

**Equity Compensation Plan Information**

The following table sets forth information as of the end of the most recently completed fiscal year, September 30, 2012:

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance |
|---|---|---|---|
| Equity compensation plans approved by security holders | 25,245,000 | $0.15 | 14,755,000 |
| Equity compensation plans not approved by security holders | 32,750,000 | $0.15 | N/A |
| Total | 57,995,000 | | 14,755,000 |

(a)    Options granted prior to 2009 vest 20% on grant date and 20% each year on the anniversary of the grant date but each vesting schedule is also determined by the Compensation Committee. Most grants after 2009 vest 50% on grant date and 50% on the one-year anniversary of the initial grant date.

(b)    The equity compensation plans not approved by stockholders are comprised of non-qualified stock options granted on June 15, 2010, July 12, 2011, and September 14, 2012. All of these options were granted at an exercise price of $0.15 per share and vest 50% on grant date and 50% at the one-year anniversary of the grant date. With respect to the options granted on June 15, 2010, the options expire on June 15, 2015. In all other cases, the options expire five years from vesting date.

**ITEM 13.    CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE**

Our "Code of Conduct and Standard of Ethics" addresses our policy for dealing with transactions with affiliates and as a matter of procedure we obtain Board of Director approval for any transaction with a director, executive officer or other affiliate of PetroHunter. A complete description of the transaction including the services or products to be provided, the financial components related to the services or products, the nature of the relationship of the entity involved in the transaction, and any other contractual obligations related to the transaction is presented to the Board

44

**EXHIBIT C**

of Directors for their review. The Board of Directors indicates their approval of the transaction with a written resolution.

Other than the transactions described below, none of our present directors, officers or principal shareholders, nor any family member of the foregoing, nor, to the best of our information and belief, any of our former directors, officers or principal shareholders, nor any family member of such former directors, officers or principal shareholders, has or had any material interest, direct or indirect, in any transaction, or in any proposed transaction which has materially affected or will materially affect us.

**Marc A. Bruner**

As of September 16, 2011, Sweetpea entered into a Joint Venture and Operating Agreement ("JVOA") with Paltar Petroleum Limited ("Paltar"), pursuant to which Paltar agreed to provide funding as stated in the JVOA for the permits and the initial work program expenses required under EPs 136 and 143 in exchange for a 50% ownership interest in the EPs. Paltar is controlled by Marc Bruner, a significant shareholder of the Company. In addition, one of our directors, Carmen Lotito, is an officer of Paltar.

**Bruner Family Trust**

At September 30, 2012, we have seven notes outstanding from the Bruner Family Trust totaling $2,828,059. Mr. Bruner's adult son is one of the trustees of the Bruner Family Trust. Mr. Bruner is not a beneficiary of the Trust.

**Global Project Finance AG**

On January 9, 2007, we entered into a Credit and Security Agreement (the "January 2007 Credit Facility") with Global in the amount of $15,000,000. As of September 30, 2012 and 2011, amounts drawn against this facility were $15,000,000.

On May 21, 2007, we entered into a second Credit and Security Agreement with Global (the "May 2007 Credit Facility") and we extended all the economic terms from the May 2007 Credit Facility retroactively to the January 2007 Credit Facility. Under the May 2007 Credit Facility, Global agreed to use its best efforts to advance up to $60,000,000 to us over the following 18 months. As of September 30, 2012 and 2011, amounts drawn against this facility were $24,800,000.

In connection with the May 2007 Credit Facility. Global received warrants to purchase 2,000,000 of our common shares at the date of execution and was to receive 400,000 warrants for each $1,000,000 advanced under the Facility. We agreed to pay an advance fee of 2% on all amounts drawn under the May 2007 Credit Facility. Payments were to have been made in such amounts as may be agreed upon by us and Global on the then outstanding principal balance in order to repay the principal balance by the maturity date, November 21, 2009. The loans are collateralized by a first perfected security interest on certain oil and gas properties and other of our assets. In the event that we sell any interest in the oil and gas properties that comprise the collateral, a mandatory payment is due in the amount equal to such sales proceeds.

As of September 30, 2012 and 2011, the cash portion of the advance fees payable incurred in connection with the two lines of credit in the amount of $716,045 and $770,241 respectively incurred proportionately at 2% of each respective draw, has been accrued.

In March 2010, in exchange in exchange for 5,000,000 shares of our common stock, Global executed an amendment to an existing $850,000 note payable bearing interest at 15%. The amendment granted us a relief of $286,664 in accrued interest related to the underlying note. In addition all other defaults under the terms of the initial note dated October 10, 2007 were waived through December 31, 2014. The due date of the note, and all scheduled interest payments were extended through December 31, 2014. We will continue to accrue interest on the note at 8.5% per annum. We recorded a $150,000 charge to interest expense related to the issuance of common stock in connection with this amendment.

45

**EXHIBIT C**

## AGREEMENT

THIS AGREEMENT ("Agreement") is entered into this 16th day of August by and between David E. Brody ("Brody") and Marc. A. Bruner ("Bruner"). Brody and Bruner may sometimes be referred to as a "Party" or collectively as the "Parties". This Agreement is based on the following premises:

## RECITALS

A.  Brody has filed a claim *In the Matter of PetroHunter Energy Corporation* in the United States Bankruptcy Court for the District of Colorado, Case No. 16-20197-KHT (the "PetroHunter Bankruptcy"), in the amount of $335,374.18 (the "Claim");

B.  Bruner and his affiliates have filed one or more claims in the PetroHunter Bankruptcy;

C.  Brody desires to sell and assign, and Bruner desires to accept, the Claim in accordance with the terms set forth in this Agreement.

NOW, THEREFORE, based on the above premises, and the mutual covenants set forth herein, the Parties agree as follows:

1.  CONSIDERATION:

    (a) Bruner shall pay and deliver to Brody: (i) $12,500 in cash (the "First Payment"), to be paid and delivered to Brody in the form of a cashier's check within thirty (30) days after signing this Agreement; (ii) $12,500 in cash (the "Second Payment") in the form of a cashier's check within sixty days from the date of this Agreement, and (iii) 150,000 shares of common stock of Fortem Resources Inc. (FRTM:US OTC) (the "Shares") owned by Bruner, free and clear of any liens or encumbrances, to be delivered to Brody in one share certificate within ten days from the date of this Agreement, which Shares shall be freely tradable on either the OTC market or on NASDAQ, with any and all restrictive legends or other restrictions removed or not applicable to the Shares by the end of the six-month holding period applicable under Rule 144, or such sooner time as the Shares can be freely traded under U.S. federal securities law. Bruner shall sign the Stock Power attached hereto simultaneously with signing this Agreement, and otherwise take all actions necessary to cause Squin Switzerland to issue a certificate for the Shares to Brody.

    (b) In the event the First Payment and the Second Payment are made by the due date, Brody shall promptly return to Bruner 25,000 Shares represented by the Stock Power attached hereto. If the First Payment and/or the Second Payment are not paid in full or in a timely manner, Brody may elect either to retain all 150,000 Shares or to extend the due date for one or both cash payments that are due under Section 1(a). If one or both cash payments are not made, Brody waives the right to make a claim against Bruner for breach of this Agreement. The provisions of Section 1(a) shall apply equally to all 150,000 Shares.

    (c) In consideration for the First Payment, the Second Payment, and delivery of the Shares, Brody hereby assigns and transfers the Claim to Bruner in accordance with the Transfer of Claim, attached hereto, effective on the date of this Agreement, together with all rights to pursue the Claim in the PetroHunter Bankruptcy, in Bruner's sole discretion.

1

**EXHIBIT D**

Notwithstanding anything in this Agreement to the contrary, in the event the Claim is fully obtained after Bruner takes all reasonable actions to collect on the Claim, and Bruner receives the value for it, Brody shall transfer to Bruner 50% of the Shares for which Brody (Whetzel) receives a certificate, or shall pay Bruner the equivalent value of said Shares as of the date of this Agreement, after Bruner receives a final and unappealable determination regarding the Claim.

2    SHARES   The number of Shares shall be adjusted in an appropriate manner in the event of any stock split, stock dividend or other recapitalization of Fortem Resources Inc. prior to issuance of the Shares to Brody, and to take account of any share issuance for less than fair market value by Fortem Resources Inc. prior to the time the Shares become freely tradable and the legends or other restrictions removed from the certificates representing the Shares.

3    MISCELLANEOUS

(a) Modification   This Agreement will not be amended, modified, revised, supplemented, waived or otherwise changed except by a written instrument duly executed by the Parties and designated as such a change.

(b) Entire Agreement   This Agreement constitutes and incorporates the entire agreement of the Parties concerning the subject matter of this Agreement and supersedes any prior agreements concerning the subject matter hereof.

(c) Severability   If any provision of this Agreement is held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement will not be affected or impaired, nor will the validity, legality or enforceability of any such defective provisions be in any way affected or impaired in any other jurisdiction.

(d) Successors and Assigns   This Agreement shall not be transferred or assigned to any third party without the non assigning Party's prior written approval.  If such approval is given, the terms, conditions, rights, benefits and obligations set forth in this Agreement will bind and inure to the benefit of each Party and their respective successors and permitted assigns.

(e) Governing Law and Venue   This Agreement will be governed by and construed in accordance with the laws of the State of Colorado and venue for any legal action brought under this Agreement will be state or federal court in Denver, Colorado.

(f) Attorneys' Fees   If any Party commences any action or proceeding against the other in order to enforce the provisions of this Agreement, the prevailing Party in any such action will be entitled to recover, in addition to any amounts or relief otherwise awarded, all reasonable costs incurred in connection therewith, including all reasonable attorneys' fees and costs.

IN WITNESSS WHEREOF, the Parties have entered into this Agreement on the day and year first written above.

_____
Dave E. Brody

_____
Marc A. Bruner

**EXHIBIT D**

Notwithstanding anything in this Agreement to the contrary, in the event the Claim is fully disallowed after Bruner takes all reasonable actions to collect on the Claim, and Bruner receives no value for it, Brody shall reassign to Bruner 50% of the Shares for which Brody physically receives a certificate, or shall pay Bruner the equivalent value of said Shares as of the date of this Agreement, after Bruner receives a final and unappealable determination regarding the Claim.

2. SHARES:  The number of Shares shall be adjusted in an appropriate manner in the event of any stock split, stock dividend or other recapitalization of Fortem Resources Inc. prior to issuance of the Shares to Brody, and to take account of any share issuance for less than fair market value by Fortem Resources Inc. prior to the time the Shares become freely tradable and the legends or other restrictions removed from the certificates representing the Shares.

3. MISCELLANEOUS:

   (a) Modification.  This Agreement will not be amended, modified, revoked, supplemented, waived or otherwise changed except by a written instrument duly executed by the Parties and designated as such a change.

   (b) Entire Agreement.  This Agreement constitutes and incorporates the entire agreement of the Parties concerning the subject matter of this Agreement and supersedes any prior agreements concerning the subject matter hereof.

   (c) Severability.  If any provision of this Agreement is held invalid, illegal or unenforceable in any jurisdiction, the validity, legality and enforceability of the remaining provisions of this Agreement will not be impaired thereby, nor will the validity, legality or enforceability of any such defective provisions be in any way affected or impaired in any other jurisdiction.

   (d) Successors and Assigns.  This Agreement shall not be transferred or assigned to any third party without the non-assigning Party's prior written approval.  If such approval is given, the terms, conditions, rights, benefits and obligations set forth in this Agreement will bind and inure to the benefit of each Party and their respective successors and permitted assigns.

   (e) Governing Law and Venue.  This Agreement will be governed by and construed in accordance with the laws of the State of Colorado and venue for any legal action brought under this Agreement will be state or federal court in Denver, Colorado.

   (f) Attorneys' Fees.  If any Party commences any action or proceeding against the other in order to enforce the provisions of this Agreement, the prevailing Party in any such action will be entitled to recover, in addition to any amounts or relief otherwise awarded, all reasonable costs incurred in connection therewith, including all reasonable attorneys' fees and costs.

IN WITNESSS WHEREOF, the Parties have entered into this Agreement on the day and year first written above.

_____          _____
David E. Brody                    Marc A. Bruner

2

**EXHIBIT D**

# Irrevocable Stock Power

FOR VALUE RECEIVED, the undersigned does hereby sell, assign and transfer to David E. Brody ("Brody") 150,000 shares of the common stock of Fortem Resources Inc. (FTMR:US) represented by Certificate No. _____, standing in the name of Squin Switzerland ("Squin") on the books of Fortem.   Squin shall take any and all corporate actions necessary to sell, assign and transfer the Shares to Brody, including but not limited to corporate resolutions and stock powers.

IN WITNESS WHEREOF, Squin has signed this Irrevocable Stock Power on the date set forth below.

Squin Switzerland

By: _____

Effective August 15, 2017

**EXHIBIT D**

FILED
KENNETH S GARDNER

2017 AUG 22  PH 4: 07

B 2100A (Form 2100A) (12/15)

# UNITED STATES BANKRUPTCY COURT
BANKRUPTCY COURT
DISTRICT OF COLORADO

District of Colorado

In re PetroHunter Energy Corp_____,          Case No. __16-20197-HRT_ KHT_

## TRANSFER OF CLAIM OTHER THAN FOR SECURITY

A CLAIM HAS BEEN FILED IN THIS CASE or deemed filed under 11 U.S.C. § 1111(a). Transferee
hereby gives evidence and notice pursuant to Rule 3001(e)(2), Fed. R. Bankr. P., of the transfer, other
than for security, of the claim referenced in this evidence and notice.

| | |
|---|---|
| Marc A. Bruner | David E. Brody |
| Name of Transferee | Name of Transferor |

Name and Address where notices to transferee
should be sent:
 1555 Blake St., Suite 1002
 Denver, Colorado 80202

Court Claim # (if known): __7__
Amount of Claim:  __$335,374.18__
Date Claim Filed:  __03/01/2017__

Phone: _(604) 562-6101_____
Last Four Digits of Acct #: _____

Phone: _(303) 503-5660_____
Last Four Digits of Acct. #: _____

Name and Address where transferee payments
should be sent (if different from above):

Phone: _____
Last Four Digits of Acct #:_____

I declare under penalty of perjury that the information provided in this notice is true and correct to the
best of my knowledge and belief.

By: _____          Date: _August 17, 2017_
    Transferee/Transferee's Agent

*Penalty for making a false statement:* Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 & 3571.

P A I D

**EXHIBIT E**