# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 19-cv-01091
DAVID E. BRODY,

      Plaintiff,

v.

MARC A. BRUNER,
THE BRUNER FAMILY TRUST, and
MARC E. BRUNER, AS TRUSTEE OF THE BRUNER FAMILY TRUST

      Defendants.

---

**SUPPLEMENTAL DECLARATION OF DAVID E. BRODY**

---

I, David E. Brody, am the plaintiff in the above-entitled action and the rightful holder of Claim No. 7, in the amount of $335,374.18, (the "Brody Claim") in *In re PetroHunter Energy Corporation*, United States Bankruptcy Court for the District of Colorado, Case No. 16-20197-KHT (the "Bankruptcy Case"). This Supplemental Declaration is in addition to my original Declaration, and is directly responsive to the Defendants' Responses to my Motion for Constructive Trust or, in the Alternative, for Prejudgment Attachment (collectively, the "Responses" or individually as applicable, the "BFT Response" or "MAB Response"). I have personal knowledge of the matters set forth herein through my own experiences and observations. If called to testify, I would testify competently thereto.

## CONTENTS:

A.  **Further background on my business relationship with Marc A. Bruner and on the August 16, 2017 Agreement (the "Agreement")**

B.  **Background on the Bruner Family Trust**

C.  **Defendants and their counsel are attempting to commit a fraud on this court.**

D.  **I didn't delay.**

E.  **It will be impossible for me to collect any judgment from Defendants without a constructive trust or prejudgment attachment on at least $1,000,000.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1

**A.    Further background on my business relationship with Marc A. Bruner and on the August 16, 2017 Agreement (the "Agreement")**

1.    Based on my 16 years representing Marc A. Bruner's ("Marc" or "Bruner") oil and gas companies, Marc is a very intelligent, highly creative individual with exceptional knowledge of all aspects of the oil and gas industry, including geology, engineering, and operations. He is a highly sophisticated businessman with substantial expertise in complex financing, oil and gas companies and complex oil and gas drilling and development projects. He's very likeable, a highly traveled "global citizen", and has in-depth knowledge of world affairs, as well as being a food and wine connoisseur, a student of history, and an opera singer.

2.    I played an important role for his companies as his primary legal advisor from 2004 through 2009, including in my positions from 2007-2009 as General Counsel of Falcon Oil & Gas Ltd. ("Falcon") and as Vice President and General Counsel of PetroHunter Energy Corporation (PetroHunter"). During those three years, I remained a partner with the firm of Patton Boggs LLP, but took a leave of absence. From 2005 to 2009, Marc raised over $400 million and led Falcon's major oil and gas drilling and development project on licenses in Hungary that were acquired under contracts I drafted and helped negotiate. Patton Boggs formed PetroHunter for Marc in 2005 and represented the company in its acquisitions of the licenses in Australia during those years. From 2005-2009, Marc also led PetroHunter's major oil and gas exploration project in the Northern Territory of Australia.

3.    During our professional relationship, Marc and I were friends and had mutual respect for each other. Until this matter arose, I trusted and believed him. I respected his talents and loyalty to me, and I believe he respected my dedication to the success of his companies and projects and the fact I was available 24/7 to respond to his legal and business issues that arose daily during that period when we were involved in a continuous series of large transactions, and that I had a large and talented team of attorneys available for Marc at Patton Boggs to address the various aspects of his companies' businesses.

4.    As mentioned in my original Declaration, I attended meetings at his residences in Vancouver and Zurich during the period I represented him. However, I do not know whether he still owns those properties, and I do not know where his other assets are located. As far as I'm aware, in recent years Marc divested all assets he owned in the U.S.

**B.    Background on the Bruner Family Trust**

5.    Patton Boggs represented Marc in the formation of the Bruner Family Trust. That work was done in Patton Boggs' Northern Virginia office and I was not involved in any respect in the formation, operation, or decisions made by the BFT. I had no direct knowledge of the amount or nature of BFT assets, except Marc told me many years ago that the BFT held shares of Falcon.

In my capacity as Vice President and General Counsel of PetroHunter, I signed some of the promissory notes made to BFT (as lender) to PetroHunter (as borrower).

6.       When I reviewed public SEC records after filing this action, I became aware of the $16 million which BFT loaned to Galaxy Energy when Marc and his son Marc E. Bruner (trustee of BFT) controlled Galaxy, and the total amount of loans that BFT made to PetroHunter which formed the basis for the BFT Claims in the Bankruptcy Case.

7.       In July 2017, Marc asked me if I would be willing to assign my Claim to him in the Bankruptcy Case so he could "consolidate" my claim with the claims of the Bruner Family Trust. I later came to understand that Marc A. used my Claim to gain standing personally in the Bankruptcy Case and for conspiring with the BFT to steal and appropriate my Claim and pursue the Bruner/BFT Strategies which are described in my original Declaration and which are the subject of the PetroHunter Trustee's September 2018 Response in the Bankruptcy Case. To my knowledge, Marc E did not participate in the Bankruptcy Case proceedings, and he acquiesced or actively joined in Marc A's appropriation and use of my Claim in the Bankruptcy Case to further the joint Bruner/BFT Strategies.

8.       In late 2017, I referred Marc A. to Glenn Merrick to represent Marc A. and the BFT in the Bankruptcy Case. Based on several conversations that I've had with Mr. Merrick, he has dealt exclusively with Marc A. Bruner, not Marc E. Bruner, during the ongoing representation of both Marc A. and the BFT, even though Marc E. is the trustee for the BFT. I note that Marc E's Affidavit fails to counter or dispute any of the following, which are true to the best of my knowledge:

(a) Marc A hired his long-time personal attorney, Barry Meinster, to file the BFT Claims in 2016.

(b) Marc E., the BFT trustee, didn't work with Mr. Meinster in 2016 and has not worked with Mr. Merrick in pursuing the Bruner/BFT Strategies since 2017 when Marc A. hired Mr. Merrick to represent the BFT.

(c) Marc E. has not personally participated in any other Bankruptcy Case filings or motions in the Bankruptcy Case.

(d) All matters pertaining to the Bruner Family Trust, including correspondence between the Trustee in the Bankruptcy Case and BFT have been directed to Marc A. Bruner's counsel Glenn Merrick, not to Marc E. Bruner, and have been addressed and handled by Marc A. Bruner and Mr. Merrick, not by Marc E. Bruner.

(e) Mr. Merrick invoiced Marc A. Bruner or one of his companies, not the BFT, for the legal services provided to the BFT beginning in late 2017.

(f) Marc A. Bruner has had de facto control of the BFT beginning with the filing of the BFT Claims in 2016, even though Marc A was not a party or claimant in the Bankruptcy Case until I assigned my claim to him in August 2017.

3

(g) Marc A's control of the BFT continued at all times during the pendency of the Bankruptcy Case despite Marc E. serving as Trustee.

(h) Funds received by the BFT in the first interim distribution by the Trustee in the Bankruptcy Case, and funds received in subsequent distributions for the BFT beneficiaries are likely to be controlled by Marc A. (similar to the $20 million of BFT assets previously controlled by Marc A.).

(i) Such funds could be transferred to an offshore bank account, or otherwise used or distributed in Marc A's discretion, despite BFT's "domestic bank accounts" and BFT's "plans to retain those funds for its beneficiaries".

My claim of civil conspiracy between Marc A. and the BFT is based on facts which occurred around the time Marc A. proposed the Agreement to me or thereafter, not when the BFT Claims were filed. The civil conspiracy arose around the same time as Marc and I signed the Agreement.

9.      Based on the foregoing, I believe that upon fraudulently obtaining my Claim through the Agreement, Marc A caused the BFT to conspire with him, and that Marc A will control the distribution of funds by the Trustee in Bankruptcy to the BFT.

10.     In July 2017, Hogan Lovells resumed representation of two of Marc's companies, Nation Energy Inc. and Fortem Resources Inc. ("Fortem"). Marc was and still is Chairman and CEO of Fortem. One of my considerations in accepting Marc's offer to purchase my Claim and assign it to him was that I did not want to create an appearance of any conflict between me and the Bruner Family Trust claims as competing creditors in the PetroHunter Bankruptcy Case while I was representing his companies. In addition, the terms that Marc and I discussed and to which we ultimately agreed were fair.

11.     After negotiating the Agreement with Marc and after I made the appropriate disclosures to Hogan Lovells, Marc and I entered into the August 2017 Agreement. I also entered into that Agreement in the context of the long history of the business relationship between us and based on my assumption I could believe Marc and trust him to perform under the Agreement.

12.     That assumption proved incorrect.

## C. Defendants and their counsel are attempting to commit a fraud on this Court.

13.     The basic facts of this case are very straightforward. Marc materially breached the August 16, 2017 agreement (the "Agreement") by failing and refusing to make the cash payments and deliver the Fortem stock that he owes me. I've also made several other claims directly related to this transaction. Defendants and their counsel have deliberately misled this Court and the Bankruptcy Court about the terms of the Agreement.

4

I recognize the seriousness of this accusation, but the truth could not be more clear. In three separate pleadings filed by Defendants' counsel in this court and in the bankruptcy court on August 5, 11, and 18, 2020, they omitted the first sentence of Section 1(b) of the Agreement in an attempt to support an absurd legal argument that I completely waived my right to bring a breach of contract claim against Marc A. Bruner.

Section 1(b) of the Agreement, in its entirety, states as follows:

> **(b) In the event the First Payment and the Second Payment are made by the due date, Brody shall promptly return to Bruner 25,000 Shares represented by the Stock Power attached hereto.** If the First Payment and/or the Second Payment are not paid in full or in a timely manner, Brody may elect either to retain all 150,000 Shares or to extend the due date for one or both cash payments that are due under Section 1(a). If one or both cash payments are not made, Brody waives the right to make a claim against Bruner for breach of this Agreement. The provisions of Section 1(a) shall apply equally to all 150,000 Shares.

14.     In the three separate pleadings listed below – which are the only times so far in this case and in the Bankruptcy Case that Defendants quoted any part of Section 1(b) – they deliberately omitted the first sentence (in bold above), and did not include any indication to the reader, even in a footnote, that they omitted the sentence or explained the reason they did so:

- Creditor Marc A. Bruner's Response to David E. Brody's Limited Objection to Motion for Authority to Pay Interim Distribution, dated August 5, 2020 (PetroHunter Bankruptcy Case, paragraph 4, page 2) ("MAB Response to Objection"), attached hereto as **Exhibit A**.
- Bruner Family Trust's Response to Brody's Motion for Constructive Trust or, in the Alternative, for Prejudgment Attachment, dated August 11, 2020 (in this action) (the "BFT Response"), paragraph 4.a.iii, page 8.
- Marc A. Bruner's Response to Brody's Motion for Constructive Trust or, in the Alternative, for Prejudgment Attachment, dated August 18, 2020, (in this action) (the "MAB Response"), Factual Background, page 3.

15.     _Unethical conduct:_   Why did Defendants consistently omit the first sentence of Section 1(b) of the August 2017 Agreement in all three filings? The answer is that the first sentence got in the way of their false legal argument that _"Brody expressly and unequivocally waived his breach of contract claim pursuant to the Agreement."_ (MAB Response at 9)   Since they have no other strategy to defend against Marc's blatant material breach of the Agreement, Defendants apparently thought they might be able to pursue a legal argument about Section 1(b) **without the first sentence** (the "**Fraudulent Omission**"). So they decided to try to fool this court and the court in the Bankruptcy Case. In other words, they're trying to cheat to win.

5

16.    _The Payment Choices:_  Section 1(b) of the Agreement is very simple to understand. The reason it's in the Agreement in the first place is because Marc asked me to include it. He wasn't sure when he would be able to come up with the cash payments, so he asked me to give him an unusually long time to make the two $12,500 payments (30 and 60 days) and to give him two choices under the Agreement (collectively, the "Payment Choices"):

(a) Pay me $25,000 (within 60 days after we signed the Agreement) and I'll return 25,000 shares to him. That is, I'll retain 125,000 shares out of the 150,000 shares of Fortem Stock that he was supposed to deliver to me ten days after the date of the Agreement; or

(b) Don't pay me any cash and I'll retain all 150,000 shares of Fortem Stock.

Under those choices, Marc had the right to make the $25,000 payment and receive 25,000 Fortem Shares back from me when he did so. Those 25,000 shares were worth $60,000 at the time of the Agreement. Thus, it would have been valuable for Marc if he had paid me the $25,000 (Payment Choice (a)). Choice (b) was also an important accommodation I made to Marc upon his request, since it gave him a break on coming up with any of the $25,000 in cash. This is referenced in my August 15, 2017 email to Marc (**Exhibit B**).

Section 1(b) in its entirety (that is, including the first sentence) accurately reflects my efforts to accommodate Marc's request for the Payment Choices, that is, to accommodate a friend and business colleague after a successful business relationship and friendship between us, which at that time had continued for over 13 years. He asked for the Payment Choices and he asked for the extended period to make the cash payments. I agreed that if he missed the due dates for either or both cash payments, I would not use that reason alone to file an action against him because I would have received valuable consideration in the form of all 150,000 Fortem Shares (worth over $300,000 at the time), including the 25,000 shares that were "freely-tradable" and worth $60,000 at the time of the Agreement.

I did not _"unequivocally waive my breach of contract claim",_ as Defendants allege, in the event Marc failed to deliver the Fortem Shares. That is an unfounded statement, as shown by the first sentence of Section 1(b) and by simply reading several other provisions of the Agreement, including Sections 1(a), 3(e), and 3(f). The waiver allegation is also disproven by the facts in Section D, below.

17.    _The Sequence of the consideration:_  Note that both cash payments ($12,500 each) were due 30 and 60 days after the date of the Agreement, while the Fortem Shares were supposed to be delivered to me within ten days after the date of the Agreement. This is clearly stated in Section 1(a) of the Agreement. The first sentence of Section 1(b) assumes that I would be in possession of the Fortem Shares if and when Marc paid the cash and I would have had the ability to transfer the 25,000 shares back to him. The omitted first sentence states: "...Brody shall promptly return to Bruner 25,000 Shares....". But the Payment Choices and my own right to extend the due date for

the cash payments (as provided in the second sentence of Section 1(b) of the Agreement) <u>never arose because I didn't receive any of the Fortem Shares and still have not received any.</u>

18.    *Marc A. Bruner's Efforts to Deceive the Court:*    In the MAB Response, he summarizes Section 1(a) of the Agreement, and then *inexplicably skips over the first sentence of Section 1(b)* before he goes on to quote the remainder of Section 1(b) (pages 2-3 of MAB Response).  Relying solely on the waiver sentence in Section 1(b), on page 7 of the MAB Response it states that I have "dim prospects ... to prevail on any [of my claims]."  Page 9 of that Response refers to "crucial language" and further quotes Section 1(b) only in part – *still omitting any reference to the Payment Choices or to the 25,000 Fortem Shares, as provided in the missing first sentence.*  Marc's counsel proceeds to use the misleading and partial quotes as the basis for their legal "analysis" that I waived my breach of contract claim.

19.    *Fraudulent Omission and "express terms":*  On page 13 of the MAB Response, he argues that I'm not likely to succeed on the merits, stating as follows:

> the Agreement... contains a waiver of his claims against MAB in the event of non-payment.... [G]ranting the injunction would enforce the Agreement against its <u>express terms</u>..." (emphasis added)

In the above portion of the MAB Response, he uses the Fraudulent Omission as the basis to describe the rest of Section 1(b) as the Agreement's "express terms", purporting to cite authority.

**That is, Defendants are asking this court first to ignore the Fraudulent Omission and then to recognize a legal argument that could not be made but for the Fraudulent Omission.**

20.    *Poor cut and paste job:*  In the BFT Response, a "cut and paste" version of Section 1(b) of the Agreement is shown on page 8 of the Response.  But Mr. Meyer, or whoever used scissors to cut out the first sentence for him, for Marc E. and the BFT, left a tiny unreadable "slice" of the missing sentence along the bottom of the words, and they left the last word of the first sentence: "hereto".  (See page 8 of the BFT Response filed in this Court on August 11, 2020.)

21.    *Legal and ethical standards regarding false statements of law and fact and material omissions:*  The first sentence of Section 1(b) of the Agreement states: **In the event the First Payment and the Second Payment are made by the due date, Brody shall promptly return to Bruner 25,000 Shares represented by the Stock Power attached hereto.**

If they had included the first sentence in their quotes and discussions of Section 1(b), Defendants' counsel could not possibly have made the legal argument that I waived my breach of contract claim against Marc.  That legal argument is a false statement of law because it's based on a false statement of fact.

A material omission is no different than an affirmative misrepresentation and often leads to civil and criminal penalties. As an attorney with over 46 years of experience practicing law and membership in the Colorado bar, I find the Fraudulent Omission to be unethical, outrageous, and worthy of sanctions.

> A lawyer shall not knowingly … offer evidence that the lawyer knows to be false. RPC 3.3(a)(3).

The Comment on this rule states:

> This Rule governs the conduct of a lawyer who is representing a client in the proceedings of a tribunal….[T]he lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false….There are circumstances where **failure to make a disclosure is the equivalent of an affirmative misrepresentation**….Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal….Paragraph (a)(3) requires that the lawyer refuse to offer evidence that the lawyer knows to be false, regardless of the client's wishes. This duty is premised on **the lawyer's obligation as an officer of the court to prevent the trier of fact from being misled by false evidence**. (emphasis added)

If the Defendants counsel's attempt to cheat pertained to a tangential issue in this case, or if there was some credible argument that I waived my right to sue Marc for breach of contract, I might not have raised it. However, their material omission was aimed directly at the most important factual and legal issue in this case, namely, whether I could sue Marc A. Bruner for breach of contract for his failure to deliver 150,000 shares of Fortem stock. There is not any credible argument that I didn't have that right, and that's exactly why they committed the Fraudulent Omission.

My final comment on this disturbing subject is that the Fraudulent Omission is not equivalent to making a creative legal argument to the court, or taking an aggressive approach for a client, or being zealous in defending your client, all of which I fully expect and support. It's qualitatively different. **This is a matter of purposely deleting a material term in the most important document in this case, falsely presenting that altered document to the court and acting as if the material term does not exist or doesn't matter, and making a false and deceptive legal argument based solely on the materially altered section.**

## D. I didn't delay.

22.    In the Responses, Defendants state I should not be granted the relief requested because they claim I delayed taking action in this case. It's true that I waited to file the Complaint in this action and initially did not aggressive pursue it. However, that was because each time Marc (and his associates) stated to me that he planned on performing his obligations under the

Agreement, I believed Marc and the others. Marc repeatedly told me he would perform and he took certain steps that appeared to be in good faith. Marc's representations turned out to be false, and the steps turned out to be made deceptively and in bad faith. The following are examples and specific evidence of Marc's misleading statements and actions, as well as my efforts to settle this matter amicably and avoid the substantial time and legal fees all parties are now incurring:

- **August 2017 (Jorge)** – Marc was Chairman and CEO of Fortem Resources Inc. when we entered into the Agreement. Before and after we signed the Agreement (August 16, 2017), Marc said he would connect me with a person named "Jorge" who would arrange for the "freely-tradable" Fortem Shares to be assigned to me by the entity called "Squin Switzerland" which Marc asked me to identify in the Agreement as the entity holding those shares. However, Marc never made that introduction. Instead, he advised me that he would have to travel to Switzerland in person to work with Jorge and obtain the shares.

- **February 9, 2018 (Michael Caetano)** – Another senior executive at Fortem, Michael Caetano ("Caetano"), was familiar with the Agreement. From August 2017 to February 2018, I reached out to Caetano several times to assist me with Marc's delivery of the Fortem shares, including in a text to Caetano on February 9, 2018. "Please help me with the Fortem shares," I said. Mike responded: ***"I'll call Jorge to see what's going on with the Certificate. The plans are for Marc and I to be in Europe next week…Fortem shares – will do."***

- **March 29, 2018 (Tony Lotito)** – Caetano continued to confirm the information I was receiving from Marc when Caetano told me that Marc had scheduled another trip to Switzerland and that Marc would bring the Fortem Shares certificate back with him. I was further encouraged that Marc planned to deliver the Fortem Shares when Tony Lotito, Marc's business associate and closest friend (who I had also known and worked with since 2004) sent me a text with Marc's travel itinerary on March 29, 2018, which confirmed that Marc was in Switzerland (see **Exhibit C**). But Marc's excuses and delays on delivering the share certificate continued.

- **June 2018 ("I promise I'll pay you…")** -- The communication between me and Marc dropped off significantly when Hogan Lovells terminated representation of Marc's oil and gas companies in May 2018. Marc continued to assure me that he would be making more trips to Switzerland and deliver the shares. In the third quarter of 2018, I reminded Marc several times of his obligations under the Agreement and continued to demand the Fortem Shares. He continued to tell me he would deliver them. In September 2018, I told him I would soon have no choice except to retain counsel and file a law suit and I suggested that he do the same. Each time, Marc assured me he would perform ("I will pay you. I promise I'll pay you and assign the shares…".), and he asked me to please defer any legal action.

- **September 4, 2018 (Barry Meinster)** – Mr. Meinster had represented Marc on several personal matters and I asked him if he was aware of the Agreement and was representing Marc on it. Barry advised me that he was not representing Marc on this matter. (See **Exhibit D**.)

- **September 4, 2018 (Alan Talesnick)** – After Hogan Lovells withdrew from representing Nation Energy Inc. in May 2018, Nation retained Haynes and Boone (in its Denver office). Alan Talesnick, my friend and former partner at Patton Boggs and the person who first introduced me to Marc in 2004, was the lead partner at Haynes and Boone representing Marc's

companies on those matters. As reflected in **Exhibit E** (as well as in Exhibit D), I reached out to Alan and asked him if Marc told him about the personal matter involving me and Marc and if Alan also represented Marc personally. Alan told me he didn't represent Marc on any personal matters and would not undertake representation on this matter.

- **October 26, 2018** – I attended Marc A's wife's memorial service and funeral near Denver, and spent time with the Bruner family and friends there, including Marc A. and Marc E. Bruner. In deference and respect for Marc A., I didn't raise the subject (to him) of the Agreement for months thereafter.

- **December 2018 and August-September 2019 (Ghislaine Bruner)** – As reflected in **Exhibit F**, during these two separate periods of time, I contacted Marc E. Bruner's wife Ghislaine (Marc A. Bruner's daughter-in-law), who I've known for many years and with whom I've had a good professional relationship. Since she's a lawyer (Mr. Meyer's partner at Polsinelli) I thought she might be able to help resolve this matter. I was hoping she or Marc E would contact Marc A and facilitate a resolution. I provided Ghislaine with all of the background documents, explained the situation to her, and we discussed this matter at lunch on December 13, 2018. We spoke about this again in the summer of 2019, after I had commenced this action. I did not hear back from her after either time we discussed this matter.

- **March 22, 2019 (Co-Counsel material information)** -- On this date, I was speaking with an attorney representing one of the same Bruner entities I had previously represented at Hogan Lovells. This highly respected senior partner in a prominent Denver-based law firm, (hereinafter, "Co-Counsel") advised me that Marc had made the comment to Co-Counsel that day (not in connection with the Agreement) that Marc intended to "contribute $15 million in Fortem stock to Beetaloo Basin Partners", an Australian company controlled by Marc, and was "planning to liquidate or otherwise use his Fortem stock for that purpose and other purposes". (If Marc denies that he made these comments to Co-Counsel, I will obtain an affidavit by Co-Counsel that confirms these facts.)

- **March 27, 2019 (Michael Rollin)** – Immediately after speaking with Co-Counsel about Marc's statements to Co-Counsel I spoke with Mr. Rollin, and I retained him on this date to represent me.

- **April 2, 2019** – Mr. Rollin sent the attached demand letter to Marc (**Exhibit G**). When Marc failed to respond, I filed the Complaint.

- **April 20, 2019 (Paul Manson)** -- Immediately after I filed this action, Marc must have found out about it (though he was not yet served) because he called me and asked me not to serve him. He also asked me to suspend taking any further action in this case because he said he would deliver the Fortem Shares to me. He gave me contact information for Paul Manson at PI Financial in Vancouver, a stock broker where Marc said his Fortem shares were being held. After sending an email to Mr. Manson (attached as **Exhibit H**) and after numerous attempts to contact Mr. Manson by phone, he finally responded and told me he was not authorized by Marc to provide any information or to release or transfer any shares to me. He also said he wasn't aware of any freely-tradable Fortem shares held by Marc. I contacted Marc and attempted to have him advise Mr. Manson to work with me to expedite the transfer of shares. Instead, Marc said he would come up with an alternative solution, but I didn't hear back from Marc or Mr. Manson.

- **May 2019 to March 2020 (Fortem's violation of securities laws and cease trading order)** – As mentioned, Marc is Chairman and CEO of Fortem Resources Inc., a publicly-traded Nevada corporation and a "reporting issuer" in the provinces of Alberta and British Columbia, Canada. Its securities are listed on the Toronto Venture Exchange. On July 16, 2019, Fortem became subject to a failure-to-file cease trade order (the "FFCTO") issued by the Alberta Securities Commission for failure to properly file certain financial information. Issuance of the FFCTO had two major impacts on me and my Agreement with Marc: (a) Marc used it as an additional excuse to continue to delay his performance under the Agreement (even though I repeatedly told him I would accept substitute consideration); and (b) the FFCTO sent the value of my undelivered 150,000 Fortem Shares plummeting from a high of $597,000 on September 28, 2018 to around $100,000 today, if the shares could even be traded today, which they still cannot.

I found out about the FFCTO in early October 2019 not from Marc, but as a result of my periodic check of public information regarding Fortem and the price of its shares. I contacted Marc as soon as I found out to ask him when the shares would resume trading. He told me he was legally prohibited from assigning any Fortem Shares to me as a result of the FFCTO, but that it would be "lifted in ten days" and he would arrange for the assignment of shares to me at that time. Again, he asked me not to further pursue this action and that as soon as the FFCTO was lifted he would deliver the shares to me. To my knowledge, the FFCTO remains in place, 14 months after it was issued.

**In other words, in his capacity as Chairman and CEO of Fortem, with access to the most accurate information possible within Fortem regarding the likely length that the FFCTO would remain pending, Marc represented to me that "it would be lifted in ten days". Yet, it's still in effect after 14 months.**

- **October 9, 2019 (Glenn Merrick)** -- In an email dated October 9, 2019, Marc's and the BFT's attorney, Glenn Merrick, advised me (through Mr. Rollin) that: (a) the Fortem stock would resume trading in about ten days; (b) Marc was planning on selling "a block of his Fortem stock" in order to pay me; and (c) Marc would "execute [necessary documents] and pay any amount outstanding."
- **October 2019 (Cam McTavish)** -- In October 2019, Marc also gave me the name of Cam McTavish, who is a partner in the Vancouver law firm of Clark Wilson, and asked me to work with Mr. McTavish to accomplish that assignment. But Mr. McTavish advised me that he wasn't authorized by Marc to prepare any documents for the transfer until the FFCTO is lifted. I advised Marc about my conversations with Mr. McTavish. Marc asked me to wait until that occurred. I waited for the FFCTO to be lifted.

It did not make sense to me that on the one hand Marc was telling Co-Counsel in March of 2019 that he planned to "liquidate $15 million worth of his Fortem shares" as well as telling Glenn Merrick in October 2019 that he planned to sell "a block of his Fortem stock" and pay me, while on the other hand, during this same period, Marc was telling me that: (a) he was not able to transfer any

Fortem Shares to me; and (b) he had no stock of any other company and no other assets he could substitute for the Fortem Shares owed to me under the Agreement.

- **May 20, 2020 (Tony Lotito and notice of first interim distributions in Bankruptcy Case)** -- By early 2020, I had abandoned all hope of amicably resolving this. I had incurred serious damages by believing Marc and waiting over two years for him to perform. However, it was not until May 25, 2020, when I received a one page notice from Mr. Weinman, attorney for the bankruptcy Trustee, dated May 20, 2020 (attached as **Exhibit I**, the "Notice") that I fully realized Marc's intentions and the impact of his fraudulent actions.

Although I was not a creditor in the Bankruptcy Case, I was still receiving some but not all the notices from that proceeding. The Notice I received did not include the Trustee's Motion or the names of the creditors scheduled to receive distributions. When I received the Notice, I called Carmen (Tony) Lotito (mentioned above as Marc A's closest friend who I met in 2004 when I first met Marc), and asked him about the Notice. As a creditor in the Bankruptcy Case, Tony had received a copy of the Motion and the full list of creditors who would receive the first interim distributions totaling $3.8 million. Tony sent me the Motion and list of creditors (see **Exhibits J and K**).

23.     Upon seeing the Trustee's Motion requesting authority to pay Marc and the BFT, Marc's purpose in entering into the Agreement and his persistent deflections and nearly three years of delays became clear. He had obtained my $335,000 Claim fraudulently by deception, "consolidated" it in August 2017 with the claims of the Bruner Family Trust which he controlled, and failed to inform me of the impending distributions. He dragged his feet for almost three years in order to begin receiving distributions from the Trustee to him and to the BFT.

24.     Eleven days after I read the Trustee's request for authority to distribute, on June 5, 2020, I filed the Amended Complaint in this matter.

**E. It will be impossible for me to collect any judgment from Defendants without a constructive trust or prejudgment attachment on at least $1,000,000.**

25.     In light of the impending distributions and the certainty that those funds and any other assets of the Defendants will never be available after a ruling in my favor, this is now an urgent matter.

26.     All of the above facts confirm that in the absence of a constructive trust or prejudgment attachment, I will never see one dollar from Marc A. Bruner or the Bruner Family Trust. The facts that Marc did not advise me of the FFCTO or the Trustee's Motion requesting authorization to make interim distributions, and the fact that Marc was waiting quietly to receive those first distributions to him and the BFT for over $500,000 without discussing it with me constitutes sufficient evidence that he will continue to do everything possible to avoid paying me

and avoid delivering any other consideration. These facts also show that Defendants' counsel's statements are not accurate. For example, they state that "Brody fails to demonstrate [Marc] ... will act to hinder or delay him from collecting any future judgment." (MAB Response at 15) Marc has been "demonstrating" his actions to hinder and delay all on his own, without me even needing to demonstrate such hindrance and delay. Since Marc hasn't paid one dollar or delivered one share to me for three years, and positioned himself to receive the first interim distributions to himself and the BFT, he will clearly do everything possible to avoid paying a judgment against him and against the BFT.

27.    Marc cannot be trusted to meet his obligation to make any payments. As of mid-2018 Marc personally and his entities owed a minimum of ten law firms millions of dollars in legal fees, which accumulated during 2015-2018. As of mid-2018, he had successfully avoided paying some of them for three years. During and after Hogan Lovells period of representing Marc's companies, I learned that he signed engagement letters with these firms on litigation and other matters, paid small retainers and some small portion of their fees, and when the unpaid balance accumulated, he then abandoned the first firm and moved on to the next without disclosing to the new firm the reason he was changing firms. As of May 2018, when Hogan Lovells withdrew from representing Nation and Fortem, the number of firms that remained unpaid was at least ten, and the aggregate amount he personally and the Bruner companies owed was several million dollars. I received this information from Marc, from some of the firms that Hogan Lovells was working with during the July 2017-May 2018 period of representation, and from various other third parties. I have the names of the firms and I'm prepared to provide them to the court on a confidential basis if Marc denies this or if it is otherwise appropriate to present this evidence. I do not know the current status of those obligations.

28.    In my original Declaration I referenced Marc's non-U.S. homes, bank accounts and other assets to demonstrate that there are no assets that would be available for execution of a judgment in my favor. Marc has resided overseas, including in Canada, Switzerland, and Italy, and perhaps other countries. He owns and manages businesses overseas, as well. To the best of my knowledge, he does not reside in Colorado or anywhere else in the U.S., although he has in the past.

29.    Contrary to the assertion in the MAB Response that past knowledge of Marc's residences "may ultimately give Brody a benefit" (MAB Response at 12), if I obtain a judgment, I do not have current knowledge of any of Marc's assets and I do not understand the point of Defendants' counsel's comments.

30.    The fact that Marc submitted himself to the jurisdiction of this court also does nothing to provide assurances that he would respond to a ruling in my favor. His voluntary appearance does nothing to change or reduce his control of the BFT and his control of proceeds paid to BFT by the Bankruptcy Trustee. Marc has undertaken the role of the BFT's representative and agent since 2004 and continued to demonstrate his complete control during the pendency of the Bankruptcy Case. It could take years to obtain a judgment in this proceeding, an additional three

years chasing Marc around the world to try to determine which judgment-proof entities controlled by Marc own his homes or other assets, and additional time attempting to execute on the foreign judgment. In defense of Marc's position, Defendants' counsel take the cynical and meaningless position that "Brody's awareness of MAB's international holdings may ultimately prove beneficial … to pursue any judgment against MAB." (MAB Response at 15)

31.    Because of my limited objection in the Bankruptcy Case, the first interim distribution to Marc personally in the Bankruptcy Case in the amount of $39,000 will now be paid into the registry of the District Court, pending a final resolution of this action. However, I am seeking recovery in an amount that greatly exceeds that distribution, including treble damages under my theft claim and punitive damages for fraud. The amount of money I ask to be held must be sufficient to compensate me for all damages, fees, and costs, which I estimate to exceed $1,000,000. Thus, until that amount is withheld from any proceeds otherwise intended to be paid on the Claim I assigned to Marc <u>and</u> the BFT Claims, and placed in a court-supervised account, no interim distributions will be safe, and therefore, they should not be made to MAB or the BFT, or the distributions should be attached or held in constructive trust. Unless and until this court imposes a constructive trust or prejudgment attachment on the BFT, neither the first distribution to the BFT in the amount of $483,000 nor any subsequent distributions will be paid into the registry of the District Court in the absence of an Order from this Court to do so. All distributions will be paid to the BFT.

32.    In light of MAB's foreign residency, offshore bank accounts, lack of ownership of any real or personal property in the U.S., and history of secreting assets, it is critical that this Court enjoin the transfer of assets from the PetroHunter Bankruptcy estate to Marc and the BFT. The following facts were provided in my original declaration to demonstrate the existence of Marc's offshore bank accounts and his history of secreting assets:

a)    During the period of time when I represented Marc A. Bruner's companies (from 2004 to 2010), I traveled with him on numerous occasions for business meetings at his residences in Vancouver and Zurich, and with him to the offices of various financial institutions and other companies located in numerous cities in Canada, Hungary, Switzerland, and England.

b)    For the majority of at least the past 16 years, and continuing to the present, Marc owned and resided for extended periods of time in homes in Italy, Switzerland, and Canada, and conducted business from those locations;

c)    Marc has had extensive business relationships and financial interests, including personal bank accounts, outside of the U.S. for decades, continuing to the present, and had or has partial ownership of the following companies, all of which are Hungarian, Australian, German, or Swiss entities (collectively, the "Foreign Entities"), and some of which are shareholders and creditors of PetroHunter: Global Project Finance AG, Paltar Petroleum Limited, Sweetpea Petroleum Pty Ltd, Falcon Australia Oil and Gas, Ltd., Mako Hungary, TXM Oil and Gas, JTE Finanz AG, CR Innovations, Hapi GmbH;

d)    The Foreign Entities maintained foreign bank accounts, several of which Marc controlled;

  e)  Marc represented to me on several occasions, advised his counsel (J. Barry Meinster), and disclosed publicly during the pendency of the case of MAB Resources, LLC v. PetroHunter (referenced in the Trustee's Response) that MAB owned an undivided interest in Global Project Finance AG;

  f)  Marc's administrative assistant (James King) with whom Marc asked me to work at the time of entering into the Agreement was located in Vancouver;

  g)  Marc's Fortem Shares that were to be delivered pursuant to the Agreement were held by a Swiss entity;

  h)  The designated agent (Jorge) to whom MAB referred me to supposedly assist in obtaining the Fortem Shares held by the Swiss entity was a resident of Switzerland;

  i)  Another account at PI Financial owned by Marc and holding Marc's Fortem Shares is located in Vancouver, B.C., Canada;

  j)  Marc's securities counsel representing him in 2018 and 2019 on issues related to Fortem Shares in the above-referenced account in Vancouver is Cam McTavish with Clark Wilson LLP, located in Vancouver.

  33. According to paragraphs 11 and 12 of Marc E. Bruner's Affidavit, dated August 11, 2020, the BFT currently has no assets except for the $4.1 million account receivable represented by the BFT Claims. Therefore, if Marc A. Bruner and/or Marc E. Bruner removes such proceeds and the proceeds from my Claim from the reach of the Court and creditors after each interim distribution made by the Trustee, and/or if the proceeds paid to BFT are distributed to the BFT beneficiaries, then BFT would be incapable of satisfying any judgment against it in this case. As previously stated, I'm certain all such proceeds will "disappear" as soon as they are paid by the Trustee in bankruptcy.

I certify under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

           David E. Brody

**EXHIBITS**:

A.  Creditor Marc A. Bruner's Response to David E. Brody's Limited Objection to Motion for Authority to Pay Interim Distribution, dated August 5, 2020 (PetroHunter Bankruptcy Case)

B.  Email from D. Brody to Marc A. Bruner, dated August 15, 2017

C.  Marc A. Bruner itinerary (Zurich to Vancouver), dated March 29, 2018

D.  Email from D. Brody to Barry Meinster, dated September 4, 2018

E.    Email from D. Brody to Alan Talesnick, dated October 1, 2018

F.    Emails between D. Brody and Ghislaine Bruner, dated August 2018 and December 2019

G.    Demand letter from Michael Rollin to Marc A. Bruner, dated April 2, 2019

H.    Email from D. Brody to Paul Manson, dated April 20, 2019

I.    Notice Pursuant to L.B.R. 9013 of the Motion for Authority to Pay Interim Distribution and Interim Trustee Fee, dated May 20, 2020 (without List of Distributees) (Received by Brody on May 25, 2020)

J.    Email from C. Lotito to D. Brody, dated May 25, 2020

K.    Motion for Authority to Pay Interim Distribution and Inteim Trustee Fee, dated May 20, 2020 (With List of Distributees) (Sent to all parties to PetroHunter Bankruptcy Case, and emailed to Brody by Lotito on May 25, 2020)

Brody Supplement Declaration

Exhibit A

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO**

In re:                                    )
                                          )
PETROHUNTER ENERGY                        )      Case No. 16-20197 KHT
CORPORATION                               )
EIN: XX-XXX1245                           )      Chapter 7
                                          )
            Debtor.                       )

---

**CREDITOR MARC A. BRUNER'S RESPONSE TO DAVID E. BRODY'S LIMITED
OBJECTION TO MOTION FOR AUTHORITY TO PAY INTERIM DISTRIBUTION
AND INTERIM TRUSTEE FEE**

---

COMES NOW Creditor Marc A. Bruner ("**MAB**"), by and through his undersigned counsel in this Chapter 7 case, Moye White LLP, for his Response (the "**Response**") to David E. Brody's ("**Brody**") Limited Objection (the "**Limited Objection**") to Motion for Authority to Pay Interim Distribution and Interim Trustee Fee (the "**Motion**"). In furtherance of the Response, MAB states as follows:

**Introduction**

1.    The Court should summarily overrule Brody's Limited Objection to the Motion, without the need for evidence, on three principled reasons: (i) Brody has waived his ability to dispute MAB's ability to receive distributions from this bankruptcy estate when Brody failed to object to the Court Clerk's Rule 3001(e)(2) notice documenting the transfer of claim from Brody to MAB; (ii) because Brody has effectively and legally transferred his claim to MAB, Brody lacks standing to assert the Limited Objection; and (iii) Brody's purported "breach of contract" claim against MAB is best heard in an already pending action Brody filed in the United States District Court for the District of Colorado (the "**District Court**") back in April of 2019 for the exact same conduct he now complains entitles him to relief in this case. Accordingly, the Court should overrule the Limited Objection and grant the Motion.

**Background**

**A.    Background Regarding the Transfer of Claim in this Bankruptcy Case.**

2.    On March 1, 2017, Brody filed his proof of claim in this Chapter 7 case in the amount of $335,374.18 (the "**Claim**"). (*See* Claims Reg. No. 7-1).

3.    On August 16, 2017, Brody and MAB entered into an agreement whereby Brody would sell the Claim to MAB (the "**Claim Purchase Agreement**"). (*See* Docket No. 561-1 for a copy of the Claim Purchase Agreement).

4829-7253-9591.2

4.      The Claim Purchase Agreement provides that in exchange for transferring the Claim, Brody would receive: (i) $12,500 in cash by September 15, 2017, (ii) an additional $12,500 in cash by October 15, 2017 (collectively, the "**Cash Consideration**"), and (iii) 150,000 shares of common stock of Fortem Resources Inc., by August 26, 2017 (the "**Stock Consideration**"). (*See* Docket No. 561-1 at ¶ 1(a)). The Claim Purchase Agreement further provided that:

> If the First Payment and/or the Second Payment are not paid in full or in a timely manner, Brody may elect either to retain all 150,000 Shares or to extend the due date for one or both cash payments that are due under Section 1(a). *If one or both cash payments are not made, Brody waives the right to make a claim against Bruner for breach of this Agreement*. The provisions of Section 1(a) shall apply equally to all 150,000 Shares.

*Id*. at ¶ 1(b) (emphasis added).

5.      On August 22, 2017, pursuant to Fed. R. Bankr. P. 3001(e)(2), MAB filed a Transfer of Claim for Other than Security regarding the transfer of the Claim from Brody to MAB (the "**Notice of Transfer**"). (Docket No. 126).

6.      On August 25, 2017, pursuant to Fed. R. Bankr. P. 3001(e)(2), the Clerk of the Court mailed a Notice of Transfer of Claim for Other than Security to Brody (the "**3001(e)(2) Notice**") putting Brody on actual notice that the Notice of Transfer had been filed and that if Brody sought to oppose the transfer of the Claim to MAB for any reason he was required to file an objection with the Court not later than twenty-one days from the mailing of 3001(e)(2) Notice, *i.e.*, September 15, 2017. (*See* Docket No. 129).

7.      Brody did not file any response to the 3001(e)(2) Notice.

**B.      Background Regarding Brody's Commencement of a District Court Action to Enforce the Claim Purchase Agreement.**

8.      On April 12, 2019, Brody commenced an action against Brody in the District Court, styled as *Brody v. Bruner*, Case No. 19-cv-01091-RM-NRN (the "**District Court Action**").

9.      In the District Court Action, Brody initially alleged that MAB breached the Claim Purchase Agreement by not paying the Cash Consideration and Stock Consideration demanding demanded specific performance, and that MAB had also violated the implied duty of good faith and fair dealing. (D. Colo., Case No. 19-cv-01091 at Docket No. 1).

10.      On August 13, 2019, more than 123 days after the District Court Action was filed, Brody first requested a summons in order to serve MAB. (D. Colo., Case No. 19-cv-01091 at Docket Nos. 14-15).

11.      On June 5, 2020, more than 400 days after Brody initiated the District Court Action, and without having served MAB, Brody filed his amended complaint (the "**Amended**

**Complaint**") naming MAB, Marc E. Bruner ("**MEB**") and the Bruner Family Trust ("**BFT**") as defendants. (*Id*. at Docket No. 16).

12.     As of the date of this Response, MAB has not yet been served in the District Court Action.

**C.     Background Regarding the Motion and Limited Objection.**

13.     On May 20, 2020, the Trustee filed the Motion requesting that he be authorized to make an interim distribution of estate funds to creditors in the amount of $4,000,000.00, including MAB on account of his Claim. (Docket No. 514-1).

14.     The Motion further stated that "[a]ny claims to which an objection has been filed and is still pending at the time of the distribution, will not be paid until resolved, however, the *pro rata* portion of that claimant's distribution will be calculated and withheld until a Final Court Order is entered." (Docket No. 514 at ¶ 12).

15.     The Trustee has not objected to the validity of MAB's Claim.

16.     On June 10, 2020, Brody filed the Limited Objection asserting nearly identical claims and allegations as those contained in the Amended Complaint that was filed in the District Court Action. (*See* Docket No. 529). The Limited Objection further states that Brody has standing as a party in interest, under Section 1109(b) of the Bankruptcy Code, in that if MAB receives an interim distribution on account of his Claim, then is Brody is concerned that *if* he is successful in the District Court Action his ability to collect on a future judgment against MAB may be stymied. (*Id*. at ¶ 7).

17.     On July 27, 2020, presumably understanding the limitations of his status and that he does not have standing to file the Limited Objection, Brody filed his Motion for Leave of Court to Intervene in Bankruptcy Case for Specified Matters Pursuant to Fed. R. Bankr. P. 2018(a) (the "**Intervention Motion**"). (*See* Docket No. 554).[1]

18.     The Court has set a preliminary hearing on the Motion for August 6, 2020, at 1:30 p.m. (Docket No. 555).

19.     On August 3, 2020, Brody commenced an adversary proceeding against MAB, MEB and BFT on the same conduct complained of in the District Court Action including, however, an interpleader claim against the Chapter 7 Trustee for the interim distribution contemplated under the Motion (the "**Adversary Proceeding**"). (*See* Adv. Pro. No. 20-01225-KHT).

---

[1] The Intervention Motion has not been sent out on notice to the Debtor's creditors pursuant to LBR 9013-1 or any other applicable bankruptcy rule.

3

**Response**

A.    **The Limited Objection Should be Overruled in its Entirety Because Brody Failed to Timely Object to the 3001(e)(2) Notice.**

20.    Fed. R. Bankr. P. 3001(e)(2) provides:

> **(2)** *Transfer of Claim Other than for Security after Proof Filed*. If a claim other than one based on a publicly traded note, bond, or debenture has been transferred other than for security after the proof of claim has been filed, evidence of the transfer shall be filed by the transferee. The clerk shall immediately notify the alleged transferor by mail of the filing of the evidence of transfer and that objection thereto, if any, must be filed within 21 days of the mailing of the notice or within any additional time allowed by the court. If the alleged transferor files a timely objection and the court finds, after notice and a hearing, that the claim has been transferred other than for security, it shall enter an order substituting the transferee for the transferor. If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor.

21.    The Rule 3001(e)(2) transfer process requires the transferee to file notice of the transfer with the Court which then obligates the Court to provide notice to the transferor and opportunity to object to the transfer if the legitimacy of the transfer is disputed. *In re Am. Hous. Found.*, 2015 Bankr. LEXIS 3730, at *9 (Bankr. N.D. Tex. Nov. 2, 2015) ("This process accomplishes three things: (1) it provides the transferor due process rights of notice and an opportunity to object before its property is transferred to another party; (2) it ensures the claim against the estate is held by its true owner; and (3) it puts the debtor or trustee on notice of the identity of the current true owner."). In 1991, Rule 3001 was amended to restrict the bankruptcy court's power to inspect the terms of claims transfers. *See In re Palmer-Dawkins*, 2013 Bankr. LEXIS 883, at *3 (Bankr. N.D. Ga. Feb. 11, 2013) ("The amended rule makes clear that the only role for the Court is resolving disputes and that a dispute only exists when the transferor objects to the transfer."). "The purpose of amending Fed. R. Bankr. P. 3001(e)(2) was to 'limit the court's role to the adjudication of disputes regarding transfers of claims . . . [but not to] affect any remedies otherwise available outside of bankruptcy.'" *In re Nw. Airlines Corp.*, 2007 Bankr. LEXIS 521, at *7 (Bankr. S.D.N.Y. Feb. 9, 2007) (citing *Viking Assocs., L.L.C. v. Drewes (In re Olson)*, 120 F.3d 98, 102 (8th Cir. 1997)). "The text of [Rule 3001(e)(2)] makes clear that the existence of a 'dispute' depends upon an objection by the transferor. Where there is no dispute, there is no longer any role for the Court." *Viking Assocs., L.L.C. v. Drewes (In re Olson)*, 120 F.3d 98, 102 (8th Cir. 1997).

22.    In this case, the Rule 3001(e) process was appropriately followed by MAB and the Court's Clerk when the Notice of Transfer was filed and when the Court's Clerk sent the 3001(e)(2) Notice to Brody setting a deadline of September 15, 2017, to object to the transfer. (*See supra* at ¶¶ 5-6). Notwithstanding receiving the 3001(e)(2) Notice, Brody failed to take *any* action with respect to the transfer of the Claim until he filed the District Court Action—more than 590 days after the Court mailed him the 3001(e)(2) Notice. (*Supra* at ¶ 8). The Rule 3001(e) process worked perfectly as envisioned by the Bankruptcy Rules because Brody was given an opportunity to contest the transfer of the claim to MAB by failing to perform under the terms of

4

the Claim Purchase Agreement. However, Brody failed to assert any objection and there must be consequences to former parties in a bankruptcy case when their rights are being affected.

23.    Furthermore, as of September 15, 2017, *i.e.*, the objection deadline of the 3001(e)(2) Notice, Brody was on notice of a potential breach claim against MAB due to: (i) not having received the first installment of the Cash Consideration by September 15, 2017, and/or (ii) not having received the Stock Consideration as of August 26, 2017.[2] Thus, Brody undoubtedly knew that—as of September 15, 2017—there was a clear basis to oppose the transfer of the Claim. Brody could have, and should have, filed an objection—or at least a reservation of rights—to the 3001(e)(2) Notice. However, Brody did not file any such objection and has waived his ability to now object to the Motion and MAB's rights thereunder as a transferee. Accordingly, the Limited Objection should be overruled now without the need for further proceeding in this Court.

**B.    The Limited Objection Should Further Because Brody Does not Have Standing as Set Forth in MEB and BFT's Response to the Limited Objection.**

24.    Because the Notice of Transfer was effective, and Brody failed to object to the 3001(e)(2) Notice, Brody no longer has any rights as a creditor in this Chapter 7 case and, therefore, does not have standing to raise and appear on this particular Motion before the Court. MAB joins in, and incorporates, as if fully set forth herein, the facts, arguments and legal authority contained in MEB and BFT's *Response to Limited Objection to Motion for Authority to Pay Interim Distribution and Interim Trustee Fee* (Docket No. 540) (the "**MEB/BFT Response**") regarding Brody's lack of standing to file the Limited Objection. Accordingly, the Limited Objection should be overruled in its entirety.

**C.    Brody's Remedy Against MAB, if any, is Appropriate in the District Court Action— Not This Court.**

25.    As revealed for the first time to this Court and MAB in the Limited Objection, Brody commenced the District Court Action in April of 2019 to assert his purported breach claim against MAB. Thus, there is already an action pending in a different forum which is capable of addressing Brody's concerns that he has advanced in the Motion. Notwithstanding the commencement of the District Court Action over a year and a half ago, Brody has filed the Adversary Proceeding which seeks nearly identical relief (plus an interpleader claim against the Trustee) as the District Court Action. Brody has unnecessarily multiplied the proceedings in different courts based upon the same conduct. Brody's relief, if any, is best sought in the District Court Action—not this Court.

26.    Moreover, to the extent that Brody's concerns that collection of a potential judgment would be frustrated if this Motion is granted are hollow. First, Brody's concerns are based upon the assumption that he will actually prevail in the District Court Action whereby none of the defendants thereto have even been served. Second, if Brody truly thought that his rights would be frustrated by this Court's granting the Motion, which was filed on May 20, 2020, *i.e.*, more than 75 days ago, Brody should have sought expedited relief from the District Court with respect to a pending prejudgment attachment motion that was only recently filed on July 21, 2020.

---

[2] Although more appropriately raised in the District Court Action, Brody has waived contractually waived his ability to assert any breach claims against MAB if he is not paid any portion of the Cash Consideration. (*Supra* at ¶ 4).

4829-7253-9591.2

However, consistent with his past conduct, Brody waited to assert his rights instead of acting in an expeditious manner.  Third, whether MAB breached the Claim Purchase Agreement is a dispute between MAB and Brody which will not affect in any way the administration of this Chapter 7 case, *i.e.*, it will not increase the amount of assets available for distribution or minimize the amount of claims against the estate.  Thus, the Court should abstain, pursuant to 28 U.S.C. § 1334(c)(1), from determining whether a breach of the Claim Purchase Agreement has occurred—especially when Brody has invoked the jurisdiction of the District Court over this exact conduct.

### Joinder and Reservation of Rights

27.    MAB further joins in and incorporates all other arguments asserted in the MEB/BFT Response to the extent they are not inconsistent with this Response.

28.    MAB makes no admission of fact or law and reserve any and all rights, claims, objections and defenses that may be available to him in any hearing on the Motion, or any other matter pending before this Court.  MAB, as a holder of a validly transferred claim, further reserves all rights to contest Brody's Motion to Intervene and any other pleading filed in this Chapter 7 case which may affect his rights.

### Conclusion

29.    The outcome of this dispute is straightforward: (i) there is nothing left for this Court to resolve on Brody's Limited Objection because he failed to object to the 3001(e)(2) Notice and has now waived the right to contest MAB's rights as a creditor in this Chapter 7 case; (ii) because Brody effectively transferred the Claim he does not have standing to assert the Limited Objection and Adversary Proceeding; and (iii) Brody's remedy, if any, is available to him in the District Court Action which has been pending since April of 2019.  Accordingly, this Court should summarily overrule the Limited Objection and grant the Motion.

WHEREFORE, MAB respectfully requests that this Court enter an order overruling the Limited Objection and granting the Motion, and for all such other and further relief this Court finds fair and equitable under the circumstances.

Dated: August 5, 2020                    **MOYE WHITE LLP**

*/s/ Timothy M. Swanson*
Timothy M. Swanson, Colorado No. 47267
1400 16th Street, Suite 600
Denver, CO 80202
(303) 292-2900
(303) 292-4510 *facsimile*
tim.swanson@moyewhite.com
*Counsel to Marc A. Bruner*

6

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of August, 2020 I caused the foregoing **CREDITOR MARC A. BRUNER'S RESPONSE TO DAVID E. BRODY'S LIMITED OBJECTION TO MOTION FOR AUTHORITY TO PAY INTERIM DISTRIBUTION AND INTERIM TRUSTEE FEE**, to be served upon all parties receiving electronic notice:

**Joseph T. Bernstein** jtb@msbfirm.com

**Tyler Ferguson** tferguson@mayerbrown.com

**Jenny M.F. Fujii** jmf@kutnerlaw.com

**Matthew A Gold** Argo Partners matthew@argopartners.net

**James S. Helfrich** Allen Vellone Wolf Helfrich & Factor PC jhelfrich@allen-vellone.com

**Jeffrey L. Hill** Jeffrey L. Hill, P.C jeffreyhillpc@gmail.com

**Lance Henry** Allen Vellone Wolf Helfrich & Factor P.C. lhenry@allen-vellone.com

**John J Kane** Kane Russell Coleman Logan PC jkane@krcl.com

**Charles S. Kelley** ckelley@mayerbrown.com

**Lee M. Kutner** lmk@kutnerlaw.com

**Mark A. Larson** Larson Law Firm, LLC mark@larsonlawyer.com

**Barry Meinster** bmeinster@meinster.com

**Glenn W. Merrick** gwm@msbfirm.com

**William P Rossini** Rossin Law Firm williamp@rossini-law.com

**Matthew D. Skeen, Jr.** jrskeen@skeen-skeen.com

**Patrick D. Vellone** Allen Vellone Wolf Helfrich & Factor PC pvellone@allen-vellone.com

**Jeffrey Weinman** jweinmantrustee@outlook.com

**Alice A. White** Onsager Fletcher Johnson LLC 600 17th Street Suite 425n, Ste 900 Denver, CO 80202

**William Meyer** wmeyer@polsinelli.com

**Chad Caby** ccaby@lrrc.com

/s/ *Timothy M. Swanson*
Timothy M. Swanson

7

Brody Supplement Declaration

Exhibit B

**Brody, David E.**

| | |
|---|---|
| **From:** | Brody, David E. |
| **Sent:** | Tuesday, August 15, 2017 9:00 AM |
| **To:** | mbruner@fortemresources.com |
| **Cc:** | Tony Lotito |
| **Subject:** | RE: Transfer of Claim in Bankruptcy Proceeding |
| **Attachments:** | BRODYbrunerAUG2017.docx |

Marc – I revised and simplified this, based on our last conversation (see attached)...If you don't come up with either or both of the $12,500 cash payments, the shares will increase from 125,000 to 150,000 – no promissory note or right to demand the cash. I will also be sending you a Stock Power to sign along with the agreement.

The one remaining important piece is for you to talk with Ted before we sign this agreement. I don't want to be the "middle man", sign the agreement with you, and then have you or Ted upset with me because there's a misunderstanding on something related to his future representation of you. You two need to talk directly. If you're available, Ted and I will call you today at 1:30 MT/12:30 Vancouver time to discuss that representation. If you're both comfortable, you and I can then sign our agreement.

Please let me know if we can call you at 1:30 today.

Dave

**David Brody**
Of Counsel

Hogan Lovells US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202

Tel:      +1 303 899 7300
Direct:   +1 303 454 2467
Cell:     +1 303 503 5660
Email:    david.brody@hoganlovells.com
          www.hoganlovells.com

*Please consider the environment before printing this e-mail.*


**From:** Brody, David E.
**Sent:** Saturday, August 12, 2017 10:12 AM
**To:** mbruner@fortemresources.com
**Cc:** Tony Lotito
**Subject:** FW: Transfer of Claim in Bankruptcy Proceeding

Marc – Please give me any comments you have on this. Your deadline for responding to the PetroHunter Trustee on the Bruner Family Trust claim (and other rejected claims) is Friday, August 25, and Ted will need time to meet with you and prepare that response.

Dave

**David Brody**
Of Counsel

Hogan Lovells US LLP
1601 Wewatta Street, Suite 900

Denver, CO 80202

Tel:       +1 303 899 7300
Direct:    +1 303 454 2467
Cell:      +1 303 503 5660
Email:     david.brody@hoganlovells.com
           www.hoganlovells.com

*Please consider the environment before printing this e-mail.*

**From:** Brody, David E.
**Sent:** Wednesday, August 09, 2017 10:46 AM
**To:** mbruner@fortemresources.com
**Cc:** Tony Lotito
**Subject:** Transfer of Claim in Bankruptcy Proceeding

Marc – Ted has agreed to represent you as soon as you and I reach agreement on the terms of the claim transfer. I'm attaching the following:

1. Proposed agreement between you and me.
2. Form of Transfer of Claim that Ted will file on your behalf in the bankruptcy court after we sign the above agreement.
3. The documents validating my Proof of Claim for $335,374.

As you can see, my claim is an additional $35,000 (or over 10%) more than I thought. Because of this and because it's important that I receive at least some cash when we sign the agreement (I'm still paying off the substantial fees I paid to Sherman & Howard to sue PetroHunter in 2015 and obtain the judgment), I'm proposing $12,500 at closing and the balance of $12,500 sixty days out (plus 125,000 Fortem shares, as we agreed).

Please let me know if you have any comments. If it's acceptable as is, I'll send you a signed copy of the agreement and Transfer of Claim.

Dave

**David Brody**
Of Counsel

**Hogan Lovells US LLP**
1601 Wewatta Street, Suite 900
Denver, CO 80202

Tel:       +1 303 899 7300
Direct:    +1 303 454 2467
Cell:      +1 303 503 5660
Email:     david.brody@hoganlovells.com
           www.hoganlovells.com

*Please consider the environment before printing this e-mail.*

Brody Supplement Declaration

Exhibit C

Exhibit C to David E. Brody's Supplemental Declaration

Brody v. Bruner, et al

March 29, 2018 text message from Tony Lotito to David Brody:

Ticket Number: 0142192524854

Marc Arnold BRUNER
SWISS AIRLINES
BUSINESS CLASS Locator:SM3KIS
Flight    LX 8
From Zurich to Chicago
Leave :   12:55 PM

Go to Domestic Terminal in Chicago

Marc Arnold BRUNER
UNITED AIRLINES
BUSINESS CLASS
Locator:EHFT5Z
FLIGHT.    UA  563
From  Chicago to  Vancouver
Leave.      7:39 PM

# Brody Supplement Declaration

# Exhibit D

8/24/2020                                Gmail – Agreement with Marc Bruner

 Gmail                                    David Brody <davidbrody7@gmail.com

## Agreement with Marc Bruner

**David Brody** <davidbrody7@gmail.com>                        Tue, Sep 4, 2018 at 4:53 P
To: alan.talesnick@haynesboone.com, Barry Meinster <bmeinster@meinster.com>

Hi Alan and Barry -- Please see the attached.

Thanks,
Dave

**Brody Letter to Alan and Barry Sept 4 2018.pdf**
212K

# Brody Supplement Declaration

# Exhibit E

E

## Brody, David E.

| | |
|---|---|
| **From:** | Brody, David E. |
| **Sent:** | Monday, October 01, 2018 12:22 PM |
| **To:** | Talesnick, Alan |
| **Subject:** | Your VM |

Alan – Thanks for your voice mail.  It sounds like I'm waiting to hear further from you and we don't need to talk right now, but if we do please let me know.  I'll make myself available any time that you and Tony are available this week.

Dave

**David Brody**
Senior Counsel

Hogan Lovells US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202

Tel:      +1 303 899 7300
Direct:  +1 303 454 2467
Cell:     +1 303 503 5660
Email:   david.brody@hoganlovells.com
           www.hoganlovells.com

*Please consider the environment before printing this e-mail.*

# Brody Supplement Declaration

# Exhibit F

F

## Brody, David E.

| | |
|---|---|
| **From:** | Ghislaine Bruner <GBruner@Polsinelli.com> |
| **Sent:** | Friday, August 02, 2019 11:24 AM |
| **To:** | Brody, David E. |
| **Subject:** | Re: Hello |

Hi David, I'm out that week in depositions in Grand Junction. I'm pretty busy for the remainder of the month but open in September.


**Ghislaine G. Torres Bruner**
*Shareholder*

gbruner@polsinelli.com
M:303-249-6550 D:(303)583-8259
1401 Lawrence Street, Suite 2300
Denver, CO 80202
polsinelli.com




On Aug 2, 2019, at 10:13 AM, Brody, David E. <david.brody@hoganlovells.com> wrote:

<span style="background:gray">EXTERNAL EMAIL</span>


Hi Ghislaine — How about lunch during the week of August 12? What's a good day for you?

Dave

**David Brody**
Senior Counsel

Hogan Lovells US LLP
1601 Wewatta Street, Suite 900
Denver, CO 80202

Tel:     +1 303 899 7300
Direct:  +1 303 454 2467
Cell:    +1 303 503 5660
Email:   david.brody@hoganlovells.com

1

www.hoganlovells.com

*Please consider the environment before printing this e-mail.*

**From:** Ghislaine Bruner [mailto:GBruner@Polsinelli.com]
**Sent:** Friday, July 19, 2019 6:22 PM
**To:** Brody, David E.
**Subject:** Hello

Hi Dave,

I saw you talking to someone earlier here at RMMLF but when I went to look for you I couldn't find you. I hope you're doing well and maybe we can connect tomorrow morning or at some point. Thanks

**Ghislaine G. Torres Bruner**
*Shareholder*

gbruner@polsinelli.com
M:303-249-6550 D:(303)583-8259
1401 Lawrence Street, Suite 2300
Denver, CO 80202
polsinelli.com



This electronic mail message contains CONFIDENTIAL information which is (a) ATTORNEY - CLIENT PRIVILEGED COMMUNICATION, WORK PRODUCT, PROPRIETARY IN NATURE, OR OTHERWISE PROTECTED BY LAW FROM DISCLOSURE, and (b) intended only for the use of the Addressee(s) named herein. If you are not an Addressee, or the person responsible for delivering this to an Addressee, you are hereby notified that reading, copying, or distributing this message is prohibited. If you have received this electronic mail message in error, please reply to the sender and take the steps necessary to delete the message completely from your computer system.

**About Hogan Lovells**
Hogan Lovells is an international legal practice that includes Hogan Lovells US LLP and Hogan Lovells International LLP. For more information, see www.hoganlovells.com.

## Brody, David E.

| | |
|---|---|
| **From:** | Ghislaine Bruner <GBruner@Polsinelli.com> |
| **Sent:** | Thursday, December 06, 2018 9:02 AM |
| **To:** | Brody, David E. |
| **Subject:** | Re: Lunch or Coffee |

Sounds great. See you then.

**Ghislaine G. Torres Bruner**
*Shareholder*

gbruner@polsinelli.com
M:303-249-6550 D:(303)583-8259
1401 Lawrence Street, Suite 2300
Denver, CO 80202
polsinelli.com



On Dec 6, 2018, at 9:01 AM, Brody, David E. <david.brody@hoganlovells.com> wrote:

> Sounds good... How about meeting at Ocean Prime (15th and Larimer) at Noon next Thursday? I'll make a reservation.
>
> Dave
>
> On Dec 6, 2018, at 8:57 AM, Ghislaine Bruner <GBruner@Polsinelli.com> wrote:
>
>> I was still waiting for confirmation from my client as to the noon meeting I was supposed to have with them.Think we should just plan for next Thursday as I think that will work best. Let me know where you would like to get together. I am right near Larimer so maybe we get together somewhere at Larimer. If you'd like we could meet at my office first or we can meet straight at the restaurant. Let me know so I can make a reservation.
>>
>> **Ghislaine G. Torres Bruner**

1

*Shareholder*

gbruner@polsinelli.com
M:303-249-6550 D:(303)583-8259
1401 Lawrence Street, Suite 2300
Denver, CO 80202
polsinelli.com



On Dec 6, 2018, at 8:14 AM, Brody, David E. <david.brody@hoganlovells.com> wrote:

> Hi Ghislaine... I assume we're not getting together today?  If we are,
> that's fine. I'm still available.
>
> Regards,
> Dave
>
> On Dec 4, 2018, at 1:31 AM, Ghislaine Bruner
> <GBruner@Polsinelli.com> wrote:
>
>> Hi David,
>>
>> So great to hear from you. Today was very busy to the
>> point that I am now checking emails.  I might tentatively
>> have time this Thursday at noon depending what a
>> client decide on a meeting scheduled for
>> Thursday.  Otherwise,  would you be available next
>> Thursday,  December, 13 for lunch? Let me know.
>> Looking forward to getting together.
>>
>> Best regards,
>>
>> **Ghislaine G. Torres Bruner**
>> *Shareholder*
>>
>> gbruner@polsinelli.com
>> T **303.583.8259 M 303.249.6550**
>> 1401 Lawrence Street, Suite 2300
>> Denver, CO 80202
>> polsinelli.com
>>
>> *"Tier One: Nationally ranked for Commercial Litigation,*
>> *U.S.News and World Report's 2018 "Best Law Firms"*
>>
>> <image001.png>
>> Polsinelli PC, Polsinelli LLP in California

2

**From:** Brody, David E.
[mailto:david.brody@hoganlovells.com]
**Sent:** Monday, December 03, 2018 11:36 AM
**To:** Ghislaine Bruner
**Subject:** Lunch or Coffee


Hi Ghislaine – I hope you're doing well and had a good
Thanksgiving. Following up from our conversation in
October…. Please let me know any dates/times you're
available for lunch or coffee this week.


Regards,
Dave

**David Brody**
Senior Counsel

**Hogan Lovells US LLP**
1601 Wewatta Street, Suite 900
Denver, CO 80202

Tel:      +1 303 899 7300
Direct:  +1 303 454 2467
Cell:     +1 303 503 5660
Email:   david.brody@hoganlovells.com
            www.hoganlovells.com

*Please consider the environment before printing this e-mail*

**About Hogan Lovells**
Hogan Lovells is an international legal practice that includes Hogan
Lovells US LLP and Hogan Lovells International LLP. For more
information, see www.hoganlovells.com.

CONFIDENTIALITY. This email and any attachments are confidential,
except where the email states it can be disclosed; it may also be
privileged. If received in error, please do not disclose the contents to
anyone, but notify the sender by return email and delete this email
(and any attachments) from your system.

This electronic mail message contains CONFIDENTIAL
information which is (a) ATTORNEY - CLIENT
PRIVILEGED COMMUNICATION, WORK PRODUCT,
PROPRIETARY IN NATURE, OR OTHERWISE
PROTECTED BY LAW FROM DISCLOSURE, and (b)
intended only for the use of the Addressee(s) named
herein. If you are not an Addressee, or the person
responsible for delivering this to an Addressee, you are
hereby notified that reading, copying, or distributing this
message is prohibited. If you have received this

# Brody Supplement Declaration

# Exhibit G

G

 Fox Rothschild LLP
ATTORNEYS AT LAW

1225 17th Street
Suite 2200
Denver, CO 80202
Tel (303) 292-1200  Fax (303) 292-1300
www.foxrothschild.com

MICHAEL A. ROLLIN
Direct No:  303.945.7412
Email: MRollin@FoxRothschild.com

April 2, 2019

***VIA FEDERAL EXPRESS***

Marc A. Bruner
Chairman and Chief Executive Officer
Fortem Resources Inc.
909- 11th Avenue SW - Suite 1020
Calgary, Alberta T2R 0E7
Canada

***VIA EMAIL***

Marc A. Bruner
c/o Tony Lotito
ctlotito@aol.com

Marc A. Bruner
c/o Michael Caetano
mcaetano@fortemresources.com

        Re:    David E. Brody – Agreement with Marc A. Bruner

Dear Mr. Bruner:

        This firm has been retained by David Brody to represent him in connection with the
attached agreement, dated August 16, 2017 (the "Agreement"). Among other terms, the
Agreement provides for Mr. Brody ("Dave") to assign his claim (in the amount of $335,374.18,
filed in the PetroHunter Energy bankruptcy proceeding) to you in consideration for 150,000 shares
of Fortem Resources Inc. (the "Shares") and cash payments totaling $25,000. Dave fully
performed his obligations under the Agreement, while you have failed and refused to perform your

A Pennsylvania Limited Liability Partnership

California    Colorado    Delaware    District of Columbia    Florida    Georgia    Illinois    Minnesota
Nevada    New Jersey    New York    North Carolina    Pennsylvania    South Carolina    Texas    Washington

Active\93007092.v1-4/2/19



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Marc A. Bruner
April 2, 2019
Page 2

obligations, resulting in your material breach of the Agreement.  I'm attaching a copy of the Agreement (including a more legible page 2), and of the Transfer of Dave's Claim to you, filed in the U.S. Bankruptcy Court on August 22, 2017, and signed by you.

Dave has described the long friendship and positive business relationship between the two of you going back to 2004.  He has also advised me that you advised Dave on numerous occasions that you would perform under the Agreement.  (Messrs. Lotito and Caetano also told Dave that you would perform as agreed, and they are copied to ensure that you get this letter in light of Dave's difficulty reaching you.)  Dave believed you, he has been extremely patient, and doesn't understand the reason for the delay or your failure to communicate with him over the last several months about the Agreement.  Dave now has no choice except to take whatever legal action is available to him.

It is Dave's understanding from various third parties that you are planning on contributing $15 million worth of your Fortem stock to Beetaloo Basin Partners, and you're liquidating or otherwise using your Fortem shares for other purposes.  In response to this information, Dave has instructed this firm to take whatever action is necessary to enjoin the diversion of the Fortem shares that you control, including filing a related law suit in Switzerland if necessary, until you have fully performed your obligations under the Agreement.

This matter would be extremely easy to resolve if you would simply deliver $25,000 and a certificate for 150,000 freely-tradable Fortem shares in Dave's name.  I therefore request that no later than close of business, this Friday, April 5, 2019, you: (1) deliver a cashier's check in the amount of $25,000 to my office (at my attention); and (2) email to me written confirmation that you will make the agreed upon transfer of Fortem shares no later than close of business on April 19, 2019.  If I don't receive the cashier's check and written confirmation on April 5 or the certificate for Fortem shares by April 19, Dave has instructed this firm to file a law suit against you for material breach of the Agreement, and proceed with the above-mentioned injunction.

Please note that venue is in Denver under the Agreement, and that the Agreement specifically provides for the prevailing party to be awarded attorneys' fees (which are now being incurred by Dave) and costs from the losing party.  Therefore, all attorneys' fees which Dave has incurred and continues to incur in this matter, including the legal expenses related to the injunction in Switzerland, will be included as part of the damages.



Marc A. Bruner
April 2, 2019
Page 3

Very truly yours,

Michael A. Rollin

Enclosures

# Brody Supplement Declaration

# Exhibit H

H

## Brody, David E.

| | |
|---|---|
| **From:** | PI website feedback <support@pifinancialcorp.com> |
| **Sent:** | Saturday, April 20, 2019 8:14 PM |
| **To:** | Brody, David E. |
| **Subject:** | Copy of message sent from PI website to Paul Manson |

Message Subject: Marc Bruner

Hi Paul -- Im an attorney with Hogan Lovells in Denver, and Im contacting you at Marc Bruners request. He wants to transfer 150,000 shares of his Fortem Resources shares to me pursuant to an agreement between us, and he suggested that the best way to facilitate that transfer would be for me to open an account at PI Financial. Ill call you early this coming week to discuss this. In the meantime, if you want to contact me, I provided my email address above, and my phone numbers are (303) 503-5660 and (303) 454-2467.

Thanks

# Brody Supplement Declaration

# Exhibit I

## Brody, David E.

| | |
|---|---|
| **From:** | Ctlotito <ctlotito@aol.com> |
| **Sent:** | Monday, May 25, 2020 10:46 PM |
| **To:** | Brody, David E. |
| **Cc:** | ctlotito@aol.com |
| **Subject:** | COPIES OF TRUSTEE'S MOTIONS AND EXHIBIT A |
| **Attachments:** | PETROHUNTER MOTION TO DISBURSE FUNDS TO CREDITORS.pdf |

Dave

I have placed calls to Marc and have not heard from him

You mentioned to me that you wanted to talk to him regarding his purchase and Agreement of your Bankruptcy Claims?

In the interim how can I help ? Please call me if I can be of further assistance.

Tony

1

# Brody Supplement Declaration

# Exhibit J

J

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

In re:                                              )
                                                    )
PETROHUNTER ENERGY CORPORATION      )      Case No. 16-20197 KHT
EIN: XX-XXX1245                                     )      Chapter 7
                                                    )
Debtor.                                             )

## NOTICE PURSUANT TO L.B.R. 9013 OF THE MOTION FOR AUTHORITY TO PAY INTERIM DISTRIBUTION AND INTERIM TRUSTEE FEE

### OBJECTION DEADLINE: JUNE 10, 2020

**YOU ARE HEREBY NOTIFIED** that the Chapter 7 Trustee, Jeffrey L. Hill, has filed a **MOTION FOR AUTHORITY TO PAY INTERIM DISTRIBUTION AND INTERIM TRUSTEE FEE** with the Bankruptcy Court and requests the following relief: the Trustee is requesting that the Court enter an Order authorizing the Trustee to make interim distribution payments to creditors and to authorize payment of an interim trustee fee of $139,219.00.

If you oppose the motion or object to the requested relief, your objection and request for hearing must be filed on or before the objection deadline stated above, served on the movant at the address indicated below, and must state clearly all objections and any legal basis for the objections. The Court will not consider general objections.

In the absence of a timely, substantiated objection and request for hearing by an interested party, the court may approve or grant the requested relief without any further notice to creditors or other interested parties.

DATED: May 20, 2020

Respectfully Submitted,

WEINMAN & ASSOCIATES, P.C.

By: /s/ Jeffrey A. Weinman
    Jeffrey A. Weinman, #7605
    730 17th Street, Suite 240
    Denver, CO 80202-3506
    Telephone: (303) 572-1010
    Facsimile: (303) 572-1011
    jweinman@weinmanpc.com

Brody Supplement Declaration

Exhibit K

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

In re:                                          )
                                                )
PETROHUNTER ENERGY CORPORATION                  )     Case No. 16-20197 KHT
EIN: XX-XXX1245                                 )     Chapter 7
                                                )
Debtor.                                         )

## MOTION FOR AUTHORITY TO PAY INTERIM DISTRIBUTION AND INTERIM TRUSTEE FEE

Chapter 7 Trustee, Jeffrey L. Hill ("Trustee"), through his counsel, Weinman & Associates, P.C., moves the Court for an order authorizing Trustee to make interim distributions to creditors and to pay interim trustee fee as more fully described below. In support of his motion, Trustee states as follows:

1. PetroHunter Energy Corporation ("Debtor") filed its voluntary Chapter 7 Petition on October 17, 2016.

2. Jeffrey L. Hill is the duly appointed and acting Chapter 7 Trustee of the Debtor's bankruptcy estate.

3. Since his appointment, the Trustee has been investigating the assets of the Estate, pursuing their collection, and reducing them to cash.

4. In particular, through the sale of the Estate's interest in its Australian subsidiary, Sweetpea Petroleum PTY, Ltd. (the "Sweetpea Sale"), Debtor acquired approximately 56,382,000 shares of stock in Falcon Oil & Gas, Ltd. ("FO"), a public company traded on the Toronto Stock Exchange, and approximately $6,000,000 in cash, representing the proceeds from the sale of FO stock which had been sold prior to the sale of the Sweetpea interest.

5. The Estate still holds 55,950,500 shares of FO stock which it continues to liquidate prudently and systematically so as not to destroy the stock's market value in the process of selling such a large number of shares.

6. While the Trustee has consummated and explored some bulk private sales, none has materialized, nor is it anticipated that any will, sufficient to take the remaining shares held by the Estate at a reasonable price.

7. Indeed, the Trustee anticipates that it will be another 4-5 years before all of the FO shares can be sold at market prices without requiring a significant discount.

8.      The Estate must also dispose of its Overriding Royalty Interests ("ORRI") which were acquired in connection with the Sweetpea Sale. This disposition could take many years as exploration in the gas fields to which the ORRI's relate continues and until production begins to generate royalties. While monetizing the ORRIs may take a long time, the Trustee reasonably believes that the reward for creditors may be quite significant. The gas fields in question are touted to be the largest ever found on earth.

9.      While most of the litigation the Estate has pursued or anticipated has been resolved, some claims objections are still under consideration and subject to further investigation. Nevertheless, the Trustee has, to date, been successful in reducing the claims against the Estate by nearly one-half, and has obtained orders disallowing approximately $40,000,000 in claims.

10.     Accordingly, given the anticipated remaining period of time required to fully liquidate the remaining Estate assets, as well as his desire to make distributions to creditors, the Trustee believes that it is appropriate to distribute $4,000,000 at this time and requests Court approval to do so. Indeed, in the near future, the Trustee will have to pay a fee for the retention fo these funds imposed by the Estate's software and banking provider and, therefore, distribution will save the Estate and creditors money.

11.     A listing of the distributees, including interim compensation to the Trustee, is attached as Exhibit A.

12.     Any claims to which an objection has been filed and is still pending at the time of the distribution, will not be paid until resolved, however, the *pro rata* portion of that claimant's distribution will be calculated and withheld until a Final Court Order is entered.

13.     In addition, Trustee requests that in connection with the distribution to creditors, Trustee receive an interim fee of $139,219. To date, Trustee has distributed for administrative and other approved expenses a total of $1,113,701, and if this motion is granted, he will distribute another $4 million. Pursuant to 11 U.S.C. §326, the Trustee's compensation is calculated to be $176,661. The Trustee has already applied for and received compensation in the amount of $37,783. Accordingly, pursuant to 11 U.S.C. §331, Trustee requests interim compensation in the amount of $139,219.

14.     The Trustee alleges that this Court has the inherent authority including that available pursuant to 11 U.S.C. §105, to authorize such distribution and that it is in the best interest of creditors and the Estate.

2

WHEREFORE, for the reasons as set forth above, the Chapter 7 Trustee respectfully requests that the Court enter an Order authorizing the allowance and payment of an interim distribution to creditors and the Trustee, and for such other and further relief as this Court deems appropriate.

DATED: May 20, 2020

Respectfully Submitted,

WEINMAN & ASSOCIATES, P.C.

By: /s/ Jeffrey A. Weinman
Jeffrey A. Weinman, #7605
730 17th Street, Suite 240
Denver, CO 80202-3506
Telephone: (303) 572-1010
Facsimile: (303) 572-1011
jweinman@weinmanpc.com

## 9013-1 CERTIFICATE OF SERVICE OF MOTION, NOTICE AND PROPOSED ORDER

The undersigned certifies that on May 20, 2020, I served by CM/ECF the foregoing **MOTION FOR AUTHORITY TO PAY INTERIM DISTRIBUTION AND INTERIM TRUSTEE FEE**, notice and proposed order on all parties that receive service in this case using the e-mail addresses on file with the Court as obtained from the parties-in-interest's Notices of Entry of Appearance and on all parties against whom relief is sought and those otherwise entitled to service pursuant to the FED.R.BANKR.P. and these L.B.R. to the following:

U.S. Trustee
1961 Stout St.
Suite 12-200
Denver, CO 80294

Jeffrey Hill, Esq.
Chapter 7 Trustee
P.O. Box 1720
Parker, CO 80134

PetroHunter Energy Corporation
910 16th Street
Suite 208
Denver, CO 80202-2931

Alice A. White, Esq.
1801 Broadway
Suite 900
Denver, CO 80202

Barry Meinster, Esq.
Meinster & Associates, PC
PO Box 681
Conifer, CO 80433

Glenn W. Merrick, Esq.
G.W. Merrick & Associates, LLC
6300 S. Syracuse Way, Ste. 220
Centennial, CO 80111

Patrick D. Vellone, Esq.
Lance Henry, Esq.
James S. Helfrich, Esq.
Allen & Vellone, P.C.
1600 Stout Street, Suite 1100
Denver, CO 80202-3131

Timothy S. Bolding
President
CCES Piceance Partners I, LLC
6400 ECR 109
Midland, TX 79706

Matthew D. Skeen, Jr., Esq.
Skeen & Skeen, P.C.
217 E. 17th Ave.
Denver, CO 80203

John J. Kane, Esq.
Kane Russell Coleman Logan PC
1601 Elm Street
3700 Thanksgiving Tower
Dallas, TX 75201

Matthew R. Silverman
621 17th Street
Suite 2300
Denver, CO 80293

Charles S. Kelley, Esq.
Mayer Brown LLP
700 Louisiana St., Ste. 3400
Houston, TX 77002

Tyler R. Ferguson, Esq.
Mayer Brown LLP
71 South Wacker Drive
Chicago, IL 60606

William P. Rossini, Esq.
Rossini Law Firm
6440 N. Central Expressway
770 Turley Law Center
Dallas, TX 75206

/s/ Lisa R. Kraai

4

| Claim No. | Claimant | amount of c Claim | Proposed Distribution | Note | |
|---|---|---|---|---|---|
| | 1 T S Capital | $1,815.00 | $184.81 | (general uns. Claim   ) | |
| | 2 Matt Silverman | $218,150.00 | $22,213.18 | (general uns. Claim   ) | |
| 2A | Matt Silverman | $12,850.00 | $4,639.07 | (net priority wage claim) | |
| | 3 Rio Blanco County | $15,260.10 | $15,260.10 | (priority tax claim) | |
| | 4 Westex Drilling CO. | $448,041.67 | $45,621.95 | general uns. Claim | |
| | 5 I.R.S. | $3,364.20 | $342.56 | general uns. Claim | |
| | 6 Argo Partners | $377,520.45 | $38,441.11 | general uns. Claim | |
| | 7 Marc Bruner | $335,374.18 | $34,149.56 | general uns. Claim | Held in reserve pending challenge to claim) |
| | 8 Carmen Lotito | $248,750.00 | $25,329.04 | general uns. Claim | |
| | 9 Bruner Family Trust | $4,158,963.82 | $423,487.53 | general uns. Claim | Held in reserve pending challenge to claim) |
| | 10 Bruner Family Trust | $25,000.00 | $2,545.63 | general uns. Claim | Held in reserve pending challenge to claim) |
| | 11 Bruner Family Trust | $2,385,184.00 | $242,871.96 | general uns. Claim | Held in reserve pending challenge to claim) |
| | 12 Bruner Family Trust | $12,000,000 | $12,219.03 | general uns. Claim | Held in reserve pending challenge to claim) |
| | 13 Bruner Family Trust | $100,000.00 | $10,182.52 | general uns. Claim | Held in reserve pending challenge to claim) |
| | 14 Bruner Family Trust | $100,000.00 | $10,182.52 | general uns. Claim | Held in reserve pending challenge to claim) |
| | 15 Bruner Family Trust | $100,000.00 | $10,182.52 | general uns. Claim | Held in reserve pending challenge to claim) |
| | 16 JTE Finanz AG | $3,593,558.34 | $365,914.97 | general uns. Claim | Held in reserve pending challenge to claim) |
| | 17 Shook,Hardy Bacon | $2,330.82 | $237.37 | general uns. Claim | |
| | 18 Renn Capital Group | $783,326.00 | $79,762.37 | general uns. Claim | |
| | 19 Renn Fund | $1,562,130.00 | $159,064.28 | general uns. Claim | |
| | 20 RENN Universal Growth | $3,915,108.00 | $398,656.85 | general uns. Claim | |
| | 21 Global Project Finance AG-claim disallowed by Order of the Court | | | | |
| | 22 CR Innovations | $345,181.00 | $35,148.14 | general uns. Claim | |
| | 23 Martin Oring -See Amended Claim below) | | | | |
| | 24 Wealth Preservation | $387,777.00 | $39,485.49 | general uns. Claim | |
| | 25 Environmental Solutions-Claim late filed so not paid at this time) | | | | |
| | 26 Context TCM Tactical | $17,505,368.45 | $1,782,487.70 | general uns. Claim | *held in reserve to await documentation as to validity, and timeliness of the claim |
| | 27 Mr. Martin Oring | $799,907.00 | $81,450.73 | general uns. Claim | |
| 27A | Oring, Martin | $12,850.00 | $4,639.07 | net priority wage claim | |

Totals                                        $3,820,163.26  Effective pro rata rate: 0.1101182525)

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

In re:                                              )
                                                    )
PETROHUNTER ENERGY CORPORATION    )    Case No. 16-20197 KHT
EIN: XX-XXX1245                              )    Chapter 7
                                                    )
Debtor.                                          )

---

## ORDER AUTHORIZING PAYMENT OF INTERIM DISTRIBUTION AND INTERIM TRUSTEE FEE

---

THIS MATTER, having come before the Court on the Chapter 7 Trustee's Motion to make interim distributions to creditors and to pay interim trustee fee ("Motion"); the Court having reviewed the Trustee's Motion and its file with respect to this matter; notice of the Application having been given pursuant to the requirements of Rule 9013 L.R.B.P. and no party in interest having objected thereto, or the Court having received an objection to the Application and having convened a hearing on this matter and having made findings of facts and conclusions of law; and the Court deeming itself sufficiently advised in the premises;

HEREBY FINDS that cause exists for granting the Trustee's Motion.

THEREFORE, THE COURT ORDERS:

1.    The Chapter 7 Trustee's Motion is granted.

2.    The Chapter 7 Trustee is hereby authorized to pay an interim distribution to creditors as listed on the list of distributees attached to the Trustee's Motion as Exhibit A.

3.    The Chapter 7 Trustee is hereby authorized an interim fee in the amount of $139,219.00.

DATED:_____

BY THE COURT:


_____
U.S. Bankruptcy Judge