# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01091
DAVID E. BRODY,

    Plaintiff,

v.

MARC A. BRUNER,
THE BRUNER FAMILY TRUST, and
MARC E. BRUNER, AS TRUSTEE OF THE BRUNER FAMILY TRUST

    Defendants.

---

### SUPPLEMENTAL DECLARATION OF DAVID E. BRODY

---

I, David E. Brody, am the plaintiff in the above-entitled action and the rightful holder of Claim No. 7, in the amount of $335,374.18, (the "Brody Claim") in *In re PetroHunter Energy Corporation*, United States Bankruptcy Court for the District of Colorado, Case No. 16-20197-KHT (the "Bankruptcy Case"). This Supplemental Declaration is in addition to my original Declaration, and is directly responsive to the Defendants' Responses to my Motion for Constructive Trust or, in the Alternative, for Prejudgment Attachment (collectively, the "Responses" or individually as applicable, the "BFT Response" or "MAB Response"). I have personal knowledge of the matters set forth herein through my own experiences and observations. If called to testify, I would testify competently thereto.

### CONTENTS:

A. **Further background on my business relationship with Marc A. Bruner and on the August 16, 2017 Agreement (the "Agreement")**

B. **Background on the Bruner Family Trust**

C. **Defendants and their counsel are attempting to commit a fraud on this court.**

D. **I didn't delay.**

E. **It will be impossible for me to collect any judgment from Defendants without a constructive trust or prejudgment attachment on at least $1,000,000.**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

1

### A. Further background on my business relationship with Marc A. Bruner and on the August 16, 2017 Agreement (the "Agreement")

1. Based on my 16 years representing Marc A. Bruner's ("Marc" or "Bruner") oil and gas companies, Marc is a very intelligent, highly creative individual with exceptional knowledge of all aspects of the oil and gas industry, including geology, engineering, and operations. He is a highly sophisticated businessman with substantial expertise in complex financing, oil and gas companies and complex oil and gas drilling and development projects. He's very likeable, a highly traveled "global citizen", and has in-depth knowledge of world affairs, as well as being a food and wine connoisseur, a student of history, and an opera singer.

2. I played an important role for his companies as his primary legal advisor from 2004 through 2009, including in my positions from 2007-2009 as General Counsel of Falcon Oil & Gas Ltd. ("Falcon") and as Vice President and General Counsel of PetroHunter Energy Corporation (PetroHunter"). During those three years, I remained a partner with the firm of Patton Boggs LLP, but took a leave of absence. From 2005 to 2009, Marc raised over $400 million and led Falcon's major oil and gas drilling and development project on licenses in Hungary that were acquired under contracts I drafted and helped negotiate. Patton Boggs formed PetroHunter for Marc in 2005 and represented the company in its acquisitions of the licenses in Australia during those years. From 2005-2009, Marc also led PetroHunter's major oil and gas exploration project in the Northern Territory of Australia.

3. During our professional relationship, Marc and I were friends and had mutual respect for each other. Until this matter arose, I trusted and believed him. I respected his talents and loyalty to me, and I believe he respected my dedication to the success of his companies and projects and the fact I was available 24/7 to respond to his legal and business issues that arose daily during that period when we were involved in a continuous series of large transactions, and that I had a large and talented team of attorneys available for Marc at Patton Boggs to address the various aspects of his companies' businesses.

4. As mentioned in my original Declaration, I attended meetings at his residences in Vancouver and Zurich during the period I represented him. However, I do not know whether he still owns those properties, and I do not know where his other assets are located. As far as I'm aware, in recent years Marc divested all assets he owned in the U.S.

### B. Background on the Bruner Family Trust

5. Patton Boggs represented Marc in the formation of the Bruner Family Trust. That work was done in Patton Boggs' Northern Virginia office and I was not involved in any respect in the formation, operation, or decisions made by the BFT. I had no direct knowledge of the amount or nature of BFT assets, except Marc told me many years ago that the BFT held shares of Falcon.

2

In my capacity as Vice President and General Counsel of PetroHunter, I signed some of the promissory notes made to BFT (as lender) to PetroHunter (as borrower).

6. When I reviewed public SEC records after filing this action, I became aware of the $16 million which BFT loaned to Galaxy Energy when Marc and his son Marc E. Bruner (trustee of BFT) controlled Galaxy, and the total amount of loans that BFT made to PetroHunter which formed the basis for the BFT Claims in the Bankruptcy Case.

7. In July 2017, Marc asked me if I would be willing to assign my Claim to him in the Bankruptcy Case so he could "consolidate" my claim with the claims of the Bruner Family Trust. I later came to understand that Marc A. used my Claim to gain standing personally in the Bankruptcy Case and for conspiring with the BFT to steal and appropriate my Claim and pursue the Bruner/BFT Strategies which are described in my original Declaration and which are the subject of the PetroHunter Trustee's September 2018 Response in the Bankruptcy Case. To my knowledge, Marc E did not participate in the Bankruptcy Case proceedings, and he acquiesced or actively joined in Marc A's appropriation and use of my Claim in the Bankruptcy Case to further the joint Bruner/BFT Strategies.

8. In late 2017, I referred Marc A. to Glenn Merrick to represent Marc A. and the BFT in the Bankruptcy Case. Based on several conversations that I've had with Mr. Merrick, he has dealt exclusively with Marc A. Bruner, not Marc E. Bruner, during the ongoing representation of both Marc A. and the BFT, even though Marc E. is the trustee for the BFT. I note that Marc E's Affidavit fails to counter or dispute any of the following, which are true to the best of my knowledge:

(a) Marc A hired his long-time personal attorney, Barry Meinster, to file the BFT Claims in 2016.

(b) Marc E., the BFT trustee, didn't work with Mr. Meinster in 2016 and has not worked with Mr. Merrick in pursuing the Bruner/BFT Strategies since 2017 when Marc A. hired Mr. Merrick to represent the BFT.

(c) Marc E. has not personally participated in any other Bankruptcy Case filings or motions in the Bankruptcy Case.

(d) All matters pertaining to the Bruner Family Trust, including correspondence between the Trustee in the Bankruptcy Case and BFT have been directed to Marc A. Bruner's counsel Glenn Merrick, not to Marc E. Bruner, and have been addressed and handled by Marc A. Bruner and Mr. Merrick, not by Marc E. Bruner.

(e) Mr. Merrick invoiced Marc A. Bruner or one of his companies, not the BFT, for the legal services provided to the BFT beginning in late 2017.

(f) Marc A. Bruner has had de facto control of the BFT beginning with the filing of the BFT Claims in 2016, even though Marc A was not a party or claimant in the Bankruptcy Case until I assigned my claim to him in August 2017.

3

        (g) Marc A's control of the BFT continued at all times during the pendency of the Bankruptcy Case despite Marc E. serving as Trustee.

        (h) Funds received by the BFT in the first interim distribution by the Trustee in the Bankruptcy Case, and funds received in subsequent distributions for the BFT beneficiaries are likely to be controlled by Marc A. (similar to the $20 million of BFT assets previously controlled by Marc A.).

        (i) Such funds could be transferred to an offshore bank account, or otherwise used or distributed in Marc A's discretion, despite BFT's "domestic bank accounts" and BFT's "plans to retain those funds for its beneficiaries".

My claim of civil conspiracy between Marc A. and the BFT is based on facts which occurred around the time Marc A. proposed the Agreement to me or thereafter, not when the BFT Claims were filed. The civil conspiracy arose around the same time as Marc and I signed the Agreement.

        9.    Based on the foregoing, I believe that upon fraudulently obtaining my Claim through the Agreement, Marc A caused the BFT to conspire with him, and that Marc A will control the distribution of funds by the Trustee in Bankruptcy to the BFT.

        10.    In July 2017, Hogan Lovells resumed representation of two of Marc's companies, Nation Energy Inc. and Fortem Resources Inc. ("Fortem"). Marc was and still is Chairman and CEO of Fortem. One of my considerations in accepting Marc's offer to purchase my Claim and assign it to him was that I did not want to create an appearance of any conflict between me and the Bruner Family Trust claims as competing creditors in the PetroHunter Bankruptcy Case while I was representing his companies. In addition, the terms that Marc and I discussed and to which we ultimately agreed were fair.

        11.    After negotiating the Agreement with Marc and after I made the appropriate disclosures to Hogan Lovells, Marc and I entered into the August 2017 Agreement. I also entered into that Agreement in the context of the long history of the business relationship between us and based on my assumption I could believe Marc and trust him to perform under the Agreement.

        12.    That assumption proved incorrect.

## C. Defendants and their counsel are attempting to commit a fraud on this Court.

        13.    The basic facts of this case are very straightforward. Marc materially breached the August 16, 2017 agreement (the "Agreement") by failing and refusing to make the cash payments and deliver the Fortem stock that he owes me. I've also made several other claims directly related to this transaction. Defendants and their counsel have deliberately misled this Court and the Bankruptcy Court about the terms of the Agreement.

4

I recognize the seriousness of this accusation, but the truth could not be more clear. In three separate pleadings filed by Defendants' counsel in this court and in the bankruptcy court on August 5, 11, and 18, 2020, they omitted the first sentence of Section 1(b) of the Agreement in an attempt to support an absurd legal argument that I completely waived my right to bring a breach of contract claim against Marc A. Bruner.

Section 1(b) of the Agreement, in its entirety, states as follows:

> **(b) In the event the First Payment and the Second Payment are made by the due date, Brody shall promptly return to Bruner 25,000 Shares represented by the Stock Power attached hereto.** If the First Payment and/or the Second Payment are not paid in full or in a timely manner, Brody may elect either to retain all 150,000 Shares or to extend the due date for one or both cash payments that are due under Section 1(a). If one or both cash payments are not made, Brody waives the right to make a claim against Bruner for breach of this Agreement. The provisions of Section 1(a) shall apply equally to all 150,000 Shares.

14. In the three separate pleadings listed below – which are the only times so far in this case and in the Bankruptcy Case that Defendants quoted any part of Section 1(b) – they deliberately omitted the first sentence (in bold above), and did not include any indication to the reader, even in a footnote, that they omitted the sentence or explained the reason they did so:

- Creditor Marc A. Bruner's Response to David E. Brody's Limited Objection to Motion for Authority to Pay Interim Distribution, dated August 5, 2020 (PetroHunter Bankruptcy Case, paragraph 4, page 2) ("MAB Response to Objection"), attached hereto as **Exhibit A**.
- Bruner Family Trust's Response to Brody's Motion for Constructive Trust or, in the Alternative, for Prejudgment Attachment, dated August 11, 2020 (in this action) (the "BFT Response"), paragraph 4.a.iii, page 8.
- Marc A. Bruner's Response to Brody's Motion for Constructive Trust or, in the Alternative, for Prejudgment Attachment, dated August 18, 2020, (in this action) (the "MAB Response"), Factual Background, page 3.

15. *Unethical conduct:* Why did Defendants consistently omit the first sentence of Section 1(b) of the August 2017 Agreement in all three filings? The answer is that the first sentence got in the way of their false legal argument that *"Brody expressly and unequivocally waived his breach of contract claim pursuant to the Agreement."* (MAB Response at 9) Since they have no other strategy to defend against Marc's blatant material breach of the Agreement, Defendants apparently thought they might be able to pursue a legal argument about Section 1(b) **without the first sentence (the "Fraudulent Omission").** So they decided to try to fool this court and the court in the Bankruptcy Case. In other words, they're trying to cheat to win.

5

16. *The Payment Choices:* Section 1(b) of the Agreement is very simple to understand. The reason it's in the Agreement in the first place is because Marc asked me to include it. He wasn't sure when he would be able to come up with the cash payments, so he asked me to give him an unusually long time to make the two $12,500 payments (30 and 60 days) and to give him two choices under the Agreement (collectively, the "Payment Choices"):

(a) Pay me $25,000 (within 60 days after we signed the Agreement) and I'll return 25,000 shares to him. That is, I'll retain 125,000 shares out of the 150,000 shares of Fortem Stock that he was supposed to deliver to me ten days after the date of the Agreement; or

(b) Don't pay me any cash and I'll retain all 150,000 shares of Fortem Stock.

Under those choices, Marc had the right to make the $25,000 payment and receive 25,000 Fortem Shares back from me when he did so. Those 25,000 shares were worth $60,000 at the time of the Agreement. Thus, it would have been valuable for Marc if he had paid me the $25,000 (Payment Choice (a)). Choice (b) was also an important accommodation I made to Marc upon his request, since it gave him a break on coming up with any of the $25,000 in cash. This is referenced in my August 15, 2017 email to Marc (**Exhibit B**).

Section 1(b) in its entirety (that is, including the first sentence) accurately reflects my efforts to accommodate Marc's request for the Payment Choices, that is, to accommodate a friend and business colleague after a successful business relationship and friendship between us, which at that time had continued for over 13 years. He asked for the Payment Choices and he asked for the extended period to make the cash payments. I agreed that if he missed the due dates for either or both cash payments, I would not use that reason alone to file an action against him because I would have received valuable consideration in the form of all 150,000 Fortem Shares (worth over $300,000 at the time), including the 25,000 shares that were "freely-tradable" and worth $60,000 at the time of the Agreement.

I did not *"unequivocally waive my breach of contract claim"*, as Defendants allege, in the event Marc failed to deliver the Fortem Shares. That is an unfounded statement, as shown by the first sentence of Section 1(b) and by simply reading several other provisions of the Agreement, including Sections 1(a), 3(e), and 3(f). The waiver allegation is also disproven by the facts in Section D, below.

17. *The Sequence of the consideration:* Note that both cash payments ($12,500 each) were due 30 and 60 days after the date of the Agreement, while the Fortem Shares were supposed to be delivered to me within ten days after the date of the Agreement. This is clearly stated in Section 1(a) of the Agreement. The first sentence of Section 1(b) assumes that I would be in possession of the Fortem Shares if and when Marc paid the cash and I would have had the ability to transfer the 25,000 shares back to him. The omitted first sentence states: "…Brody shall promptly return to Bruner 25,000 Shares….". But the Payment Choices and my own right to extend the due date for

6

the cash payments (as provided in the second sentence of Section 1(b) of the Agreement) <u>never arose because I didn't receive any of the Fortem Shares and still have not received any</u>.

18.  *Marc A. Bruner's Efforts to Deceive the Court:*  In the MAB Response, he summarizes Section 1(a) of the Agreement, and then *inexplicably skips over the first sentence of Section 1(b)* before he goes on to quote the remainder of Section 1(b) (pages 2-3 of MAB Response). Relying solely on the waiver sentence in Section 1(b), on page 7 of the MAB Response it states that I have "dim prospects ... to prevail on any [of my claims]." Page 9 of that Response refers to "crucial language" and further quotes Section 1(b) only in part – *still omitting any reference to the Payment Choices or to the 25,000 Fortem Shares, as provided in the missing first sentence*. Marc's counsel proceeds to use the misleading and partial quotes as the basis for their legal "analysis" that I waived my breach of contract claim.

19.  *Fraudulent Omission and "express terms":* On page 13 of the MAB Response, he argues that I'm not likely to succeed on the merits, stating as follows:

> the Agreement… contains a waiver of his claims against MAB in the event of non-payment…. [G]ranting the injunction would enforce the Agreement against its <u>express terms</u>…" (emphasis added)

In the above portion of the MAB Response, he uses the Fraudulent Omission as the basis to describe the rest of Section 1(b) as the Agreement's "express terms", purporting to cite authority.

**That is, Defendants are asking this court first to ignore the Fraudulent Omission and then to recognize a legal argument that could not be made but for the Fraudulent Omission.**

20.  *Poor cut and paste job:* In the BFT Response, a "cut and paste" version of Section 1(b) of the Agreement is shown on page 8 of the Response. But Mr. Meyer, or whoever used scissors to cut out the first sentence for him, for Marc E. and the BFT, left a tiny unreadable "slice" of the missing sentence along the bottom of the words, and they left the last word of the first sentence: "hereto". (See page 8 of the BFT Response filed in this Court on August 11, 2020.)

21.  *Legal and ethical standards regarding false statements of law and fact and material omissions:* The first sentence of Section 1(b) of the Agreement states: **In the event the First Payment and the Second Payment are made by the due date, Brody shall promptly return to Bruner 25,000 Shares represented by the Stock Power attached hereto.**

If they had included the first sentence in their quotes and discussions of Section 1(b), Defendants' counsel could not possibly have made the legal argument that I waived my breach of contract claim against Marc. That legal argument is a false statement of law because it's based on a false statement of fact.

7

A material omission is no different than an affirmative misrepresentation and often leads to civil and criminal penalties. As an attorney with over 46 years of experience practicing law and membership in the Colorado bar, I find the Fraudulent Omission to be unethical, outrageous, and worthy of sanctions.

> A lawyer shall not knowingly ... offer evidence that the lawyer knows to be false. RPC 3.3(a)(3).

The Comment on this rule states:

> This Rule governs the conduct of a lawyer who is representing a client in the proceedings of a tribunal....[T]he lawyer must not allow the tribunal to be misled by false statements of law or fact or evidence that the lawyer knows to be false....There are circumstances where **failure to make a disclosure is the equivalent of an affirmative misrepresentation**....Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal....Paragraph (a)(3) requires that the lawyer refuse to offer evidence that the lawyer knows to be false, regardless of the client's wishes. This duty is premised on **the lawyer's obligation as an officer of the court to prevent the trier of fact from being misled by false evidence**. (emphasis added)

If the Defendants counsel's attempt to cheat pertained to a tangential issue in this case, or if there was some credible argument that I waived my right to sue Marc for breach of contract, I might not have raised it. However, their material omission was aimed directly at the most important factual and legal issue in this case, namely, whether I could sue Marc A. Bruner for breach of contract for his failure to deliver 150,000 shares of Fortem stock. There is not any credible argument that I didn't have that right, and that's exactly why they committed the Fraudulent Omission.

My final comment on this disturbing subject is that the Fraudulent Omission is not equivalent to making a creative legal argument to the court, or taking an aggressive approach for a client, or being zealous in defending your client, all of which I fully expect and support. It's qualitatively different. **This is a matter of purposely deleting a material term in the most important document in this case, falsely presenting that altered document to the court and acting as if the material term does not exist or doesn't matter, and making a false and deceptive legal argument based solely on the materially altered section.**

### D. I didn't delay.

22. In the Responses, Defendants state I should not be granted the relief requested because they claim I delayed taking action in this case. It's true that I waited to file the Complaint in this action and initially did not aggressive pursue it. However, that was because each time Marc (and his associates) stated to me that he planned on performing his obligations under the

8

Case 1:19-cv-01091-RM-NRN Document 46-1 Filed 07/01/20 USDC Colorado Page 10 of 17
Case No. 1:19-cv-01091-RM-NRN Document 48-1 Filed 07/01/20 USDC Colorado Page 10 of 57
pg 10 of 17

Agreement, I believed Marc and the others. Marc repeatedly told me he would perform and he took certain steps that appeared to be in good faith. Marc's representations turned out to be false, and the steps turned out to be made deceptively and in bad faith. The following are examples and specific evidence of Marc's misleading statements and actions, as well as my efforts to settle this matter amicably and avoid the substantial time and legal fees all parties are now incurring:

- **August 2017 (Jorge)** – Marc was Chairman and CEO of Fortem Resources Inc. when we entered into the Agreement. Before and after we signed the Agreement (August 16, 2017), Marc said he would connect me with a person named "Jorge" who would arrange for the "freely-tradable" Fortem Shares to be assigned to me by the entity called "Squin Switzerland" which Marc asked me to identify in the Agreement as the entity holding those shares. However, Marc never made that introduction. Instead, he advised me that he would have to travel to Switzerland in person to work with Jorge and obtain the shares.

- **February 9, 2018 (Michael Caetano)** – Another senior executive at Fortem, Michael Caetano ("Caetano"), was familiar with the Agreement. From August 2017 to February 2018, I reached out to Caetano several times to assist me with Marc's delivery of the Fortem shares, including in a text to Caetano on February 9, 2018. "Please help me with the Fortem shares," I said. Mike responded: *"I'll call Jorge to see what's going on with the Certificate. The plans are for Marc and I to be in Europe next week...Fortem shares – will do."*

- **March 29, 2018 (Tony Lotito)** – Caetano continued to confirm the information I was receiving from Marc when Caetano told me that Marc had scheduled another trip to Switzerland and that Marc would bring the Fortem Shares certificate back with him. I was further encouraged that Marc planned to deliver the Fortem Shares when Tony Lotito, Marc's business associate and closest friend (who I had also known and worked with since 2004) sent me a text with Marc's travel itinerary on March 29, 2018, which confirmed that Marc was in Switzerland (see **Exhibit C**). But Marc's excuses and delays on delivering the share certificate continued.

- **June 2018 ("I promise I'll pay you...")** -- The communication between me and Marc dropped off significantly when Hogan Lovells terminated representation of Marc's oil and gas companies in May 2018. Marc continued to assure me that he would be making more trips to Switzerland and deliver the shares. In the third quarter of 2018, I reminded Marc several times of his obligations under the Agreement and continued to demand the Fortem Shares. He continued to tell me he would deliver them. In September 2018, I told him I would soon have no choice except to retain counsel and file a law suit and I suggested that he do the same. Each time, Marc assured me he would perform ("I will pay you. I promise I'll pay you and assign the shares..."), and he asked me to please defer any legal action.

- **September 4, 2018 (Barry Meinster)** – Mr. Meinster had represented Marc on several personal matters and I asked him if he was aware of the Agreement and was representing Marc on it. Barry advised me that he was not representing Marc on this matter. (See **Exhibit D**.)

- **September 4, 2018 (Alan Talesnick)** – After Hogan Lovells withdrew from representing Nation Energy Inc. in May 2018, Nation retained Haynes and Boone (in its Denver office). Alan Talesnick, my friend and former partner at Patton Boggs and the person who first introduced me to Marc in 2004, was the lead partner at Haynes and Boone representing Marc's

9

Case No. 1:19-cv-01079-RM-NRN Document 46-1 Filed 07/01/20 USDC Colorado Page 11 of 17
Case 1:19-cv-01079-RM-NRN Document 48 Filed 06/18/20 USDC Colorado Page 11 of 57
pg 11 of 17

companies on those matters. As reflected in **Exhibit E** (as well as in Exhibit D), I reached out to Alan and asked him if Marc told him about the personal matter involving me and Marc and if Alan also represented Marc personally. Alan told me he didn't represent Marc on any personal matters and would not undertake representation on this matter.

- **October 26, 2018** – I attended Marc A's wife's memorial service and funeral near Denver, and spent time with the Bruner family and friends there, including Marc A. and Marc E. Bruner. In deference and respect for Marc A., I didn't raise the subject (to him) of the Agreement for months thereafter.

- **December 2018 and August-September 2019 (Ghislaine Bruner)** – As reflected in **Exhibit F**, during these two separate periods of time, I contacted Marc E. Bruner's wife Ghislaine (Marc A. Bruner's daughter-in-law), who I've known for many years and with whom I've had a good professional relationship. Since she's a lawyer (Mr. Meyer's partner at Polsinelli) I thought she might be able to help resolve this matter. I was hoping she or Marc E would contact Marc A and facilitate a resolution. I provided Ghislaine with all of the background documents, explained the situation to her, and we discussed this matter at lunch on December 13, 2018. We spoke about this again in the summer of 2019, after I had commenced this action. I did not hear back from her after either time we discussed this matter.

- **March 22, 2019 (Co-Counsel material information)** -- On this date, I was speaking with an attorney representing one of the same Bruner entities I had previously represented at Hogan Lovells. This highly respected senior partner in a prominent Denver-based law firm, (hereinafter, "Co-Counsel") advised me that Marc had made the comment to Co-Counsel that day (not in connection with the Agreement) that Marc intended to "contribute $15 million in Fortem stock to Beetaloo Basin Partners", an Australian company controlled by Marc, and was "planning to liquidate or otherwise use his Fortem stock for that purpose and other purposes". (If Marc denies that he made these comments to Co-Counsel, I will obtain an affidavit by Co-Counsel that confirms these facts.)

- **March 27, 2019 (Michael Rollin)** – Immediately after speaking with Co-Counsel about Marc's statements to Co-Counsel I spoke with Mr. Rollin, and I retained him on this date to represent me.

- **April 2, 2019** – Mr. Rollin sent the attached demand letter to Marc (**Exhibit G**). When Marc failed to respond, I filed the Complaint.

- **April 20, 2019 (Paul Manson)** -- Immediately after I filed this action, Marc must have found out about it (though he was not yet served) because he called me and asked me not to serve him. He also asked me to suspend taking any further action in this case because he said he would deliver the Fortem Shares to me. He gave me contact information for Paul Manson at PI Financial in Vancouver, a stock broker where Marc said his Fortem shares were being held. After sending an email to Mr. Manson (attached as **Exhibit H**) and after numerous attempts to contact Mr. Manson by phone, he finally responded and told me he was not authorized by Marc to provide any information or to release or transfer any shares to me. He also said he wasn't aware of any freely-tradable Fortem shares held by Marc. I contacted Marc and attempted to have him advise Mr. Manson to work with me to expedite the transfer of shares. Instead, Marc said he would come up with an alternative solution, but I didn't hear back from Marc or Mr. Manson.

10

Case No. 1:19-cv-01093-RM-NRN Document 46-1 Filed 09/01/20 USDC Colorado Page 12 of 17
Case 1:19-cv-01093-RM-NRN Document 48-1 Filed 09/01/20 USDC Colorado Page 12 of 57
pg 12 of 17

- **May 2019 to March 2020 (Fortem's violation of securities laws and cease trading order)** – As mentioned, Marc is Chairman and CEO of Fortem Resources Inc., a publicly-traded Nevada corporation and a "reporting issuer" in the provinces of Alberta and British Columbia, Canada. Its securities are listed on the Toronto Venture Exchange. On July 16, 2019, Fortem became subject to a failure-to-file cease trade order (the "FFCTO") issued by the Alberta Securities Commission for failure to properly file certain financial information. Issuance of the FFCTO had two major impacts on me and my Agreement with Marc: (a) Marc used it as an additional excuse to continue to delay his performance under the Agreement (even though I repeatedly told him I would accept substitute consideration); and (b) the FFCTO sent the value of my undelivered 150,000 Fortem Shares plummeting from a high of $597,000 on September 28, 2018 to around $100,000 today, if the shares could even be traded today, which they still cannot.

I found out about the FFCTO in early October 2019 not from Marc, but as a result of my periodic check of public information regarding Fortem and the price of its shares. I contacted Marc as soon as I found out to ask him when the shares would resume trading. He told me he was legally prohibited from assigning any Fortem Shares to me as a result of the FFCTO, but that it would be "lifted in ten days" and he would arrange for the assignment of shares to me at that time. Again, he asked me not to further pursue this action and that as soon as the FFCTO was lifted he would deliver the shares to me. To my knowledge, the FFCTO remains in place, 14 months after it was issued.

**In other words, in his capacity as Chairman and CEO of Fortem, with access to the most accurate information possible within Fortem regarding the likely length that the FFCTO would remain pending, Marc represented to me that "it would be lifted in ten days". Yet, it's still in effect after 14 months.**

- **October 9, 2019 (Glenn Merrick)** -- In an email dated October 9, 2019, Marc's and the BFT's attorney, Glenn Merrick, advised me (through Mr. Rollin) that: (a) the Fortem stock would resume trading in about ten days; (b) Marc was planning on selling "a block of his Fortem stock" in order to pay me; and (c) Marc would "execute [necessary documents] and pay any amount outstanding."
- **October 2019 (Cam McTavish)** -- In October 2019, Marc also gave me the name of Cam McTavish, who is a partner in the Vancouver law firm of Clark Wilson, and asked me to work with Mr. McTavish to accomplish that assignment. But Mr. McTavish advised me that he wasn't authorized by Marc to prepare any documents for the transfer until the FFCTO is lifted. I advised Marc about my conversations with Mr. McTavish. Marc asked me to wait until that occurred. I waited for the FFCTO to be lifted.

It did not make sense to me that on the one hand Marc was telling Co-Counsel in March of 2019 that he planned to "liquidate $15 million worth of his Fortem shares" as well as telling Glenn Merrick in October 2019 that he planned to sell "a block of his Fortem stock" and pay me, while on the other hand, during this same period, Marc was telling me that: (a) he was not able to transfer any

11

Case No. 1:19-cv-01091-RM-NRN Document 46-1 Filed 06/18/20 Colorado Page 13 of 57
Case 1:19-cv-01091-RM-NRN Document 48 Filed 07/01/20 USDC Colorado Page 13 of 17
pg 13 of 17

Fortem Shares to me; and (b) he had no stock of any other company and no other assets he could substitute for the Fortem Shares owed to me under the Agreement.

- **May 20, 2020 (Tony Lotito and notice of first interim distributions in Bankruptcy Case)** -- By early 2020, I had abandoned all hope of amicably resolving this. I had incurred serious damages by believing Marc and waiting over two years for him to perform. However, it was not until May 25, 2020, when I received a one page notice from Mr. Weinman, attorney for the bankruptcy Trustee, dated May 20, 2020 (attached as **Exhibit I**, the "Notice") that I fully realized Marc's intentions and the impact of his fraudulent actions.

Although I was not a creditor in the Bankruptcy Case, I was still receiving some but not all the notices from that proceeding. The Notice I received did not include the Trustee's Motion or the names of the creditors scheduled to receive distributions. When I received the Notice, I called Carmen (Tony) Lotito (mentioned above as Marc A's closest friend who I met in 2004 when I first met Marc), and asked him about the Notice. As a creditor in the Bankruptcy Case, Tony had received a copy of the Motion and the full list of creditors who would receive the first interim distributions totaling $3.8 million. Tony sent me the Motion and list of creditors (see **Exhibits J and K**).

23. Upon seeing the Trustee's Motion requesting authority to pay Marc and the BFT, Marc's purpose in entering into the Agreement and his persistent deflections and nearly three years of delays became clear. He had obtained my $335,000 Claim fraudulently by deception, "consolidated" it in August 2017 with the claims of the Bruner Family Trust which he controlled, and failed to inform me of the impending distributions. He dragged his feet for almost three years in order to begin receiving distributions from the Trustee to him and to the BFT.

24. Eleven days after I read the Trustee's request for authority to distribute, on June 5, 2020, I filed the Amended Complaint in this matter.

### E. It will be impossible for me to collect any judgment from Defendants without a constructive trust or prejudgment attachment on at least $1,000,000.

25. In light of the impending distributions and the certainty that those funds and any other assets of the Defendants will never be available after a ruling in my favor, this is now an urgent matter.

26. All of the above facts confirm that in the absence of a constructive trust or prejudgment attachment, I will never see one dollar from Marc A. Bruner or the Bruner Family Trust. The facts that Marc did not advise me of the FFCTO or the Trustee's Motion requesting authorization to make interim distributions, and the fact that Marc was waiting quietly to receive those first distributions to him and the BFT for over $500,000 without discussing it with me constitutes sufficient evidence that he will continue to do everything possible to avoid paying me

12

Case No. 1:19-cv-01091-RM-KLM Document 46-1 Filed 07/01/20 USDC Colorado Page 14 of 57
Case 1:19-cv-01091-RM-KLM Document 48 Filed 07/02/20 USDC Colorado Page 14 of 17
pg 14 of 17

and avoid delivering any other consideration. These facts also show that Defendants' counsel's statements are not accurate. For example, they state that "Brody fails to demonstrate [Marc] … will act to hinder or delay him from collecting any future judgment." (MAB Response at 15) Marc has been "demonstrating" his actions to hinder and delay all on his own, without me even needing to demonstrate such hindrance and delay. Since Marc hasn't paid one dollar or delivered one share to me for three years, and positioned himself to receive the first interim distributions to himself and the BFT, he will clearly do everything possible to avoid paying a judgment against him and against the BFT.

27. Marc cannot be trusted to meet his obligation to make any payments. As of mid-2018 Marc personally and his entities owed a minimum of ten law firms millions of dollars in legal fees, which accumulated during 2015-2018. As of mid-2018, he had successfully avoided paying some of them for three years. During and after Hogan Lovells period of representing Marc's companies, I learned that he signed engagement letters with these firms on litigation and other matters, paid small retainers and some small portion of their fees, and when the unpaid balance accumulated, he then abandoned the first firm and moved on to the next without disclosing to the new firm the reason he was changing firms. As of May 2018, when Hogan Lovells withdrew from representing Nation and Fortem, the number of firms that remained unpaid was at least ten, and the aggregate amount he personally and the Bruner companies owed was several million dollars. I received this information from Marc, from some of the firms that Hogan Lovells was working with during the July 2017-May 2018 period of representation, and from various other third parties. I have the names of the firms and I'm prepared to provide them to the court on a confidential basis if Marc denies this or if it is otherwise appropriate to present this evidence. I do not know the current status of those obligations.

28. In my original Declaration I referenced Marc's non-U.S. homes, bank accounts and other assets to demonstrate that there are no assets that would be available for execution of a judgment in my favor. Marc has resided overseas, including in Canada, Switzerland, and Italy, and perhaps other countries. He owns and manages businesses overseas, as well. To the best of my knowledge, he does not reside in Colorado or anywhere else in the U.S., although he has in the past.

29. Contrary to the assertion in the MAB Response that past knowledge of Marc's residences "may ultimately give Brody a benefit" (MAB Response at 12), if I obtain a judgment, I do not have current knowledge of any of Marc's assets and I do not understand the point of Defendants' counsel's comments.

30. The fact that Marc submitted himself to the jurisdiction of this court also does nothing to provide assurances that he would respond to a ruling in my favor. His voluntary appearance does nothing to change or reduce his control of the BFT and his control of proceeds paid to BFT by the Bankruptcy Trustee. Marc has undertaken the role of the BFT's representative and agent since 2004 and continued to demonstrate his complete control during the pendency of the Bankruptcy Case. It could take years to obtain a judgment in this proceeding, an additional three

13

Case 1:19-cv-01041-RM-NRN Document 46-1 Filed 07/01/20 USDC Colorado Page 15 of 17
Case No. 1:19-cv-01041-RM-NRN Document 48 Filed 07/02/20 USDC Colorado Page 15 of 57
pg 15 of 17

years chasing Marc around the world to try to determine which judgment-proof entities controlled by Marc own his homes or other assets, and additional time attempting to execute on the foreign judgment. In defense of Marc's position, Defendants' counsel take the cynical and meaningless position that "Brody's awareness of MAB's international holdings may ultimately prove beneficial … to pursue any judgment against MAB." (MAB Response at 15)

31. Because of my limited objection in the Bankruptcy Case, the first interim distribution to Marc personally in the Bankruptcy Case in the amount of $39,000 will now be paid into the registry of the District Court, pending a final resolution of this action. However, I am seeking recovery in an amount that greatly exceeds that distribution, including treble damages under my theft claim and punitive damages for fraud. The amount of money I ask to be held must be sufficient to compensate me for all damages, fees, and costs, which I estimate to exceed $1,000,000. Thus, until that amount is withheld from any proceeds otherwise intended to be paid on the Claim I assigned to Marc and the BFT Claims, and placed in a court-supervised account, no interim distributions will be safe, and therefore, they should not be made to MAB or the BFT, or the distributions should be attached or held in constructive trust. Unless and until this court imposes a constructive trust or prejudgment attachment on the BFT, neither the first distribution to the BFT in the amount of $483,000 nor any subsequent distributions will be paid into the registry of the District Court in the absence of an Order from this Court to do so. All distributions will be paid to the BFT.

32. In light of MAB's foreign residency, offshore bank accounts, lack of ownership of any real or personal property in the U.S., and history of secreting assets, it is critical that this Court enjoin the transfer of assets from the PetroHunter Bankruptcy estate to Marc and the BFT. The following facts were provided in my original declaration to demonstrate the existence of Marc's offshore bank accounts and his history of secreting assets:

a) During the period of time when I represented Marc A. Bruner's companies (from 2004 to 2010), I traveled with him on numerous occasions for business meetings at his residences in Vancouver and Zurich, and with him to the offices of various financial institutions and other companies located in numerous cities in Canada, Hungary, Switzerland, and England.

b) For the majority of at least the past 16 years, and continuing to the present, Marc owned and resided for extended periods of time in homes in Italy, Switzerland, and Canada, and conducted business from those locations;

c) Marc has had extensive business relationships and financial interests, including personal bank accounts, outside of the U.S. for decades, continuing to the present, and had or has partial ownership of the following companies, all of which are Hungarian, Australian, German, or Swiss entities (collectively, the "Foreign Entities"), and some of which are shareholders and creditors of PetroHunter: Global Project Finance AG, Paltar Petroleum Limited, Sweetpea Petroleum Pty Ltd, Falcon Australia Oil and Gas, Ltd., Mako Hungary, TXM Oil and Gas, JTE Finanz AG, CR Innovations, Hapi GmbH;

d) The Foreign Entities maintained foreign bank accounts, several of which Marc controlled;

14

   e)  Marc represented to me on several occasions, advised his counsel (J. Barry Meinster), and disclosed publicly during the pendency of the case of MAB Resources, LLC v. PetroHunter (referenced in the Trustee's Response) that MAB owned an undivided interest in Global Project Finance AG;

   f)  Marc's administrative assistant (James King) with whom Marc asked me to work at the time of entering into the Agreement was located in Vancouver;

   g)  Marc's Fortem Shares that were to be delivered pursuant to the Agreement were held by a Swiss entity;

   h)  The designated agent (Jorge) to whom MAB referred me to supposedly assist in obtaining the Fortem Shares held by the Swiss entity was a resident of Switzerland;

   i)  Another account at PI Financial owned by Marc and holding Marc's Fortem Shares is located in Vancouver, B.C., Canada;

   j)  Marc's securities counsel representing him in 2018 and 2019 on issues related to Fortem Shares in the above-referenced account in Vancouver is Cam McTavish with Clark Wilson LLP, located in Vancouver.

  33. According to paragraphs 11 and 12 of Marc E. Bruner's Affidavit, dated August 11, 2020, the BFT currently has no assets except for the $4.1 million account receivable represented by the BFT Claims. Therefore, if Marc A. Bruner and/or Marc E. Bruner removes such proceeds and the proceeds from my Claim from the reach of the Court and creditors after each interim distribution made by the Trustee, and/or if the proceeds paid to BFT are distributed to the BFT beneficiaries, then BFT would be incapable of satisfying any judgment against it in this case. As previously stated, I'm certain all such proceeds will "disappear" as soon as they are paid by the Trustee in bankruptcy.

I certify under penalty of perjury that the foregoing is true and accurate to the best of my knowledge.

                  */s/ D. Brody*
                  David E. Brody

**EXHIBITS**:

A. Creditor Marc A. Bruner's Response to David E. Brody's Limited Objection to Motion for Authority to Pay Interim Distribution, dated August 5, 2020 (PetroHunter Bankruptcy Case)

B. Email from D. Brody to Marc A. Bruner, dated August 15, 2017

C. Marc A. Bruner itinerary (Zurich to Vancouver), dated March 29, 2018

D. Email from D. Brody to Barry Meinster, dated September 4, 2018

15

E.  Email from D. Brody to Alan Talesnick, dated October 1, 2018

F.  Emails between D. Brody and Ghislaine Bruner, dated August 2018 and December 2019

G.  Demand letter from Michael Rollin to Marc A. Bruner, dated April 2, 2019

H.  Email from D. Brody to Paul Manson, dated April 20, 2019

I.  Notice Pursuant to L.B.R. 9013 of the Motion for Authority to Pay Interim Distribution and Interim Trustee Fee, dated May 20, 2020 (without List of Distributees) (Received by Brody on May 25, 2020)

J.  Email from C. Lotito to D. Brody, dated May 25, 2020

K.  Motion for Authority to Pay Interim Distribution and Inteim Trustee Fee, dated May 20, 2020 (With List of Distributees) (Sent to all parties to PetroHunter Bankruptcy Case, and emailed to Brody by Lotito on May 25, 2020)

16