# EXHIBIT A



**User Name:** Tanya Sevy

**Date and Time:** Friday, November 5, 2021 3:11:00 PM MDT

**Job Number:** 157159940

## Document (1)

1. *Black-Polsen v. Blansett, 2005 U.S. Dist. LEXIS 61273*

   **Client/Matter:** 16785-00003

   **Search Terms:** "motion to supplement" /p denied /p "summary judgment"

   **Search Type:** Terms and Connectors

   **Narrowed by:**

   | Content Type | Narrowed by |
   | --- | --- |
   | Cases | Court: Federal > 10th Circuit |

No *Shepard's* Signal™
As of: November 5, 2021 9:11 PM Z

# Black-Polsen v. Blansett

United States District Court for the District of New Mexico

June 24, 2005, Decided; June 24, 2005, Filed

No. CIV 04-963 MCA/ACT

**Reporter**
2005 U.S. Dist. LEXIS 61273 *

KIMBERLY BLACK-POLSEN, Plaintiff, vs. VIRGINIA BLANSETT, individually and in her official capacity as jail administrator for Otero County Detention Center, and THE COUNTY OF OTERO, NEW MEXICO, Defendants.

## Core Terms

customs, deliberate indifference, summary judgment, inmates, deprivation, material fact, policies, parties, non-moving, evidentiary record, medical attention, disputed issue, medical care, summary-judgment, violations, Exhibits, constitutional violation, summary judgment motion, serious medical needs, constitutional right, individual capacity, qualified immunity, pretrial, requests, staff, jail, pain, light most favorable, reasonable inference, decisionmaker

**Counsel:** [*1] For Kimberly Black-Polsen, Plaintiff: Timothy L. Rose, LEAD ATTORNEY, The Rose Law Firm PC, Ruidoso, NM.

For Virginia Blansett, individually and in her official capacity as jail administrator for Otero County Detention Center, County of Otero, Defendants: Carolyn A. Wolf, LEAD ATTORNEY, Montgomery & Andrews, PA, Santa Fe, NM; Sarah M. Singleton, LEAD ATTORNEY, Montgomery & Andrews, PA, Santa Fe, NM.

**Judges:** M. CHRISTINA ARMIJO, United States District Judge.

**Opinion by:** M. CHRISTINA ARMIJO

## Opinion

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on *Defendant's Motion for Summary Judgment* [Doc. No. 17] filed on March 2, 2005, Plaintiff's *Motion for Protection Pursuant to Fed. R. Civ. P. 56(f)* [Doc. No. 25] filed on March 23, 2005, and *Defendant's Motion to Supplement Exhibits to Motion for Summary Judgment* [Doc. No. 40] filed on June 22, 2005. Having reviewed the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court *denies* Defendant's *summary-judgment* motion for the reasons set forth below. In light of the Court's ruling on this motion, the other pending motions are *denied* as moot.

### I. BACKGROUND

Plaintiff filed this civil action on August 26, 2004, seeking damages from Defendants [*2] Virginia Blansett and the County of Otero under *42 U.S.C. § 1983* for alleged violations of her constitutional rights under the *Eighth* and *Fourteenth Amendments to the*

United States Constitution. These alleged violations arise from delays or failures in providing an appropriate medical response to complications associated with Plaintiff's pregnancy, which culminated in a miscarriage while she was incarcerated at the Otero County Detention Center (OCDC) in Otero County, New Mexico, during the month of October 2002. Defendant Blansett was the administrator and/or director of the OCDC during the relevant time period, and Defendant Otero County is the owner and operator of OCDC. [Doc. No. 1, at ¶¶ 4, 5; Doc. No. 7, at ¶ 3.]

On March 2, 2005, Defendants moved for summary judgment on Plaintiff's claim under 42 U.S.C. § 1983, and in that motion Defendant Blansett raised the defense of qualified immunity insofar as she is sued in her individual capacity. [Doc. No. 17.] The undisputed facts and evidence of record concerning Defendants' motion can be summarized as follows.

Plaintiff was booked into the OCDC on October 10, 2002, for an alleged probation violation. At that time, Plaintiff indicated that she was pregnant on a health-history form that was filled out and delivered to the OCDC [*3] staff during the intake process. [Ex. 1 to Blansett Aff.] Plaintiff also claims that she orally advised the OCDC staff of her pregnancy. [Polsen Aff. ¶ 2.]

The parties dispute the timing, number, and significance of Plaintiff's medical complaints after she was booked on October 10, 2002. According to Plaintiff, she advised the OCDC staff that, in addition to being pregnant, she believed that she had a urinary tract infection and that she had been cramping in her lower back and running a fever on that date. From October 10, 2002, until approximately October 23, 2002, Plaintiff was experiencing discomfort in her abdominal area that slowly increased in intensity. During that time period, she still believed this discomfort might relate to a possible urinary tract infection. Plaintiff also claims that she inquired about prenatal care during this period, and that OCDC staff responded on more than occasion by telling her that she could not receive prenatal care while incarcerated at OCDC. [Polson Aff. ¶¶ 2-4.]

On October 23, 2002, Plaintiff filled out an OCDC form requesting a medical appointment and delivered it to the OCDC staff. On the form she wrote: "I'm pregnant and need to see the doc. [*4] I haven't seen one since I found out. I need to see Doc. Sampat." She also stated that she had a "possible kidney infection." [Ex. 6 to Curry Aff.]

The parties dispute what transpired as a result of this request for an appointment with a physician. According to Plaintiff and Melanie Gilmore, one of the correctional officers employed at the OCDC during the relevant time period, Plaintiff became very noticeably ill on or about October 23, 2002, and she made repeated and insistent requests for medical attention during that time. As reflected on the OCDC request form, Plaintiff specifically sought an appointment with Dr. Sampat, on OB-GYN physician at the Women's Health Center in Alamogordo, New Mexico. [Polsen Aff. ¶¶ 4-6; Gilmore Aff. ¶¶ 2-6; Ex. 6 to Curry Aff.]

According to Defendants, Plaintiff's request of October 23, 2002, was answered by a newly employed OCDC nurse, Val Curry, who claims that Plaintiff reported no pain or medical problems to her at that time. Defendants assert that Ms. Curry forwarded Plaintiff's request to see Dr. Sampat to Defendant Blansett, who instructed her the next day that Plaintiff would first have to see the OCDC's physician, who would then decide whether [*5] an outside referral was appropriate. [Curry Aff. ¶¶ 4-5; Blansett Aff. ¶ 3.] According to Defendants, Ms. Curry informed Plaintiff of this policy and made an appointment for Plaintiff to see the OCDC physician on November 2, 2002. Ms. Curry claims that Plaintiff indicated she was satisfied to wait until this appointment

on November 2, 2002. [Curry Aff. ¶ 5.] The notes attached to Ms. Curry's affidavit confirm that Plaintiff "did agree to see facility M.D. Will call for appt. on 11-1-02. M.D. out of town @ this time." [Ex. 4 to Curry Aff.]

Plaintiff and Ms. Gilmore tell a story that differs in several significant respects from Defendants' version. They claim that Plaintiff was in obvious pain and running a fever during the period running from approximately Wednesday, October 23, 2002, through Friday, October 25, 2002. They further claim that Plaintiff spent most of her time in bed being comforted and cared for by other inmates, and that the OCDC staff denied all of her repeated requests to be taken to a doctor and given immediate medical attention during this period. [Polson Aff. ¶¶ 5-6; Gilmore Aff. ¶¶ 2-6.]

In particular, Plaintiff claims that Ms. Curry told her that, per Defendant [*6] Blansett's instructions, she was not allowed to be taken outside of the OCDC for medical care unless it were a "life or death" situation, or until she saw the OCDC physician who was not available until November 2002 and who would not be able to treat her anyway because he does not treat "female problems." Plaintiff was not satisfied with this response and continued to seek immediate medical care. [Polson Aff. ¶¶ 5-6; Gilmore Aff. ¶¶ 3-6.]

In this regard, Ms. Gilmore asserts that after witnessing Plaintiff's worsening medical condition for several days, she assisted Plaintiff in writing another request for medical care, hand delivered that request to Defendant Blansett, stayed in Defendant Blansett's office while Defendant Blansett read the request, and was advised by Defendant Blansett to give the request to another employee to be "stamped and put in her basket." Despite these requests, Plaintiff was not taken to see a doctor until October 28, 2002. [Gilmore Aff. ¶¶ 3-6.]

Plaintiff contends that her condition continued to worsen over the weekend of October 26 and October 27, 2002, and that when she awoke from her bed on the morning of October 28, 2002, she discovered that she was bleeding [*7] from her vaginal area, and she again adamantly demanded to be taken to a doctor immediately. According to Plaintiff, she was not taken to the Women's Health Center until the afternoon, and by that time, her pregnancy already was terminated or in the process of termination. [Polson Aff. ¶¶ 5, 7; Jackson Report.]

Defendants acknowledge the medical records from the Women's Health Center indicating that Plaintiff was experiencing a probable miscarriage on October 28, 2002, but they claim that she was taken to the Women's Health Center promptly and that she was given appropriate follow-up care after that date. In particular, they note that Plaintiff was temporarily placed in a holding cell for observation when she returned from the Women's Health Center, until Defendant Blansett approved Plaintiff's request to be returned to her regular cell. They also note that Plaintiff was taken back to the Women's Health Center for follow-up visits on October 31, 2002, and again on November 7, 2002. She was given pain medication for the rest of her incarceration at OCDC, which ended with her release on November 13, 2002. [Blansett Aff. ¶¶ 4, 7; Curry Aff. ¶¶ 6-10; Ex. 2 to Blansett Aff.; Ex. 7 to Curry [*8] Aff.]

Plaintiff disputes Defendants' characterization of the follow-up care she requested or received after her hospital visit on October 28, 2002. According to Plaintiff, her condition worsened dramatically on October 29, 2002, leaving her crying in excruciating pain as she lay in her jail-cell bed and experienced further vaginal bleeding. On that night, Plaintiff claims she repeatedly begged for medical attention but was told by correctional officers that there was nothing they could do for her because " medical was closed." She claims her requests for immediate medical attention continued

to be ignored until she miscarried into the toilet of her jail cell on the evening of October 30, 2002. [Polson Aff. ¶¶ 9-12.]

## II. ANALYSIS

### A. Standard of Review

Under *Fed. R. Civ. P. 56(c)*, the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. See *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986)*. An issue [*9] of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. See *id. at 248*. Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial. See *Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)*; *Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998)*.

When an individual defendant raises the affirmative defense of qualified immunity in a summary-judgment motion, the burden shifts to the plaintiff to establish that the defendant's actions violated a constitutional or statutory right and that the right at issue was clearly established at the time of the defendant's unlawful conduct. See *Gross v. Pirtle, 245 F.3d 1151, 1155-56 (10th Cir. 2001)*. If the plaintiff fails to meet this burden, then the Court must grant the defendant qualified immunity. See *id. at 1156*. If the plaintiff does establish the violation of a clearly-established constitutional or statutory right, then (for purposes of the defendant's summary-judgment motion) the burden shifts to the defendant to prove that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law. See id.

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary [*10] judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial). See *Celotex Corp., 477 U.S. at 324*; *Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998)*. "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient.'" *Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995)* (quoting *Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir. 1991))*. Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion. *Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995)*; see also *Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995)* (applying this rule to inadmissible hearsay testimony in depositions).

In reviewing the exhibits and affidavits submitted by the parties to determine whether Defendants are entitled to summary judgment, the Court does not consider statements that affiants attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant witnessed. See *Fed. R. Evid. 801(d)(2)*; *Wright-Simmons, 155 F.3d at 1268*; *Pastran v. K-Mart Corp., 210 F.3d 1201, 1203 n.1 (10th Cir. 2000)*. The Court does, however, consider statements attributed to third parties when they are offered for other admissible purposes. For example, such statements may be considered for the limited purpose of showing their effect on the listener or the

declarant's state of mind. See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (effect on the [*11] listener); Wright v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (declarant's state of mind); Pastran, 210 F.3d at 1203 n.1 (similar). They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements. See generally Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001).

Apart from these limitations, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment. Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor. See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

### B. Merits of Plaintiff's Claim Under 42 U.S.C. § 1983

Plaintiff's *Complaint* [Doc. No. 1] asserts a cause of action under 42 U.S.C. § 1983. This statute provides that:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured [*12] in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Persons sued in their individual capacity under this civil-rights statute generally are entitled to qualified immunity unless it is shown that their actions violated a specific federal statutory or constitutional right and that the rights which they allegedly violated were clearly established at the time of the conduct at issue. See Oliver v. Woods, 209 F.3d 1179, 1185 (10th Cir. 2000). " Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Medina v. City & County of Denver, 960 F.2d 1493, 1498 (10th Cir. 1992). But "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Hope v. Pelzer, 536 U.S. 730, 741, 745 (2002); accord Holland v. Harrington, 268 F.3d 1179, 1197 (10th Cir. 2001). The "salient question" is whether the state of the law at the time of the incident gave the individual defendants "fair warning" that their conduct was unconstitutional. Hope, 536 U.S. at 741.

Persons also may be sued in their individual capacity under a theory of supervisory liability. To establish supervisory liability under 42 U.S.C. § 1983, a plaintiff must demonstrate an affirmative link between the supervisor's conduct and the constitutional [*13] deprivation. See Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997); Holland, 268 F.3d at 1187. In particular, a plaintiff must show that the supervisor acquiesced in the constitutional violation through "'personal participation," her "exercise of control or direction," or her "failure to supervise." Id. (quoting Meade v. Grubbs, 841 F.2d 1512, 1527 (10th Cir.1988)).

In addition to being sued in their individual capacities under theories of personal or supervisory liability, county officials can be sued in their official capacity. A suit

Tanya Sevy

under *42 U.S.C. § 1983* against a county official or employee in his or her official capacity, however, is treated as a suit against the county itself. See *Brandon v. Holt, 469 U.S. 464, 471-72 (1985)*; *Watson v. City of Kansas City, 857 F.2d 690, 695 (10th Cir.1988)*.

Counties can be held liable under *42 U.S.C. § 1983* only for their own unconstitutional or illegal policies, not for the tortious acts of their employees. See *Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir.1998)*. In order to prevail on a claim under *42 U.S.C. § 1983* against a county or a county official sued in his or her official capacity, a plaintiff must prove (1) that a county employee committed a constitutional violation, and (2) that a county policy or custom was the " moving force" behind the constitutional deprivation. See *Myers v. Okla. County Bd. of County Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998)*.

When an official county policy itself violates federal law, "issues of culpability and causation are straightforward; simply proving the existence of the unlawful policy puts an end to the question." [*14] *Barney, 143 F.3d at 1307*. Proving the existence of such an official county policy also is relatively straightforward when that policy is expressly established by the county's authorized decisionmaker, *i.e.*, the person "responsible for establishing final policy [for the county] with respect to the subject matter in question." *Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986)* (plurality opinion). "If the decision to adopt [a] particular course of action is properly made by [the] government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood." *Id. at 481*; see *Lopez v. Lemaster, 172 F.3d 756, 763-64 (10th Cir. 1999)*. A county also may be liable for constitutional deprivations "visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978)*; see *Pembaur, 475 U.S. at 481-82 n.10* (holding that the custom may be established by proof of knowledge and acquiescence).

Finally, a county's liability also can be established through a theory of inadequate training or supervision. To prevail on such a theory, however, a plaintiff must show that the failure to train or supervise amounts to "'deliberate indifference.'" *Olsen v. Layton Hills Mall, 312 F.3d 1304, 1318 (10th Cir. 2002)* (quoting *City of Canton v. Harris, 489 U.S. 378, 385 (1989))*. Such deliberate indifference may be shown "'when the municipality has actual [*15] or constructive notice that its action or failure is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.'" Id. (quoting *Barney, 143 F.3d at 1307*).

In this case, Plaintiff's claim against Defendant Blansett in her individual capacity is intertwined with Plaintiff's claim against Defendant Otero County (which also encompasses her claim against Defendant Blansett in her official capacity). As explained in further detail below, it is alleged that Defendant Blansett is both a county employee directly responsible for committing a constitutional violation and a county official with the requisite authority to establish the county policies or customs which are the " moving force" behind that violation. Under theories of individual liability, it is alleged that Defendant Blansett personally violated Plaintiff's rights by denying her requests to see a physician on at least two occasions prior to her first hospital visit, and that Defendant Blansett also is liable for constitutional violations committed by OCDC employees under her supervision because she actively participated or acquiesced in these violations through an exercise of control [*16] or direction, or a failure to supervise. Under theories of official or county liability, the parties do not dispute that Defendant Blansett is the

jail administrator and, therefore, is the county's authorized decisionmaker "responsible for establishing final policy [for the county] with respect to the subject matter in question." *Pembaur, 475 U.S. at 483*. Thus, her decisionmaking with respect to the timing and scope of Plaintiff's medical care may carry the weight of an official county policy which, according to Plaintiff, resulted in the violation of her constitutional rights.

Before proceeding to the analysis of each of these intertwined theories of liability, the Court must first identify the specific federal constitutional rights which Defendants are alleged to have violated. *42 U.S.C. § 1983* is not an independent source of substantive rights, but rather a mechanism for enforcing federal rights conferred elsewhere. See *Graham v. Connor, 490 U.S. 386, 393-94 (1989)*. Thus, alleged violations of a state law or county policies and procedures cannot, standing alone, form the basis for a claim under *42 U.S.C. § 1983*. See *Jones v. City & County of Denver, 854 F.2d 1206, 1209 (10th Cir.1988)*. Instead, the Court limits its analysis of Plaintiff's claims under *42 U.S.C. § 1983* to her assertion that Defendants violated the *Eighth* and *Fourteenth Amendments to the United States Constitution* by depriving her of timely medical attention [*17] and failing to attend to her medical needs during her incarceration at OCDC in October 2002.

The *Due Process Clause of the Fourteenth Amendment* includes both procedural and substantive components. "Procedural due process ensures the state will not deprive a party of property without engaging fair procedures to reach a decision, while substantive due process ensures the state will not deprive a party of property for an arbitrary reason regardless of the procedures used to reach that decision." *Hyde Park Co. v. Santa Fe City Council, 226 F.3d 1207, 1210 (10th Cir. 2000)*.

The presumption that criminal defendants are innocent until proven guilty beyond a reasonable doubt is a basic component of procedural due process under the *Fourteenth Amendment*. See generally *Holbrook v. Flynn, 475 U.S. 560, 567-68 (1986)*. This presumption, however, does not necessarily preclude criminal defendants from being detained before their trials have begun, or being subjected to certain security measures relating to their status as pretrial detainees. See generally *Bell v. Wolfish, 441 U.S. 520, 533 (1979)*; *United States v. Nichols, 841 F.2d 1485, 1500 (10th Cir. 1988)*. Moreover, "[p]rison administrators [are to be] accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell, 441 U.S. at 547*.

While allowing for such policies, the substantive component of the *Fourteenth Amendment's Due Process Clause* does not [*18] permit the State to act with deliberate indifference to a pretrial detainee's serious medical needs. " Although the *Eighth Amendment* applies only to convicted inmates, the *Fourteenth Amendment's Due Process Clause* guarantees pretrial detainees the same degree of medical attention as the *Eighth Amendment* provides for inmates." *Myers, 151 F.3d at 1320*; see generally *Bell, 441 U.S. at 535* & n. 16 (explaining the relationship between the *Eighth* and *Fourteenth Amendments* in this context).

The *Eighth Amendment* requires jail officials "to provide humane conditions of confinement by ensuring inmates receive the basic necessities of adequate food, clothing, shelter, and medical care and by taking reasonable measures to guarantee the inmates' safety." *Barney, 143 F.3d at 1310*. To the extent she is considered a pretrial detainee, Plaintiff is afforded the same protections under the *Fourteenth Amendment* in this

case. See *Barrie v. Grand County, Utah, 119 F.3d 862, 868-69 (10th Cir.1997)*.

Prison officials may be held liable for violating the *Eighth* or *Fourteenth Amendments* if they exhibit "deliberate indifference" to the "serious medical needs" of an inmate. *Estelle v. Gamble, 429 U.S. 97, 104 (1976)*. "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id. at 104-05*.

In the context of prison conditions, the Supreme Court and the Tenth Circuit [*19] have described the "deliberate indifference" requirement as involving both a subjective component and an objective component. See *Wilson v. Seiter, 501 U.S. 294, 298-99 (1991)*; *Barney, 143 F.3d at 1310*. The severity and the duration of the alleged deprivation are relevant considerations with respect to both components. See *Barney, 143 F.3d at 1311-12*. Both the subjective and objective components of the "deliberate indifference" requirement must be satisfied in order to prevail on this type of claim.

The subjective component is satisfied only if the "'[prison] official knows of and disregards an excessive risk to inmate health and safety.'" *Barney, 143 F.3d at 1310* (quoting *Farmer v. Brennan, 511 U.S. 825, 837 (1994))*. In other words, a plaintiff alleging deliberate indifference to her serious medical needs must show (1) "actual knowledge of the specific risk of harm [to the detainee] ... or that the risk was so substantial or pervasive that knowledge can be inferred," (2) "fail[ure] to take reasonable measures to avert the harm," and (3) that "failure to take such measures in light of [the] knowledge, actual or inferred, justifies liability for the attendant consequences of [the] conduct, even though unintended." *Berry v. City of Muskogee, 900 F.2d 1489, 1498 (10th Cir.1990)* (citations omitted). "It is not enough to establish that the official should have known of the risk of harm." *Barney, 143 F.3d at 1310*. Thus, the fact that [*20] treatment of a medical condition is performed negligently or inadvertently delayed for a brief period will not establish the deliberate indifference needed to prevail on this type of *Fourteenth Amendment* claim. See *Riddle v. Mondragon, 83 F.3d 1197, 1203 (10th Cir. 1996)*.

The objective component requires that the alleged deprivation be "sufficiently serious." See *Wilson, 501 U.S. at 298*. Jail conditions may be "'restrictive and even harsh'" without violating constitutional rights. *Barney, 143 F.3d at 1311* (quoting *Rhodes v. Chapman, 452 U.S. 337, 347 (1981))*. "[O]nly those deprivations denying the minimal civilized measure of life's necessities ... are sufficiently grave to form the basis of an *Eighth Amendment* violation." *Wilson, 501 U.S. at 298* (internal quotation marks and citation omitted). In this context, a medical need is considered "'sufficiently serious'" if the condition has been diagnosed by a physician as mandating treatment, or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. See *Oxendine v. Kaplan, 241 F.3d 1272, 1276 (10th Cir. 2001)*.

The above requirements are clearly established and have been consistently applied in numerous reported opinions concerning claims by pregnant inmates who experience medical complications while incarcerated. See generally *Boswell v. County of Sherburne, 849 F.2d 1117, 1122 (8th Cir. 1988)* (collecting cases); see, e.g., *Coleman v. Rahija, 114 F.3d 778, 785-86 (8th Cir. 1997)*; *Archer v. Dutcher, 733 F.2d 14, 16-17 (2d Cir. 1984)*; *Doe v. Gustavus, 294 F. Supp. 2d 1003, 1008-10 (E.D. Wis. 2003)*; *Ferris v. County of Kennebec, 44 F. Supp. 2d 62, 67 (D. Me. 1999)*. In light of these authorities, Defendant Blansett cannot rely on the defense that Plaintiff's [*21] claim presents novel factual

circumstances in an area of law that is not clearly established. Rather, I conclude that the state of the law at the time of the incident gave Defendant Blansett "fair warning" that the conduct alleged here was unconstitutional. See *Hope, 536 U.S. at 741*.

I further conclude that there are disputed issues of material fact which preclude summary judgment on both the subjective and objective components of Plaintiff's claim that Defendants were deliberately indifferent to her serious medical needs. In particular, the evidence of record shows that the parties sharply dispute the facts concerning the apparent severity and duration of Plaintiff's medical problems in the days leading up to her miscarriage. When viewed in the light most favorable to Plaintiff, the evidence of record supports a reasonable inference that the complications associated with Plaintiff's pregnancy presented an objectively "serious medical need" by no later than October 23, 2002. At that time, she requested to see Dr. Sampat, and she has presented evidence that the symptoms of her condition, as well as her expressions of pain and distress, were so obvious that even a layperson would have then easily recognized [*22] the necessity for a physician's attention. See *Coleman, 114 F.3d at 785*; *Boswell, 849 F.2d at 1121-22* & n.5; *Ferris, 44 F. Supp. 2d at 67*. While Defendants dispute Plaintiff's version of these events, the resolution of this dispute is for the fact-finder at trial.

The evidence of record also shows that the parties sharply dispute whether Defendants (and particularly Defendant Blansett) exhibited deliberate indifference to Plaintiff's medical needs. Defendants contend that they did not have actual knowledge of the seriousness of Plaintiff's medical condition or, to the extent they were aware of her condition, they took reasonable measures to avert the harm. But Plaintiff has presented evidence that creates disputed issues of material fact concerning Defendants' knowledge and the efforts they took to avert the harm. These disputed issues of material fact preclude summary judgment.

In particular, Plaintiff has presented evidence that other jail personnel specifically brought Plaintiff's medical complaints to the attention of Defendant Blansett on at least two occasions several days before Plaintiff's miscarriage, and that Defendant Blansett declined to authorize immediate attention by a qualified physician or conduct any further investigation on those occasions. Defendant [*23] Blansett does not dispute that the newly employed OCDC nurse, Ms. Curry, informed her of Plaintiff's request to see Dr. Sampat by no later than October 24, 2002, and that she responded by instructing Ms. Curry on the OCDC's policy which required inmates to see the OCDC's physician first, who would then decide whether an outside referral was appropriate. [Blansett Aff. ¶ 3.] But Defendant Blansett apparently denies Ms. Gilmore's allegation that she received and did not respond to a second, more urgent request for medical attention delivered by Ms. Gilmore. [Blansett Aff. ¶ 5; Gilmore Aff. ¶ 5.] For purposes of the pending summary-judgment motion the Court must view the evidence in the light most favorable to Plaintiff. When viewed in this light, I conclude that the evidence of record supports a reasonable inference that Defendant Blansett was subjectively aware of Plaintiff's medical complaints, as well as the basis for those complaints, by no later than October 24, 2002.

The evidence of record viewed in the light most favorable to Plaintiff also supports a reasonable inference that Defendant Blansett deliberately chose to implement a series of policies or customs at OCDC which had the [*24] obvious effect of delaying necessary medical treatment and causing Plaintiff to suffer unnecessary pain from approximately October 24, 2002, until she was taken to the hospital on October 28, 2002, and upon her return to OCDC thereafter. These policies or customs include Defendant Blansett's ruling

that "inmates should see the detention center's physician first who would then decide whether a referral" to an outside physician " was appropriate." [Blansett Aff. ¶ 3; Curry Aff. ¶ 5.] Although it is unlikely that a policy requiring an in-house physician to serve as a "gatekeeper" for outside referrals is unconstitutional in and of itself, such a policy may give rise to a constitutional violation when it is implemented in combination with other policies or customs that result in the unavailability of any qualified health-care provider for significant periods of time. See, e.g., *Sealock v. Colorado, 218 F.3d 1205, 1211 (10th Cir. 2000)*.

Taken in combination, the series of policies or customs at issue here created an obvious " Catch 22" in which inmates such as Plaintiff could not see a physician during the week of October 23, 2002, through November 1, 2002, because the detention center's physician was unavailable to see them during that period, [*25] and they were prohibited from seeing any other physician during that period because they could not first obtain a referral from the detention center's physician. While such a " Catch 22" does not constitute direct evidence of Defendant Blansett's subjective mental state, direct evidence is not necessary to establish a disputed issue of material fact concerning a claim of deliberate indifference. "Instead, such claims commonly rely on a jury's ability to make inferences based on the circumstances involved." *Doe, 294 F. Supp. 2d at 1009*; see *Gonzalez v. Martinez, 403 F.3d 1179, 1187 (10th Cir. 2005)*. Here the jury could "connect the dots" and reasonably infer from the evidence that Defendant Blansett was deliberately indifferent to Plaintiff's serious medical needs when those needs were brought to her attention on or about October 24, 2002, and thereafter. See *Doe, 294 F. Supp. 2d at 1009*.

The evidence viewed in the light most favorable to Plaintiff also shows an affirmative link between the harms that form the basis for Plaintiff's *Complaint* and the policies or customs that Defendant Blansett authorized or approved, thereby supporting a claim of supervisory liability against Defendant Blansett in her individual capacity, see *Boswell, 849 F.2d at 1122-23*, as well as a claim against the county based on the theory that policies [*26] or customs duly established by Defendant Blansett were the moving force behind the violation of Plaintiff's constitutional rights, see *Lopez, 172 F.3d at 763-64*. When, as here, a jail official with the requisite authority is "'exposed to information concerning the risk' of future injury," the official " may not turn a blind eye to it." *Ginest v. Bd. of County Comm'rs, 333 F. Supp. 2d 1190, 1198 (D. Wyo. 2004)* (quoting *Farmer, 511 U.S. at 842*). "Either the risk must be abated, or, if the officer is uncertain as to its depth or degree, an investigation must ensue." Id. (citing *Farmer, 511 U.S. at 842 n.8*, and *Lopez, 172 F.3d at 762*). Plaintiff has presented evidence that Defendant Blansett's response to her complaints fell short of these standards.

In reaching this conclusion, I do not rely on evidence concerning any deficiency in the quality of care, or the accuracy of the diagnosis, given at the Women's Health Center when Plaintiff eventually was taken there on May 28, 2002, or thereafter. The nature of Plaintiff's claim is not one of medical malpractice or negligence with respect to the outside medical care she did receive, but rather one of Defendants' deliberate indifference with respect to their "gatekeeper" role in determining when and under what conditions Plaintiff would be given access to medical personnel. See *Sealock, 218 F.3d at 1210*; *Archer, 733 F.2d at 16*. For all of the above reasons, [*27] Plaintiffs have presented disputed issues of material fact on each of the essential elements of their claims against each Defendant, and Defendant Blansett is not entitled to qualified immunity. Therefore,

Defendants' motion for *summary judgment* is *denied*.

### C. Defendant's *Motion to Supplement* Exhibits

More than two and one-half months after the completion of briefing on their *summary-judgment* motion, Defendants filed a *motion to supplement* the exhibits to that motion with a declaration by their proposed expert witness, Michael Flax, M.D. The general rule is that when a movant submits additional evidence in support of *summary judgment* after the filing of the non-movant's response, district courts have the option of either disregarding that additional evidence or providing the non-movant with the opportunity to file a surreply. See *Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-65 (10th Cir. 1998)*. In this case, I find it unnecessary to afford Plaintiff an opportunity to file a surreply because even if the additional evidence submitted with Defendants' motion is considered, that evidence does not change my conclusion that there are disputed issues of material fact which preclude *summary judgment*. Therefore, Defendants' *motion to supplement* exhibits is [*28] *denied* as moot.

### D. Plaintiff's Motion for Protection Pursuant to *Fed. R. Civ. P. 56(f)*

The denial of Defendants' motion for *summary judgment* makes it unnecessary for the Court to rule on Plaintiff's motion for protection under *Fed. R. Civ. P. 56(f)*. Therefore, Plaintiff's motion is also *denied* as moot.

Pursuant to the terms of the Magistrate Judge's *Order* [Doc. No. 35] filed on April 12, 2005, the stay of discovery is lifted.

The parties are directed to alert the Court by written motion should the present posture of this case require any further modification of pretrial deadlines, and any proposed modifications must also address the need, if any, to continue the pretrial conference and trial settings in this case.

### III. CONCLUSION

For the foregoing reasons, I conclude that Defendant Blansett is not entitled to qualified immunity based on the evidence of record at this time, and that there exist disputed issues of material fact which preclude *summary judgment* as to each Defendant.

IT IS, THEREFORE, ORDERED that *Defendant's Motion for Summary Judgment* [Doc. No. 17] is *DENIED*.

IT IS FURTHER ORDERED that Plaintiff's *Motion for Protection Pursuant to Fed. R. Civ. P. 56(f)* [Doc. No. 25] is *DENIED* AS MOOT.

IT IS FURTHER ORDERED that *Defendants' Motion to Supplement* [*29] *Exhibits to Motion for Summary Judgment* [Doc. No. 40] is *DENIED* AS MOOT.

IT IS FURTHER ORDERED that the stay of discovery [Doc. No. 35] granted on April 12, 2005, is hereby lifted based on the Court's denial of Defendants' *summary-judgment* motion.

SO ORDERED, this 24th day of June, 2005, in Albuquerque, New Mexico.

/s/ M. Christina Armijo

**M. CHRISTINA ARMIJO**

United States District Judge

---

End of Document