IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01091-RM-NRN

DAVID E. BRODY

Plaintiff,

v.

MARC A. BRUNER,
THE BRUNER FAMILY TRUST, and
MARC E. BRUNER, AS TRUSTEE OF THE BRUNER FAMILY TRUST,

Defendants.

**MOTION TO SUPPLEMENT MOTION FOR RECONSIDERATION**

Plaintiff David E. Brody respectfully submits this Motion to Supplement his Motion for Reconsideration, ECF Nos. 135, 151, so that he may replead to state facts newly discovered in document productions and depositions that further demonstrate the conspiracy among Defendants.

**Certificate of Conferral**

Counsel for Plaintiff certifies that he has conferred in good faith with counsel for the Bruner Family Trust (the "BFT") and Marc E. Bruner ("MEB," collectively with the BFT the "BFT Defendants"), and states that this Motion is opposed.

**Introduction**

This Motion supplements the existing Motion for Reconsideration with facts recently discovered in the documents produced by and the depositions of Barry Meinster and Glenn Merrick, who successively served as Defendants' joint lawyers in the PetroHunter bankruptcy, and in the documents and deposition of Carmen J. ("Tony") Lotito, who was an authorized and designated agent for, and represented, the BFT in Defendants' collective actions. The facts discovered specifically and

directly support Plaintiff's civil conspiracy claim against the BFT Defendants and are responsive to each of the bases on which the Court dismissed Plaintiff's Amended Complaint in its Order dated September 20, 2021.

Although a complaint need not contain detailed factual allegations under the authorities set forth in the Motion for Reconsideration, the addition of these facts is necessary because the Court dismissed the Amended Complaint as against the BFT Defendants before Plaintiff had the ability to develop—and therefore plead—these additional facts. Some of these additional facts would have been available earlier, but Marc A. Bruner ("MAB") did not produce documents in the possession of his bankruptcy lawyers, though he was required to. *E.g.*, *Am. Soc'y. for the Prevention of Cruelty to Animals v. Ringling Bros. and Barnum & Bailey Circus*, 233 F.R.D. 209, 212 (D.C. Cir. 2006); *see also* 8A Charles A. Wright, Arthur R. Miller, & Richard L. Marcus, Fed. Practice & Procedure, §§ 2210, 2217. Messrs. Meinster and Merrick ultimately provided them in response to subpoenas issued by Plaintiff once it was clear MAB would not. Furthermore, Plaintiff could not have taken the depositions of Messrs. Meinster, Merrick, and Lotito at the time of the motion to dismiss briefing because discovery was not yet open. *Compare* ECF No. 74 (Plaintiff's response in opposition to motion to dismiss dated Jan. 15, 2021) *with* ECF No. 89 (Scheduling Order dated April 23, 2021).

The documents and depositions reveal that Defendants engaged in a conspiracy reflected in a plan (the "Joint Plan") to fraudulently strip the PetroHunter bankruptcy estate of its only valuable asset to the detriment of all other creditors. A critical and necessary element of the Joint Plan was to acquire and use Plaintiff's $335,000 bankruptcy claim ("Plaintiff's Claim"), which MAB did through an agreement with Plaintiff (the "2017 Agreement") that Lotito helped facilitate. MAB induced Plaintiff to enter the 2017 Agreement without MAB having the ability or any intent to perform under it. MAB materially breached the 2017 Agreement by failing to pay any of the required consideration. Thus, the conspiracy among MAB and the BFT Defendants, who were guided and aided by Lotito,

2

to do unlawful acts occurred in two separate respects, namely, (1) the Joint Plan itself (to defraud the PetroHunter bankruptcy trustee), and (2) MAB's acquisition and Defendants' joint continued use of Plaintiff's Claim in the bankruptcy proceedings for years (with neither performance nor any ability or intent on the part of MAB to perform under the 2017 Agreement).

As Plaintiff originally alleged in Count VI of his Amended Complaint, the conspiracy was conducted among MAB and the BFT Defendants to "steal the Brody Claim, use the Brody Claim, and/or retain the benefit of the Brody Claim…in order to enrich themselves at the expense of Plaintiff." The facts obtained from the depositions—which were not established until after the Court's Order but were pleaded generally in Plaintiff's Amended Complaint—confirm that Lotito was acting as the BFT Defendants' agent starting in 2016 and continuing through the time the Joint Plan was being implemented by all Defendants.

The facts set forth in the Amended Complaint, in Plaintiff's Declaration, and now in discovery show the Joint Plan in detail and go well beyond conclusory allegations of conspiracy. As set forth below, the depositions confirmed the material aspects of the claim against the BFT Defendants, including a meeting of the minds and an unlawful overt act:

a. The Joint Plan was originally presented and later developed by Lotito, a 50-year colleague of MAB, the pre-bankruptcy CFO of PetroHunter, an executive in other Bruner entities involved in the underlying events, and a beneficiary of the BFT;
b. Lotito acted with the *express authority* of MEB, the BFT's trustee;
c. Three days prior to the parties entering into the 2017 Agreement, MAB retained Mr. Merrick as counsel for himself and the BFT (and for the other movants controlled by MAB for the purposes of the Joint Plan) to implement the Joint Plan;
d. Once MAB acquired Plaintiff's Claim and assembled other claims, including that of the BFT, into a combined voice, he and Lotito, as the BFT Defendants' authorized agents and representatives, directed Merrick as their joint lawyer to use those claims to achieve MAB's personal, financial interests; and
e. MAB's acquisition of Plaintiff's Claim and its combined use with the claims of others, including the BFT, were in furtherance of and part of an unlawful series of actions taken by MAB and the BFT, through Lotito and authorized by MEB.

3

Though ultimately unsuccessful due to the diligence of the bankruptcy trustee and its lawyers, the intentions and misconduct of Defendants are now confirmed in the testimony of their own agents and representatives, and, consistent with the liberal pleading standard and in the interest of justice, Plaintiff should be allowed to amend his complaint and present these additional facts.

## Legal Standard

Reconsideration is appropriate to permit the identification and consideration of newly-discovered facts not previously available to the moving party. *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000); *see also* Fed. R. Civ. P. 60(b)(2). Because reconsideration is a necessary pre-condition to repleading, *Curley v. Perry*, 246 F.3d 1278, 1284 (10th Cir. 2001), a Court should grant a motion to reconsider to provide for the liberal right to amend one's complaint. Fed. R. Civ. P. 15(a)(2).

"[Th]e district court clearly has discretion to permit supplemental [evidence] that is…relevant and admissible as evidence." *Lighton v. Univ. of Utah*, 209 F.3d 1213, 1227 (10th Cir. 2000) (applied in the more exacting summary judgment context) (internal quotations omitted). *Id. See also Hamer v. City of Trinidad*, 441 F.Supp.3d 1155, 1159 n.1 (D. Colo. 2020) ("Because I find the supplemental materials at least relevant to the issues before the court, I grant the Parties' Motions to Supplement without further discussion."). This Court's Practice Standards expressly provide for supplementation. Civ. Practice Standard IV.E.3.

## Supplemental Facts

On October 17, 2016, PetroHunter Energy Corporation ("PetroHunter") filed Chapter 7 bankruptcy in the District of Colorado. **Exhibit 6**. It had only one asset, a 100% interest in Sweetpea Petroleum Pty Ltd. ("Sweetpea"). *See* **Exhibit 10**, Deposition of Glenn Merrick 79:3-23. The bankruptcy debtor valued Sweetpea at nearly $6 million, Meinster Deposition **Exhibit 113**, but it may

4

be worth "hundreds of millions of dollars" or even "billions in these oilfields that Sweetpea ha[s] the right to in Australia," **Exhibit 11**, Deposition of Barry Meinster 70:21-71:22.

MAB had been trying to obtain this multi-million-dollar asset from PetroHunter for some time. When PetroHunter filed bankruptcy, there was pending in Colorado state court an action against it and Sweetpea brought by MAB Resources, LLC ("MAB Resources"), "to acquire the Sweetpea interest from PetroHunter." *Id.* at 47:11-18. MAB Resources is wholly owned by MAB. *Id.* at 6:21-23. MAB Resources lost the state court case on summary judgment, *id.* at 14:4-8, and its appeal was pending at the time of the automatic bankruptcy stay, *id.* at 47:19-48:12. MAB Resources unsuccessfully tried to have the automatic stay lifted. *Id.*

Thereafter, MAB, collectively with companies he controlled as well as the BFT Defendants, made a series of attempts to wrest Sweetpea from the bankruptcy estate. The first was to have MAB-controlled Paltar Petroleum Ltd. ("Paltar") issue several fraudulent demands for payment totaling $60 million (the "Called Sum Notices") to the bankruptcy trustee. **Exhibit 7** (Bankruptcy Case ECF 216) at 5-6, ¶¶ 7-9. MAB owned 95% of Paltar and it "was his vehicle." **Exhibit 12**, Deposition of Carmen Lotito (Rough Transcript) 44:23-45:13. As to Lotito, he was Paltar's Executive Vice President, Exhibit 7 at 5, ¶ 6, and was involved in issuing the Called Sum Notices, Lotito Depo. 139:3-23.

The bankruptcy trustee rejected this demand after determining it was "a sham" and that the expenses Paltar allegedly incurred were not, in fact, incurred:

> 8. Paltar's $60 million demand was a sham. The demand was based entirely on fraudulent documents, falsified materials that Paltar attempted to portray as invoices for work *already performed*. In fact, the documents were mere quotes for future work to be performed—which was also work that had not been authorized under the JVOA. Indeed, there were no expenses incurred by the field operator, Paltar, that were being reimbursed pursuant to the JVOA's terms; rather, it was to disadvantage Sweetpea and provide a vehicle for seizing Sweetpea's 50% interest in the JVOA. It is likely no coincidence that the $60 million amount that Paltar fraudulently demanded of Sweetpea was just slightly greater than the exact amount that Sweetpea's approximately 89 million shares of Falcon Oil & Gas were worth at the time of the demand.

Exhibit 7 at 6, ¶ 8. The bankruptcy trustee also responded to Paltar's fraudulent demands by having Sweetpea file a lawsuit against Paltar in Australia. *Id.* at 8, ¶ 12.

Unable to take the Sweetpea asset through the Called Sum Notices and a threat of default thereunder, MAB and Lotito implemented the Joint Plan which Lotito had devised soon after PetroHunter filed bankruptcy. The Joint Plan involved combining bankruptcy claims (then yet) to be filed by (1) MAB Resources, (2) the BFT, (3) Lotito, and (4) Plaintiff. The clear purpose of the Joint Plan was for MAB and Lotito to pressure the bankruptcy trustee to sell Sweetpea to Nation Energy, Inc. ("Nation"), an entity also controlled by MAB and for which Lotito served as CFO. Lotito Depo. 46:11-16. This plan is laid out in an October 31, 2016 email authored by Lotito, Lotito Deposition **Exhibit 108**, to a number of people that included MAB's and the BFT's joint bankruptcy lawyer at the time, Mr. Meinster. *See* Meinster Deposition **Exhibit 111** (entering appearances on behalf of multiple claimants, including MAB and the BFT); *see also* Lotito Depo. 130:23-134:4 (testifying that everything done by a lawyer on behalf of the BFT in bankruptcy was done by either Meinster or his successor, Mr. Merrick).

6

Mr. Meinster understood the plan as "combining a number of claims, including those held by MAB Resources, [t]he Bruner Family Trust, Mr. Brody, and Mr. Lotito himself, to pursue the acquisition of PetroHunter's interest in Sweetpea." Meinster Depo. 29:1-20; *see also* Lotito Depo. 66:22-70:20 (describing the purpose of the Joint Plan). That is, the Joint Plan sought to accomplish through the bankruptcy process that which MAB and Lotito could not in the state court litigation.

When it came time to implement the Joint Plan, there was a problem: neither MAB personally nor MAB Resources had filed any claim against the PetroHunter estate. *See* Meinster Deposition **Exhibit 122** (claims register showing that MAB's only claim was the one later transferred by Plaintiff); Exhibit 7 at 16, ¶ 9 (stating that MAB Resources never filed a claim). So, MAB and Lotito requested that Plaintiff transfer Plaintiff's Claim to MAB for specified valuable consideration. *See, e.g.*, Meinster Depo. 29:22-30:17 (showing the transfer from Plaintiff to MAB on the claims register). Though Merrick inferred other possible bases for MAB obtaining standing, he could identify none in deposition and the evidence shows that Plaintiff's Claim was the sole basis on which MAB obtained standing in the bankruptcy case. Merrick Depo. 22:16-17 ("having Mr. Brody's claim, along with other claims, gave rise to party [in] interest standing"); 23:9-11 (Q. "…that claim gave him individual standing in the PetroHunter bankruptcy, right? A. It was asserted to have, yes."); 21:25-22:4 ("In a bankruptcy proceeding, in order to have standing to do much of anything, you have to be a party [in] interest. One way to become a party [in] interest is to acquire [a[ claim."). Lotito helped facilitate the transfer from Plaintiff to MAB. *E.g.*, Lotito Deposition **Exhibits 150, 152**.

Once MAB had Plaintiff's Claim, he had standing and he and Lotito controlled all of the claims they thought were essential under the Joint Plan, including claims held by MAB's and Lotito's various friends and family members. The purpose in obtaining Plaintiff's Claim was so that MAB could "acquire the [Sweetpea] assets" and "to oppose the sale" of those assets to someone else. Merrick Depo. 21:6-18. Indeed, according to Mr. Merrick, once MAB had Plaintiff's claim, "he was the

7

representative of parties asserting claims that took identical positions to his case." *Id.* at 23:3-4. Mr. Merrick described the group as having a "common goal." *Id.* at 30:8-19. The two people he took direction from were MAB and Lotito, *id.* 49:24-52:15, and Lotito, as described below, acted for the BFT on the express authority of its trustee, MEB.

In addition to giving MAB standing, obtaining an assignment and transfer of Plaintiff's Claim would help the Joint Plan beyond MAB's personal standing because, at the time MAB and Lotito hatched it, they thought Plaintiff's Claim was a secured claim. *See* Exhibit 108; *see also* Lotito Depo. 109:13-114:18 (testifying he thought[1] the claim was secured and that holding Plaintiff's claim would help MAB because he would be able to proceed against the collateral, which was an interest in Sweetpea). Holding a secured claim—especially one secured by assets of Sweetpea—would put MAB in a stronger position in the bankruptcy case because it gave him direct access to the very asset he was trying to obtain and because secured claims have priority over unsecured claims. *See In re Gayety Candy Co., Inc.*, 625 B.R. 390, 402 (N.D. Ill. 2021) ("There is little question that, but for the ability to surcharge reasonable, necessary costs and expenses of preserving or disposing of property of the estate, *see* 11 U.S.C. § 506(c), secured claims are afforded a priority over all other claims in bankruptcy.").

Thus, it was imperative for MAB and for Lotito, on the BFT's behalf, to acquire Plaintiff's Claim to implement the Joint Plan. MAB offered to acquire Plaintiff's Claim in exchange for cash and shares of stock in Fortem Resources Inc. ECF No. 16 ¶ 12. MAB and Plaintiff entered into the 2017 Agreement on August 16, 2017. ECF No. 89 at 4 (first undisputed fact). The facts show that MAB never paid Plaintiff any portion of the consideration.

---

[1] It turned out that, contrary to Lotito's belief, the claim was unsecured.

8

Once MAB acquired Plaintiff's Claim, he and possibly Lotito directed Merrick to make an offer to buy Sweetpea from the estate.[2] Merrick Depo. 53:6-15; 55:5-14. *See also* **Exhibit 8** (Oct. 2, 2017 offer letter). The purchase offer and the fraudulent Called Sum Notices are intertwined in that Palter's offer leveraged the latter by offering to withdraw them if the bankruptcy trustee accepted its offer:

> It should be underscored that this purchase bid has very substantial benefits both for PetroHunter's chapter 7 estate and for Sweetpea. For example, if this bid is accepted, and if the purchase and sale of Sweetpea equity contemplated by this bid is approved by the Bankruptcy Court, the Purchaser and Paltar will cause very substantial amounts owed by Sweetpea to be cancelled. Pursuant to the Joint Venture Operating Agreement between Sweetpea and Paltar ("JVOA"):
>
> 1. An outstanding Called Sum is owed by Sweetpea in the amount of US$43,783,950 (i.e., 50% of US$87,567,900);
> 2. An outstanding Called Sum for prior incurred expenses is owed by Sweetpea in the amount of US$90,367.81 (plus interest), as set forth in Annexure E (Prior Expenditures) to the JVOA;
> 3. An amount for pending work program commitments is owed by Sweetpea in respect of the application for EP(A) 197 in the approximate amount of AUD$11,500,000; and
> 4. Cross Charges against Sweetpea have been (or are in the process of being) recorded in the public records of the Northern Territory in respect of EP 136 and 143, in the approximate amount of AUD$10,185,000, pursuant to Article 13 of the JVOA and Article 6 of the Joint Venture Cross Charge.

Exhibit 8 at 1-2.

Thus, in exchange for a bankruptcy asset listed at $6 million but which could be worth hundreds of millions or billions of dollars, Paltar offered only $500,000 in cash and a 2% overriding royalty interest. Exhibit 8 at 3. Paltar's offer to give up the $60 million in Called Sum Notices had no value because it was a fraudulent demand in the first place.

---

[2] By this time, the Joint Plan had changed in one respect: Paltar was the proposed purchaser instead of Nation. Merrick Depo. 28:7-13. Regardless, MAB controlled both, and Mr. Meinster testified that MAB was involved in so many corporations that Meinster "couldn't keep them all straight" and, in any event, MAB would "be the principal behind the purchase." Meinster Depo. 71:23-73:6.

9

The bankruptcy trustee rejected this offer because he viewed MAB as a "con man," Meinster Depo. 73:7-22, and a "bad man" who "could not be trusted," Merrick Depo. 58:8-20. The trustee likewise rejected a renewed offer from Paltar six months later. Merrick Deposition **Exhibit 21**.

When the bankruptcy trustee refused to deal with MAB and his affiliates, MAB, the BFT, Lotito, and Merrick started planning to remove the bankruptcy trustee. Merrick Depo. 61:1-6. This was to "keep momentum in pursuing Marc's identified goals." Merrick Deposition **Exhibit 22**. In so doing and in all respects, Merrick took all of his direction for the collective group, including Defendants, from MAB and Lotito. Merrick Depo. 51:10-52:15. This was also true when Mr. Meinster represented the group. He testified that the agents and representatives of the BFT for purposes of his legal representation were MAB and Lotito. Meinster Depo. 58:22-59:9.

No motion specifically asking to remove the bankruptcy trustee was ever filed. Merrick Depo. 64:14-16. Instead, the group set out to accomplish the same thing by filing a motion to convert the case from Chapter 7 to Chapter 11:

> Conversion of the Chapter 7 (liquidation) case to Chapter 11 (Reorganization): If Jeff Weinman is correct in his most recent correspondence to me that the lifting of the fracking operations in the Northern Territories has made the Sweetpea equity substantially more valuable perhaps conversion of the case to chapter 11 should be considered. 11 U.S.C. §706(b) provides that "on request of a party in interest and after notice and a hearing the court may convert a case [under chapter 7 liquidation] to a case under [chapter 11 reorganization] at any time." In the event that a case is converted, the chapter 7 trustee is immediately divested of authority to act as the legal representative of PetroHunter and PetroHunter would then be managed and controlled by its last board of directors and officers who had not been replaced or resigned. One imagines that a meeting of the PetroHunter shareholders would immediately be convened to elect a new board and to appoint new officers.

**Exhibit 9**. *See also* Merrick Depo. 47:19-21; 53:16-54:7; *see also id.* at 63:24-64:13 (testifying that converting the case to Chapter 11 would have the effect of removing the Chapter 7 trustee).

The purpose of the motion to convert was to get "the equity in Sweetpea back into [MAB's] hands and not in the debtor's hands." *Id.* at 74:5-8. The same constellation of claimants signed on as moving parties, including MAB, as assignee of Plaintiff's Claim, and the BFT, through Lotito. *See*

10

Merrick Depo. 48:12-15; 49:24-52:15. Importantly, Mr. Lotito expressly obtained MEB's permission to join the BFT to the motion to convert. Lotito Depo. 104:20-107:16. Lotito even provided comments to Merrick on the draft motion. *See* Merrick Deposition **Exhibit 28**. Thereafter, Merrick, as their collective lawyer, filed the motion.

In response, the bankruptcy trustee detailed the "Bruner Interests'" conflicted, fraudulent, and bad faith efforts to strip the value of the estate for themselves to the detriment of other creditors. Exhibit 7 at 20-24.

While the motion to convert was pending, the bankruptcy trustee agreed to sell Sweetpea to another purchaser. In an effort to block the sale, the same group filed an objection. Merrick Depo. 74:9-75:1. Here, again, Merrick took his direction from MAB and Lotito. *Id.* 74:15-17. And, again, Lotito had MEB's express authority to join the BFT to the objection. Lotito Depo. 157:16-158:14. This, too, failed, and the bankruptcy trustee sold Sweetpea to the other purchaser.

## Application

As the Court's dismissal Order correctly noted, "[t]o state a claim for civil conspiracy in Colorado, a plaintiff must allege: "(1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) an unlawful overt act; and (5) damages as to the proximate result." ECF No. 123 at 4 (citing *Nelson v. Elway*, 908 P.2d 102, 106 (Colo. 1995)). The Court found that Plaintiff "lack[ed] facts to support at least two elements of his claim: (1) meeting of the minds and (2) an unlawful overt act." *Id.* The evidence adduced shows facts sufficient to plead, if not prove, both of these elements.

### *Meeting of the Minds*

The evidence is that the BFT trustee and a BFT beneficiary (who is also the BFT trustee's stepfather and authorized agent) used the BFT's bankruptcy claims, collectively with Plaintiff's Claim, to try to wrest control of a very valuable asset in Sweetpea from the bankruptcy trustee and estate.

11

This was a continuation of the unsuccessful effort to do so through the MAB Resources litigation against PetroHunter and Sweetpea in state court. But because MAB was not a creditor personally or through any entity he owned, and because of the added benefit (later disproved) that Plaintiff's bankruptcy claim was thought to be secured, MAB offered to purchase and then acquired Plaintiff's Claim.

Having assembled all of the claims identified in Lotito's October 31, 2016 Joint Plan under one Bruner roof, MAB and Lotito went about trying to leverage them to get the Sweetpea asset—first by demanding it under the fraudulent Called Sum Notices, then by trying to buy it for a fraction of its value, then by trying to throw out the Chapter 7 trustee by converting the case to Chapter 11, and finally by opposing the Section 363 sale to another purchaser. As Merrick emphasized in deposition, everything he did was directed by MAB and Lotito, and as Lotito admitted in his deposition, he was acting as agent for the BFT with the authority of MEB. Thus, the evidence shows a meeting of the minds between MAB and the BFT Defendants, acting through Lotito.

Under the Colorado law cited in the Motion for Reconsideration, a meeting of the minds may be inferred from the circumstances, *see generally* ECF No. 135 at 7-11 (citing authorities), though no inference is necessary because the meeting of the minds is admitted. Nor could Plaintiff have previously pleaded any of these admissions because conspiracies are, by their nature, secret. *Id.* All that's required at the pleading stage is that discovery is reasonably likely to reveal the conspiracy. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 1965, 167 L.Ed.2d 929 (2007).

Plaintiff submits that the Amended Complaint was adequate under *Twombly* but, in any event, more facts were borne out in discovery that should at least give Plaintiff the right to plead the detail the Court stated was absent. This evidence should cure the Court's concern that the Amended Complaint "lacks "factual support about the substance of this illicit plan, when it was discussed, or why the parties conspired…." ECF No. 123 at 5 (citing ECF No. 16 ¶ 62).

12

*Unlawful Overt Act*

The Court's dismissal Order also expressed concern that "there is no indication that the BFT Defendants were aware of [MAB's] wrongdoings" and that "there are no facts supporting that [the BFT's acts to strengthen its claim in the PetroHunter bankruptcy] was to be accomplished by unlawful means." *Id.* at 6. However, the evidence adduced shows two unlawful overt acts, though the law requires only one. *Nelson*, 908 P.2d at 106 (using the singular article "an").

The documents and depositions demonstrate the collective behavior and the full knowledge and authorized participation of the BFT through Lotito. There's no speculation here; Lotito admitted it, and Merrick and Meinster both confirmed that they were taking direction from Lotito as the agent and representative of the BFT. Defendants acted in concert, with the same objectives, in joint pleadings filed by their joint lawyer, Merrick. Indeed, it was the BFT's agent—Lotito—who constructed the Joint Plan and had been a central figure in the effort to strip Sweetpea from PetroHunter from the start, even playing a key role in MAB Resources' state court case. Meinster Depo. 6:4-7:13.

The bankruptcy trustee was crystal clear about the unlawful nature of this collective action: the group that included MAB and the BFT tried to defraud the bankruptcy estate of its only asset— one that could be worth hundreds of millions or even billions of dollars. Defendants' series of actions—from ginning up fraudulent demands, to using those demands to leverage a cheap purchase, to working to throw out the uncooperative bankruptcy trustee, to opposing the sale to another purchaser—were all designed to take for themselves (in accordance with "Marc's identified goals") all the value of a bankruptcy estate to the detriment of creditors. This is unlawful both in its means and its ends. *See Schneider v. Midtown Motor Co.*, 854 P.2d 1322, 1327 (Colo. App. 1992) (holding that an act is unlawful for conspiracy purposes when it is unlawful either in its means or its ends). Fraud is

13

definitionally unlawful. So is filing, submitting, or advocating a written motion or other paper for any improper purpose or that lacks legal or factual support. Fed. R. Bankr. Proc. 9011(b).

Thus, there cannot be a reasonable dispute that the collective efforts were unlawful. The bankruptcy trustee laid it out in detail and the documents and depositions confirmed it.

The second unlawful act, which was a predicate to the collective action, was MAB's fraudulent acquisition of Plaintiff's Claim. MAB would not have been able to participate—much less join Lotito in directing—any of the collective actions had he not acquired Plaintiff's Claim, a transaction that Lotito helped facilitate, and had he not continued to use Plaintiff's Claim in the PetroHunter bankruptcy proceeding during the ongoing material breach of the 2017 Agreement.

MAB's acquisition of Plaintiff's Claim in furtherance of the larger conspiracy alone is enough to constitute the unlawful act required under Colorado conspiracy law:

> Where a conspiracy is charged, it is not essential that all of the conspirators take part in an overt act or acts arising from the conspiracy. It is enough if an overt act was committed by one of conspirators in furtherance of the conspiracy. So long as petitioner took part in the conspiracy it would be immaterial whether he committed an overt act or knew of it, provided an overt act was committed by one of the conspirators.

*Brock v. Hudspeth*, 111 F.2d 447, 448 (10th Cir. 1940) (applied in the criminal context but having the same requirement to prove an unlawful overt act). The same is true in civil cases:

> Proof of the alleged conspiracy does not require that there shall have been a common plan or design on the part of the defendants to cheat or defraud [the plaintiff] in particular, or that the defendants shall have agreed upon the details of the plan, if any, to so cheat and defraud, or that the other defendants shall have consented to or authorized the particular means employed by one of them to accomplish the general purpose, if any, of the defendants.

*Morrison v. Goodspeed*, 68 P.2d 458, 483-84 (Colo. 1937). Meaning, liability may be imposed on the BFT Defendants *solely* because of MAB's unlawful act of acquiring Plaintiff's Claim in furtherance of the conspiracy. *See also New Crawford Valley, Ltd. v. Benedict*, 877 P.2d 1363, 1374 (Colo. App. 1993) ("[T]he allegation of a conspiracy or an endeavor to violate [the law] will properly allow evidence to explain a

14

series of what might otherwise be considered to be unrelated acts and to impose liability upon one alleged conspirator for the actions of another.").

This case law further demonstrates that only one unlawful overt act is required to state a claim and that an unlawful overt act taken *in furtherance* of a conspiracy to commit some other unlawful act is enough—indeed, more than enough. That is what happened here. In fact, assuming solely for the sake of argument that the conspiracy was not specifically intended to harm Plaintiff but instead only to strip Sweetpea from the bankruptcy estate, the resulting harm to Plaintiff alone (which the Court already found sufficiently pleaded) would still be enough to show an unlawful overt act because the conspiracy "need not be shown to have been entered into for the specific purpose of defrauding the particular person damaged." *Morrison*, 68 P.2d at 484.

With that said, and while no more is required under Colorado law, it would be giving Lotito and the BFT Defendants too much credit to assume they were somehow completely uninvolved in: (a) MAB's initial fraudulent and unlawful acquisition of Plaintiff's Claim; and/or (b) MAB's breach of his specific duties to perform under the 2017 Agreement for the ongoing period of years while MAB and Lotito used Plaintiff's Claim as part of the Joint Plan. The Joint Plan was Lotito's plan, and Lotito proposed and facilitated the transaction. Lotito was also aware of the fact that while he and MAB were directing Merrick to use Plaintiff's Claim and the BFT's claims to further MAB's goals, MAB had not paid for Plaintiff's Claim. Indeed, Lotito expressly kept Plaintiff from interfering in Defendants' use of Plaintiff's Claim by:

> repeatedly misled[ing] Plaintiff into believing that Bruner would fulfill his obligations under the Agreement…by stating to Plaintiff on several occasions that Lotito would provide Bruner with Plaintiff's communications that Plaintiff seeks to resolve the dispute amicably, and then for almost three years falsely telling Plaintiff that Bruner intended to pay and would pay the consideration required under the Agreement.

ECF No. 16 ¶ 64.

Thus, as shown in the evidence adduced from newly-produced documents and in depositions, Plaintiff ought to be allowed to plead that MAB unlawfully obtained Plaintiff's Claim in furtherance of his and the BFT Defendants' larger unlawful goals vis-à-vis PetroHunter and the Sweetpea asset. The BFT participated in all of this through Lotito, as authorized by the BFT's trustee. There is both a meeting of the minds and at least one unlawful overt act.

### Request for Relief

Therefore, Plaintiff respectfully requests that the Court grant its request to supplement the motion to reconsider and grant reconsideration so that he may replead to aver these facts and those facts identified in the Motion for Reconsideration.

Respectfully submitted this 7th day of March, 2022.

> */s/ Michael A. Rollin*
> Michael. A. Rollin, Esq.
> Mallory A. Revel, Esq.
> Lindsey Idelberg, Esq.
> FOSTER GRAHAM MILSTEIN & CALISHER LLP
> 360 South Garfield Street,
> Sixth Floor
> Denver, Colorado 80209
> mrollin@fostergraham.com
> mrevel@fostergraham.com
> lidelberg@fostergraham.com
> Tel: (303) 333-9810
> Fax: (303) 333-9786
> *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on March 7, 2022, I served the foregoing **MOTION TO SUPPLEMENT MOTION FOR RECONSIDERATION** via CM/ECF to all counsel of record.

By: /s/ *Michael A. Rollin*
Michael. A. Rollin, Esq.