Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01091-RM-NRN

_____

DEPOSITION OF GLENN W. MERRICK
Monday, February 7, 2022
(Via Zoom)

_____

DAVID E. BRODY,

Plaintiff,

v.

MARC A. BRUNER, THE BRUNER FAMILY TRUST, and
MARC E. BRUNER, AS TRUSTEE OF THE BRUNER FAMILY
TRUST,

Defendants.

**EXHIBIT 10**

Page 21

1        A      Not that I recall.

2        Q      Okay.  You did, in the course of your

3    representation of Mr. Bruner, however seek to have a

4    claim paid to Mr. Bruner to satisfy that claim?

5        A      You want to try that question again?

6        Q      Sure, I'll try it again.  You -- you

7    represented Mr. Bruner in connection with that claim,

8    correct?

9        A      I represented Mr. Bruner as an assignee of

10   a claim I believe came from David Brody.

11       Q      Okay.  And the purpose of having that

12   claim into the PetroHunter bankruptcy estate was to

13   obtain payment from the PetroHunter bankruptcy

14   estate, fair?

15       A      Well, at different points in time it was

16   different things.  At one point in time, the idea was

17   to acquire the assets.  At a different point in time,

18   it was to oppose the sale.

19       Q      So the -- I want to make sure I understand

20   that.  The one -- there was a point in time in which

21   the purpose of having that claim into the PetroHunter

22   bankruptcy estate was to acquire the assets of the

23   PetroHunter bankruptcy estates.  Is that what you

24   meant?

25       A      No.  Let me be more precise.  In a

**EXHIBIT 10**

Page 22

1   bankruptcy proceeding, in order to have standing to

2   do much of anything, you have to be a party and

3   interest.  One way to become a party and interest is

4   to acquire of claim.  The more claims you have for

5   the more dollars you have, speaking loosely and

6   colloquially, you have the louder voice, so to speak.

7   As I understood it, Mr. Bruner had acquired a claim

8   from Mr. Brody, the circumstances of which I don't

9   know.  That claim in conjunction with other claims

10  was asserted at different points in the case trying

11  to achieve different results, such as the acquisition

12  of assets, the opposition of sales to third parties,

13  the conversion of the case, and so on.  So the

14  strategic goals of the case changed over time.  The

15  strategic goals of the claim in the case changed over

16  time, but having Mr. Brody's claim, along with other

17  claims, gave rise to party and interest standing.

18  Does that make sense?

19      Q    It does make sense.  And so specifically

20  for Mr. Bruner, the thing that gave him party and

21  interest standing was the possession of the claim

22  that he got from Mr. Brody?

23      A    Well, I don't know if it was just that

24  claim.  There were other claims that were acquired.

25  I just don't remember off the top of my head whether

**EXHIBIT 10**

Page 23

1    Mr. Bruner had other separate claims in his

2    individual capacity.  He certainly was asserting --

3    he was the representative of parties asserting claims

4    that took identical positions to his case.

5         Q    I understand.  The -- the claim that he

6    got from Mr. Brody was held in Mr. Bruner's

7    individual capacity and that -- now, I know you don't

8    know if he had other individual claims, but at least

9    that claim gave him individual standing in the

10   PetroHunter bankruptcy, right?

11        A    It was asserted to have, yes.

12        Q    Okay.  And without a claim in the

13   PetroHunter bankruptcy, Mr. Bruner, in his individual

14   capacity, would not have standing, right?

15        A    No, that's wrong.

16        Q    Okay.  Explain.

17        A    He could also have an equity interest

18   position.  As equity interest holder, he would be a

19   party and interest.  There are other constituencies

20   that one can hold in a bankruptcy without -- which

21   gives rise to party and interest standing other than

22   holding a claim.

23        Q    Did he have an equity interest?

24        A    I believe so.

25        Q    Did the --

**EXHIBIT 10**

Page 28

1    are occasions when assets are sold to the highest

2    bidder.  Whether or not one holds a claim, one can

3    seek to be an acquirer of assets.  One can make an

4    offer to buy the assets from bankruptcy trustee or

5    deter in possession whether or not one is a party and

6    interest.

7         Q     Did your clients seek to acquire the

8    assets?

9         A     Yes.

10        Q     Was that through Paltar?

11        A     I'm sorry?

12        Q     Was that through the Paltar purchase?

13        A     Yes.  There may have also been a

14   subsequent offer.  I'm not certain whether the

15   subsequent one was solely through Paltar.  I have a

16   vague recollection that it may have included another

17   acquirer, but I may be misremembering.

18        Q     Was the other acquirer Nation?

19        A     I just don't remember.

20        Q     The other thing that you said, at some

21   point in time, a purpose of having the claims into

22   the estate was to oppose the sale.  Is that to oppose

23   the sale of the same assets to somebody other than

24   your clients?

25        A     That's one possibility.  One may oppose a

EXHIBIT 10

Page 30

 1      Q      Is that true here with respect to your

 2   clients?

 3      A      I assume the clients wanted to get paid, I

 4   assume the clients, to the extent they were trying to

 5   acquire the assets, wanted to take advantage of what

 6   they believed would be an economically productive

 7   exercise.

 8      Q      As I understand it, the group of clients

 9   that you represented in the PetroHunter bankruptcy

10   were, for lack of a better way of saying it and

11   please correct me if I'm wrong, acting collectively

12   with respect to trying to accomplish the goals that

13   you've just outlined; is that true?

14      A      They were acting in concert pursuing a

15   common goal.

16      Q      The common goal being one of those that

17   you described that evolved over the course of the

18   case?

19      A      Sure.

20      Q      Were there any other common -- I'm sorry.

21      A      The goals are reflected in the papers that

22   were filed in the court.  They say very plainly up

23   front.

24      Q      Were there any other common goals of that

25   client group?

EXHIBIT 10

Page 47

1       A      Well, that's the theory of the process,

2  yes.

3       Q      Okay.  Now I'm showing you Exhibit 5.  Can

4  you see that on your screen?

5       A      I can.

6       Q      I'm going to scroll down to the last page

7  just briefly so you can take a look at the signature

8  block, and I want you to know as I show you

9  documents, if you say to me, "Scroll up, scroll

10 drown, I want to read something," I will do whatever

11 you say, okay?  Is this your signature indicating

12 that you filed Exhibit 5 in a bankruptcy court?

13      A      That's not my signature.  It was an

14 electronic signature of a pleading that I filed in

15 the bankruptcy court.

16      Q      This is your electronic signature

17 indicating that you filed Exhibit 5?

18      A      Correct.

19      Q      All right.  And can you explain what

20 Exhibit 5 is?

21      A      It's a motion to convert the case.

22      Q      And this was filed on behalf of the

23 clients who are listed in the opening paragraph of

24 Exhibit 5, which include Marc A. Bruner as an

25 individual, and a then the various clients that we

**EXHIBIT 10**

Page 48

1    talked about a little while ago, right?

2        A    Correct.

3        Q    What was the purpose of seeking to convert

4    the case from Chapter 7 to Chapter 11?

5        A    Because the idea was that you could

6    reorganize this case and that the highest and best

7    value would not be achieved in the Chapter 7

8    liquidation, which is often under the hammer

9    liquidation value as opposed to reorganization value

10    in Chapter 11.  The idea was to try and achieve a

11    higher and better price of the assets.

12        Q    Who directed you to file this?

13        A    Marc Bruner and Tony Lotito.

14        Q    Speaking on behalf of all of the clients?

15        A    Correct.

16        Q    Was the case converted?

17        A    No.

18        Q    Is that because the judge disagreed with

19    the idea that a higher value would be obtained

20    through Chapter 11?

21            MS. SEVY:  Objection.  Calls for

22    speculation.

23        Q    (By Mr. Rollin) To the extent you know.

24        A    I don't know that the conversion case ever

25    came on for hearing, conversion motion.

**EXHIBIT 10**

Page 49

```
 1        Q     Did there come a point in time where you

 2   abandoned the conversion effort then?

 3        A     No.  I think what it -- I think it got put

 4   on -- I could be wrong about this, but I think it got

 5   put on the back burner because I think the sale

 6   motion was pursued in advance, and if the sale motion

 7   was successful, there was nothing to reorganize

 8   around.

 9        Q     Because the sale took all the assets of --

10        A     Correct.

11        Q     -- the estate?

12        A     Correct.

13        Q     And that's what happened, right, that

14   sale --

15        A     I think that's right.

16        Q     I'm sorry.  I'm just going to say the

17   question again so the court reporter doesn't have to

18   hear us talking over each other, but that's -- that's

19   ultimately what happened is the sale referred to

20   earlier to the TS Group basically sucked all of the

21   assets out of the PetroHunter estate?

22        A     I think that's correct.  That's my

23   recollection.

24        Q     And it was this collection of group --

25   the -- sorry.  I'll start over.
```

**EXHIBIT 10**

Page 50

1         It was this collection of clients

2    reflected in the opening paragraph of Exhibit 5 that

3    was trying to have a loud voice, to use your phrasing

4    earlier, in an effort to try to convince the court

5    that the case should be converted Chapter 11; is that

6    fair?

7         A    When everyone is trying to achieve a

8    result in a bankruptcy, it's generally believed true

9    that the broader the constellation of interests

10   seeking a result, the more likely it is that you're

11   going to get favorable attention from the court.

12        Q    And the constellation of interests

13   reflected in Exhibit 5 trying to accomplish this

14   conversion were all of the clients listed there in

15   the first paragraph of Exhibit 5; is that right?

16        A    That's what I just said.

17        Q    Well, you said it generally, and I just

18   want to tie it to this case and these clients; do you

19   understand?

20        A    Yes.

21        Q    Okay.  And this constellation was

22   assembled by Marc A. Bruner, wasn't it?

23             MR. MEYER:  Objection.  Calls for

24   speculation.

25             MS. SEVY:  Join.

**EXHIBIT 10**

Page 51

1       A    I have no idea.

2       Q    (By Mr. Rollin) Well, how did these people

3  come to you and say, "I want to be amovent with

4  respect to the conversion of the case to Chapter 11"?

5            MS. SEVY:  Same objection.  Also object

6  to the extent that it calls for attorney-client

7  privileged communications.

8       A    That does call for attorney-client

9  privilege.

10      Q    (By Mr. Rollin) Well, let's break this

11 down a little bit.  You were comfortable that each of

12 those parties wanted to be a moving party in

13 connection with Exhibit 5, correct?

14      A    Yes.

15      Q    And the two people who spoke on behalf of

16 each of these are one, Marc A. Bruner, and two,

17 Carmen Tony Lotito, correct?

18      A    That's what I've said at least three times

19 now.

20      Q    Okay.  And so the group of people who

21 assembled this constellation of claimants includes

22 one or more of Marc A. Bruner and Carmen Tony Lotito?

23      A    Those are two of the constellation parties

24 seeking the relief.

25      Q    I'm asking who told you that these are

**EXHIBIT 10**

Page 52

1    going to be the parties, it can only be one or both

2    of the --

3         A     For the --

4              MR. MEYER:  Hold on.  Objection.

5    Objection.  That calls for an attorney-client

6    communication as well.

7              MS. SEVY:  I'll also join in that

8    objection, although I'm -- I'm not quite sure that

9    the question was finished, but I join in that

10   objection.

11        A     So for the fourth time, I cannot tell you

12   about attorney-client privilege, but I can tell you

13   that the two people I communicated with with respect

14   to these parties were the two individuals you

15   mentioned.

16        Q     (By Mr. Rollin) That's all I'm asking.

17   That's all I was ask asking.  Now, the debtor -- I

18   want to make sure I'm clear about this.  The debtor

19   is PetroHunter, and PetroHunter has an asset that is

20   called Sweetpea, right?

21        A     It has an equity position in Sweetpea.

22        Q     What was its equity position in Sweetpea,

23   what percentage?

24        A     It owned equity in Sweetpea.

25        Q     What percent object of the equity?

**EXHIBIT 10**

Page 53

1       A       I don't remember.

2       Q       Okay.  And Paltar wanted to buy Sweetpea,

3    right?

4       A       It wanted to have access to the assets of

5    Sweetpea.

6       Q       So let's take a look at Paragraph 8 that

7    I've put up.  I just want to make sure we're clear

8    about this.  "On October 2, 2017, Paltar made a

9    substantial written offer to the Trustee (in the form

10   of a Letter of Intent) to acquire under 11 U.S.C.,

11   §363(f) all of the Chapter 7 estate's interest in

12   Sweetpea.  The Paltar offer was rejected by the

13   trustee by correspondence from the trustee's counsel

14   dated October 4, 2017."  Is that factual?

15      A       That's a factual statement.

16      Q       Okay.  And at that point, your clients

17   collectively moved to convert to Chapter 11 as a

18   result of that refusal; is that correct?

19      A       It was moved to convert August 7, 19 --

20   2018.

21      Q       Was it in part at least because of the

22   trustee's refusal to sell the assets to Paltar?

23      A       What was in part?  Are you trying -- are

24   you trying to ask me whether he moved to convert the

25   case because the trustee wouldn't sell the assets to

**EXHIBIT 10**

Page 54

1    Paltar?  Is that what you're trying to ask me?

2         Q     At least in part.  It may not be the whole

3    reason, but yeah, that's what I'm asking.

4         A     Well, if they had sold the assets to us at

5    the price that had been set forth in the October 2,

6    2017 letter, there wouldn't have been a need to

7    convert.

8         Q     Okay.  So the answer to my question is

9    yes, right?

10        A     Since it didn't happen, I can't answer it

11   that way.  I can tell you that the offer to purchase

12   was not accepted, and I can tell you that we moved to

13   convert in August of '18.

14        Q     And as you said, had the trustee sold or

15   been willing to sell the assets to Paltar, there

16   would be no need to file a motion to convert, right?

17        A     There wouldn't have been a need to convert

18   the case to Chapter 11 to reorganize around those

19   assets because the assets would have been acquired.

20        Q     What would your clients have received had

21   the sale proposed by Paltar gone forward?

22        A     I don't know.

23        Q     Would they have received any of the

24   Sweetpea assets?

25        A     I don't know.  A conversion means it goes

**EXHIBIT 10**

Page 55

1   to Chapter 11, and somebody's got to put together a

2   Chapter 11 reorganization plan.  That plan will tell

3   you what people get.  We never got there, so by

4   definition, I don't know.

5       Q       Now, you represented Paltar, didn't you?

6       A       For a period of time, yes.

7       Q       You made the offer, the sale offer to the

8   trustee on behalf of Paltar, right?

9       A       Correct.

10      Q       And your point of contact at Paltar,

11  the -- the principal who gave you direction was Marc

12  A. Bruner, right?

13      A       And maybe Lotito as well.  I just don't

14  remember.

15      Q       Okay.  But certainly Marc A. Bruner was

16  one of them, and maybe Tony Lotito was -- was one of

17  them also, right?

18      A       Correct, yes.

19      Q       Did any of your clients -- do you know

20  whether any of your other clients that were listed as

21  moving parties on Exhibit 5, whether any of them had

22  an interest in Paltar other than Marc A. Bruner?

23      A       I don't remember.

24      Q       Do you know that Marc A. Bruner had an

25  interest in Paltar?

**EXHIBIT 10**

Page 58

1  A. Bruner and Mr. Lotito?

2      A    It appears to be, yes.

3      Q    Among others.  And this discusses the -- a

4  re-advancing, a re-proposal of Paltar's offer to

5  acquire the Sweetpea asset; is that right?

6      A    Yes.  I believe there was a follow-up

7  offer from Paltar.

8      Q    Can you explain how that came up?  There

9  was an offer, it was rejected, then there was another

10 offer?

11     A    The original offer was rejected out of

12 hand by the trustee, which we viewed as being pretty

13 appalling, no counter, no negotiation, no nothing.

14 The trustee was of the view that Marc was a bad man

15 for whatever reason.  The trustee's perspective, I

16 think had been poisoned by other players in the case,

17 and as much as we tried to convince the trustee that

18 dollars are fungible, the trustee was being persuaded

19 by TS that Marc was a bad man and he -- he could not

20 be trusted, and the trustee bought into it.

21     Q    Were there individuals -- I -- TS

22 obviously speaks through individuals.  Do you know

23 the names of the individuals?

24     A    I don't remember their names, but they --

25 they were sort of competitors of Marc's.  They knew

**EXHIBIT 10**

Page 61

1      Q     Okay.  You also considered the possibility

2    of removing the trustee, right?

3      A     Correct.

4      Q     And it looks like that's what's reflected

5    in Exhibit 20, correct?

6      A     Yes.

7      Q     And as I understand this, what you're

8    doing is you're reaching out to Mr. Bruner and Mr.

9    Lotito to develop that constellation of parties and

10   interests who would sport such a motion?

11     A     Is there a question?

12     Q     Is that right?

13     A     I'm suggesting a course of action maybe to

14   try and replace the trustee for failing to discharge

15   a fiduciary duty to consider the highest and best

16   offer and that we need somebody who's going to be

17   impartial to weigh the competing offers for the

18   assets.  If somebody is poisoned in their point of

19   view and refuses to consider your dollars, which are

20   every bit as spendable as the other fellows' dollars,

21   then the trustee is not doing his job.  I am of the

22   point of view that any motion that I file is better

23   off with a broad base of parties seeking the same

24   relief.  That's what this is about.

25     Q     So they were the ones, Mr. Bruner and Mr.

**EXHIBIT 10**

Page 63

1    offer later in time, and they were competing offers,

2    and the way the process typically happens is you walk

3    into the bankruptcy court and you get sort of, for

4    lack of a better term, an open auction for the

5    assets.  Bring your checkbook.

6         Q     So at the end of the open auction, was

7    Paltar's offer the highest and best offer?

8         A     There was never an open auction.  What

9    typically happens is, let's say you and I are

10   competing for an asset in bankruptcy.  You walk into

11   the bankruptcy court, I walk into the bankruptcy

12   court, you make an offer for the asset, I object and

13   say I'm willing to pay more.  Bankruptcy court

14   says, "Your offer's rejected.  Is anybody going to

15   pay more than Merrick?"  And so you have an auction

16   process in the bankruptcy court.  What happened in

17   this particular case, it was a 363 sale where the

18   trustee went to the court and said, "Here's the offer

19   the trustee wants to accept."  An objection was

20   filed.  We tried to walk into the bankruptcy court

21   and convince Judge Tyson that was not the highest and

22   best offer.  Judge Tyson did not agree.  She approved

23   the offer to the TS Group.

24        Q     Is -- is one way of removing a Chapter 7

25   trustee converting the case to a Chapter 11?

**EXHIBIT 10**

Page 64

1        A        It's -- yes, but it's kind of a -- you're

2    vocabulary is a little awkward.  What happens is when

3    you convert a case from a Chapter 7 to a Chapter 11,

4    the Chapter 7 trustee is replaced by operation of law

5    either with a debtor in a possession or with an

6    Chapter 11 trustee, who may be the same person as the

7    Chapter 7 trustee.  There's no assurance that the

8    Chapter 11 trustee will not be the Chapter 7 trustee.

9    That's a different process than trying to replace a

10   Chapter 7 trustee with a different Chapter 7 trustee.

11       Q        And what's contemplated in Exhibit 20,

12   replacing Chapter 7 with another Chapter 7 trustee?

13       A        Yes.

14       Q        Okay.  Did you ultimately seek that

15   relief?

16       A        Not that I recall, no.

17       Q        But you then later, I think you said in

18   August of 2018, so about four months later, you did

19   file the motion to convert that we saw earlier in

20   Exhibit 5, right?

21       A        Correct.

22       Q        Okay.  In evaluating the highest and best

23   offer, is the credit worthiness of the offeror of

24   relevant consideration?

25       A        Yes.

**EXHIBIT 10**

Page 74

1    Sweetpea equity that he somehow conveyed to

2    PetroHunter or something like that, and Marc had a

3    claim, I think that would give rise to rescissionary

4    relief, but I'm pushing my recollection.

5         Q    Okay.  And in that sense, what it would do

6    is it would get Sweetpea -- that equity in Sweetpea

7    back into Marc's hands and not in the debtor's hands?

8         A    That's the approach, yes.

9         Q    Got it.  Now, you also in addition to

10   trying to purchase the Sweetpea through palter, the

11   other thing that you did is when it came up -- when

12   Sweetpea came up for sale to TS, you also opposed

13   that sale, correct?

14        A    Yes.

15        Q    And you received your direction from Marc

16   A. Bruner with respect to that too, correct?

17        A    And Tony Lotito.

18        Q    Understood.  And as you'll see in

19   Exhibit 2, this is the objection to that sale that

20   you filed; is that right?

21        A    It appears to be.

22        Q    And it's on behalf of the same

23   constellation of parties and interests that were

24   parties to the other efforts made in the PetroHunter

25   bankruptcy case; is that correct?

**EXHIBIT 10**

Page 75

1      A    That would make sense.

2      Q    Now, the timing of this looks to me, but

3  tell me if I'm wrong, that it's during the pendency

4  of the motion to convert; is that right?

5      A    Well, probably.  My recollection is the

6  motion to convert was filed, and then TS made an

7  offer, and the trustee accepted the offer and placed

8  it before the bankruptcy court.  So it makes sense

9  that you'd object.  I just think, as I said before, I

10  kind of have a vague recollection that the conversion

11  case -- the conversion motion was put in abeyance.

12      Q    Understood.  Thank you.  I'm showing you

13  Exhibit 11 now.  I -- this -- Exhibit 11 is another

14  document filed by you in the bankruptcy case; is that

15  correct?

16      A    Yes.

17      Q    Same constellation of parties and

18  interests, correct?

19      A    Correct.

20      Q    With direction received from Mr. Bruner

21  and Mr. Lotito, correct?

22      A    And can you explain the relationship of

23  this motion to the other proceedings that were going

24  on at the time?

25      A    Scroll up.

**EXHIBIT 10**

Page 79

1    Lotito as the owners?

2         A    Appears to be.

3         Q    Now, on Page 2, I noticed something you

4    wrote in Paragraph 2.  Do you see the italicized

5    bullet language at the end of Paragraph 2?

6         A    Yes.

7         Q    It says, "The trustee's sale motion

8    propose said to sell the estate's only asset - all

9    the stock interest in Sweetpea Petroleum," is that

10   party, Pty, "Ltd. ("Sweetpea )."

11        A    No.  That's -- that's a corporal

12   designation.  It's not party.

13        Q    Thank you.  How do you pronounce it?

14        A    P-t-y.

15        Q    Just P-t-y?  So it says, "The trustee's

16   sale motion proposes to sell the estate's only

17   asset -- all the stock interest in Sweetpea Petroleum

18   Pty Ltd. ("Sweetpea") for inadequate consideration on

19   a highly expedited basis and without cause."  My

20   question for you, sir, is was that true that the

21   Sweetpea -- the stock interest in Sweetpea was the

22   estate's only asset?

23        A    I believe so.

24        Q    Now, the estate, as we saw from the

25   schedules that you sent, that you remembered sending

**EXHIBIT 10**