```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01091-RM-NRN
_____

               DEPOSITION OF BARRY MEINSTER
                Tuesday, February 15, 2022
_____

DAVID E. BRODY,

Plaintiff,

v.

MARC A. BRUNER;
THE BRUNER FAMILY TRUST; and
MARC E. BRUNER, AS TRUSTEE OF THE BRUNER FAMILY TRUST,

Defendants.
_____

REMOTE APPEARANCES:

For Plaintiff:     MICHAEL A. ROLLIN, ESQ.
                   Foster Graham Milstein & Calisher, LLP
                   360 South Garfield Street, 6th Floor
                   Denver, Colorado 80202
                   mrollin@fostergraham.com
                   303.333.9810

For Defendant:     WILLIAM F. JONES, ESQ.
Marc A. Bruner     Moye White, LLP
                   1400 16th Street, 6th Floor
                   Denver, Colorado 80202-1486
                   billy.jones@moyewhite.com
                   303.292.7930

For Defendant:     WILLIAM R. MEYER, ESQ.
The Bruner         Polsinelli, PC
Family Trust       1401 Lawrence Street, Suite 2300
                   Denver, Colorado 80202
                   wmeyer@polsinelli.com
                   303.572.9300

Also Present:      David E. Brody
```

**EXHIBIT 11**

Page 6

1  A. Okay. Go ahead, yeah.

2  Q. Super.

3     (Deposition Exhibit 126 was marked.)

4  Q. (BY MR. ROLLIN) Mr. Meinster, I'm showing you

5  the cover page of a deposition given by Carmen James

6  Lotito Jr. in a case in which -- the caption of which

7  is on the second page. And I've got this whole thing

8  marked as Exhibit 126 as you can see.

9  A. Right. I'm familiar with the case. Yes, go

10 ahead.

11 Q. Okay. Is this a case in which you were

12 counsel?

13 A. Yes.

14 Q. And were you counsel for the Plaintiff?

15 A. Yeah, MAB Resources, yes.

16 Q. Is M-A-B, or MAB, an acronym for Marc A.

17 Bruner?

18 A. To my knowledge, yeah. I don't know what else

19 it would stand for. Yeah, I believe it is Marc A.

20 Bruner, yes.

21 Q. And is Marc A. Bruner the owner of MAB

22 Resources, LLC?

23 A. You got it.

24 Q. Is Marc A. Bruner the person from whom you

25 took direction in connection with your representation

**EXHIBIT 11**

Page 7

1  in the case reflected here in Exhibit 126?

2     A.   He and Mr. Lotito.

3     Q.   What was Mr. Lotito's sort of standing status

4  or relationship with respect to that case such that he

5  could give you direction?

6     A.   Tony, Mr. Lotito, the best as I can -- well,

7  from my personal knowledge, he has a ton and a half of

8  information.  He actually knows more of the details of

9  all of these transactions than Marc does.  So my main

10 dealings were with Mr. Lotito.

11    Q.   Was it your understanding that he was acting

12 on behalf of Marc A. Bruner?

13    A.   That was my understanding, yes.

14    Q.   Okay.  And when you said the name "Marc" --

15 when you say, "Marc" in the course of the deposition,

16 just so that we're clear, are you referring to Marc A.

17 Bruner?

18    A.   Yes.

19    Q.   Okay.  Can you generally explain the nature of

20 the MAB Resources, LLC case that's reflected in

21 Exhibit 126?

22    A.   You know, I haven't fooled with this since I

23 believe 2016.  It involved Sweetpea, Sweetpea

24 Petroleum, which is or was, I don't even know its

25 current status, a wholly owned subsidiary of

**EXHIBIT 11**

Page 14

1  whether they were incurred or not.  I don't remember

2  that this was a dispute on that particular issue, no.

3     Q.   Okay.  Now, the case in Denver District Court,

4  that case was dismissed; is that right?

5     A.   Well, summary judgment was granted.

6     Q.   Summary judgment was granted.  For the

7  Defendants; correct?

8     A.   That's correct.

9     Q.   And do you remember the grounds on which

10  summary judgment was entered?

11     A.   No.  There was an order issued by the judge.

12  I don't know if you're going to ask me or not.  I think

13  he was wrong.  I think that -- well, summary

14  judgment -- more cases are reversed on appeal on

15  summary judgment than probably any other issue.

16          You know, I was thinking that -- and that's

17  why we appealed, because all I have to do is show a

18  couple of disputed facts, material facts, and they

19  would reverse them.  I'll just let it go at that.

20     Q.   Okay.

21     A.   I don't want to be critical of a judge on the

22  record.

23     Q.   Fair enough.

24          And it sounds like, just like with respect to

25  the Complaint, I can simply go to the docket for that

**EXHIBIT 11**

Page 29

1    Q.   (BY MR. ROLLIN)  Well, I guess looking at this

2    are you able to describe what the -- sort of what's

3    going on here, what's intended by this plan, for lack

4    of a better word?

5    A.   I relied heavily on Mr. Lotito.  He had, as I

6    said before, more knowledge about all this than

7    Mr. Bruner, or at least it seemed that he did.  And

8    whenever I needed an outline or a direction in terms of

9    what happened from A to Z, Mr. Lotito would supply me

10   with the information I needed.  So this was basically

11   an introduction to what he was talking about.  Does

12   that make any sense?  Does that answer your question?

13   Q.   Yeah, yeah, I think so.

14        Is it fair to say that what Mr. Lotito is

15   talking about is combining a number of claims,

16   including those held by MAB Resources, The Bruner

17   Family Trust, Mr. Brody, and Mr. Lotito himself, to

18   pursue the acquisition of PetroHunter's interest in

19   Sweetpea?

20   A.   Yeah, I think so, yes.

21        (Deposition Exhibit 122 was marked.)

22   Q.   (BY MR. ROLLIN)  I'm showing you Exhibit 122.

23   And I'll enlarge it for you here.  I'll start with

24   showing you the number.  Do you see the No. 122 there

25   on your screen?

**EXHIBIT 11**

Page 30

1    A.   Yes.

2    Q.   And I'll scroll back up to the top.  Do you

3  understand this to be the Claims Register from the

4  PetroHunter bankruptcy case?

5    A.   Yes.

6    Q.   And I'm going to scroll down here for you.  Do

7  you see on your screen now the very top section says,

8  "Creditor: Marc A. Bruner"?

9    A.   Right.

10   Q.   And it shows that this is Claim No. 7?

11   A.   Right.

12   Q.   And do you see down below where it shows the

13 history and then the word "details" in blue shows that

14 on March 2, 2017, David E. Brody filed Claim No. 7 and

15 then on August 22, 2017, it was transferred from

16 Mr. Brody to Mr. Bruner?

17   A.   Yes.

18   Q.   And there are some other claims here.

19 Immediately below that do you see Carmen Lotito is a

20 claimant?

21   A.   Right.

22   Q.   And that's Claim No. 8?

23   A.   Right.

24   Q.   And you filed that claim on behalf of

25 Mr. Lotito?

**EXHIBIT 11**

Page 47

1  opportunity for Nation Energy to acquire the Sweetpea

2  interest; isn't that right?

3      A.   And, again, I didn't review my Complaint.

4  That was the purpose of the lawsuit, okay.  All the

5  assets of PetroHunter, including Sweetpea, you know, in

6  the 7, would have become the property of the Trustee to

7  pay the claims and what have you.  So I wasn't really

8  interested in the bankruptcy in trying to get the

9  interest owned by PetroHunter in the various properties

10 and things like that.  Does that make any sense?

11     Q.   Yeah, let me see if I can get clarity around

12 that.  When you said that was the purpose of the

13 lawsuit, did you mean to say the purpose of the lawsuit

14 in Denver District Court --

15     A.   Yes.

16     Q.   -- between MAB Resources and PetroHunter was

17 to acquire the Sweetpea interest from PetroHunter?

18     A.   That's correct.

19     Q.   Okay.  But once PetroHunter went into

20 bankruptcy, that wasn't available through the Denver

21 District Court unless you got relief from the automatic

22 stay; right?

23     A.   That's correct.  No, you're a hundred percent

24 correct.  And I just don't have the chronology here,

25 but my remembrance of this is that the case in the

**EXHIBIT 11**

Page 48

1  District Court, summary judgment was granted, we
2  filed -- Mr. Dodson and I filed an appeal from that
3  granting of summary judgment.  The case at that point
4  was at the court of appeals.
5           At that point, the action in the court of
6  appeals was stayed.  And for the last five years or
7  whatever it is I've been filing status reports with the
8  court of appeals saying PetroHunter's still in
9  bankruptcy, we can't do anything.  And I did go for
10 relief from stay, it must have been to pursue the
11 appeal, and that was denied.  So we've been frozen
12 for -- since '16, 2016.
13    Q.   And doesn't that mean, Mr. Meinster, that in
14 order for your clients to pursue the acquisition of the
15 Sweetpea interest that PetroHunter held it had to then
16 do so through the bankruptcy court process?
17          MR. JONES:  Objection; form.
18    A.   I suppose we could have done it through an
19 adversary proceeding.  But since we had the litigation
20 pending in Denver, the Trustee took over all the assets
21 of PetroHunter and PetroHunter -- see, this is where I
22 lost control of it because I was no longer the
23 attorney.
24          The Trustee sold -- and, again, I wasn't
25 involved in this.  Merrick or maybe another attorney

**EXHIBIT 11**

Page 58

1     Q.    (BY MR. ROLLIN)  Did you not inquire?

2     A.    No.

3     Q.    Did you have the impression -- I'm alerting my

4  colleagues I'm not trying to get to a privilege, but

5  I'm asking you did you have the impression that the

6  people that you were supposed to deal with on behalf of

7  The Bruner Family Trust were Marc A. Bruner and Tony

8  Lotito?

9           MR. MEYER:  Form and foundation.  I think it's

10 also privileged.

11          MR. JONES:  I would join in that as well since

12 that's the only source.

13          MR. ROLLIN:  I don't think the party --

14          This is not for you, Barry.  This is for the

15 lawyers.

16          The party on the other side of a communication

17 is not a privileged fact, only the contents of the

18 communication are.

19    Q.    (BY MR. ROLLIN)  I'm going to ask it this

20 way --

21          MR. JONES:  Okay.

22    Q.    (BY MR. ROLLIN)  -- who did you speak with on

23 behalf of The Bruner Family Trust?

24    A.    Marc and Tony.

25          MR. MEYER:  Asked and answered, but go ahead.

**EXHIBIT 11**

Page 59

1  A. Marc and Tony.

2  Q. (BY MR. ROLLIN) Okay. Was there anybody else

3  who you spoke with who was acting on behalf of The

4  Bruner Family Trust?

5  A. No.

6  Q. Was it your impression that Marc A. Bruner and

7  Tony Lotito had the authority to act on behalf of The

8  Bruner Family Trust in connection with the PetroHunter

9  bankruptcy?

10  MR. JONES: I think that's privileged. I

11  mean, because the only source of that information would

12  be their statements and they are both his clients.

13  MR. MEYER: Join.

14  MR. ROLLIN: Just to police the record, are

15  you instructing the witness not to answer that

16  question?

17  MR. JONES: I am.

18  MR. MEYER: Yes. I mean, I'd add, honestly,

19  Mike, I'm not sure it's relevant what his impression

20  was, I mean, you know, without delving deeper into how

21  he got that impression, what the basis -- I mean, I

22  don't know if it's going anywhere.

23  MR. ROLLIN: Okay. No, I don't necessarily

24  disagree with that.

25  Q. (BY MR. ROLLIN) Let me ask you this,

**EXHIBIT 11**

Page 70

1    A.   I've represented creditors for 48 or 49 years,
2   since 1973.  In Maryland 12 years and then out here the
3   rest of the time.  When I say, "these situations," I'm
4   talking not about this case.  Basically, what I'm
5   saying here, as politely as possible, is I have some
6   experience in this area, please leave me alone and
7   don't get involved with talking to the Trustee and
8   PetroHunter officials, you know, let me do it.
9        So it really -- I don't -- I've written the
10  same email to clients, not just in bankruptcy, but, you
11  know, in other cases, for all those years.  Whenever I
12  have a client that's getting involved personally in
13  something, I tell them, don't screw it up, just let me
14  handle it.  That's what I meant.  I'm sure every one of
15  you has written a similar email.
16   Q.   Were there subsequent communications with the
17  Trustee or PetroHunter concerning the matters discussed
18  in Mr. Lotito's email?
19   A.   I don't remember.  I don't think so.  When was
20  this again, November of '16?
21   Q.   I'll show you.  November 1, 2016.
22   A.   Yeah, I don't think so.  I can't remember
23  anything.  Once I got the Trustee to agree with me that
24  this was not a no-asset case, the Trustee handles it
25  from that point forward.

**EXHIBIT 11**

Page 71

1          The Trustee was salivating because at the 341

2    meeting I showed that we could be talking about not

3    just 6 million but hundreds of millions of dollars,

4    about billions in these oilfields that Sweetpea had the

5    right to in Australia.  So at that point, there really

6    wasn't anything that I personally could do.

7          I did talk to the Trustee, who I knew from

8    other cases.  I can't remember his name, but I -- but I

9    talked to him and told him that I wanted -- not me

10   personally, but that I could arrange to have Sweetpea's

11   assets purchased.  We never came to a number.  And I

12   don't think the Trustee believed me.  It's not that he

13   didn't believe me personally.  I don't think the

14   Trustee, he may have even said this, believed that Marc

15   had put together a deal to buy these assets.  And he

16   kind of just blew Marc off.

17         But I wasn't -- other than suggesting that and

18   basically telling the Trustee, well, let me see what I

19   can put together for you, I don't think the Trustee

20   ever looked at Marc as being a bona fide purchaser, you

21   know, somebody who had the money that could purchase

22   this.

23      Q.   When you said you told the Trustee you thought

24   you could arrange for the purchase of the Sweetpea

25   assets, the purchaser in that context is Marc A.

**EXHIBIT 11**

Page 72

1  Bruner?
2      A.  I don't know if it was Marc personally.  Marc
3  was involved with so many corporations, I couldn't keep
4  them all straight, okay.  So I don't know if it was him
5  personally that was going to purchase it or if it was
6  one of his corporations.
7      Q.  Either way, he'd be the principal behind the
8  purchase?
9      A.  Yeah, yeah, he'd be the one who gave me the
10 deal.  But I wanted -- I wanted hard facts.  I didn't
11 want to go to a Trustee and say, we'll give you X
12 amount of dollars.  I wanted to know that if I was
13 going to make an offer, that we could come up with the
14 money.  When I say, "we," I'm not talking about me
15 personally, but that -- whoever was my client in the
16 offer.
17          And the Trustee -- the Trustee knew that Marc
18 was behind any of these corporations.  So when the
19 Trustee just basically didn't trust Marc, it didn't
20 matter if I was talking about any of these other
21 corporations because the Trustee knew that Marc was
22 behind them all.
23     Q.  Does that include Nation Energy reflected here
24 in Mr. Lotito's email?
25     A.  Nation, Paltar.  I can't remember the rest of

**EXHIBIT 11**

Page 73

1  them.  I think Paltar had two names.  I don't remember.
2         But, yeah, Nation Energy, Paltar.  I don't
3  even know -- because the Trustee knew what was going on
4  here and he just didn't believe that Marc could come up
5  with the money.  So it didn't matter what the
6  corporation was.
7     Q.   What does that mean, "what was going on here"?
8  What did you mean by that?
9     A.   That Marc wouldn't be able to come up with the
10 money basically.
11    Q.   What makes you think the Trustee knew that
12 Marc couldn't come up with the money?
13    A.   I knew the Trustee, okay.  I can't believe I
14 can't remember his name.  Hill, Jeffrey Hill was the
15 Trustee?
16    Q.   (Attorney nodded head up and down.)
17    A.   Yeah, I dealt with him for years, not on this
18 case, but we had a relationship where, you know, we
19 were morally strained.  We didn't go out to dinner
20 together or anything like that.  You know, he just
21 said -- well, I'll be blunt.  He thought Marc was a
22 conman.
23    Q.   That's what he told you?
24    A.   More or less, more or less.
25    Q.   Did he give you anymore detail than that or

**EXHIBIT 11**