UNCERTIFIED ROUGH DRAFT

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-cv-01091-RM-NRN
_____

DEPOSITION OF CARMEN J. LOTITO JR.
Thursday, February 17, 2022
_____

DAVID E. BRODY,

Plaintiff,

v.

MARC A. BRUNER;
THE BRUNER FAMILY TRUST; and
MARC E. BRUNER, AS TRUSTEE OF THE BRUNER FAMILY TRUST,

Defendants.
_____

**EXHIBIT 12**

Page 44

1       A.   Well, we were -- he was President of Montag

2   Resources and I was a Vice President with Montag '74

3   through '77.  And then I went back to -- you know, that

4   was in Texas.  And then I went back to California for

5   two or three years.  And then rejoined Marc with a

6   company called PetroHunter -- no, PetroRock, Inc.,

7   which we had exploration projects with Kidder Peabody

8   and Conoco Oil & Gas.

9            And then I left that and I went back to

10  California and worked, you know, for ConAgra for about

11  five years, four years.  And then rejoined Marc's

12  company.  We started a company called GSL Energy, which

13  then became a merger partner with Petro, which became

14  PetroHunter.  And then also became a Vice President in

15  Falcon Oil & Gas.  And then became Executive Vice

16  President of Falcon Oil & Gas later on and carried out

17  my duties in PetroHunter.

18           And since -- then left Falcon in 2010 and kept

19  on as a Director of PetroHunter.  In 2012, joined him

20  in Paltar Petroleum.  Yeah, that's it.

21      Q.   Sorry, go ahead.

22      A.   Well, that's it.

23      Q.   What about MAB Resources?

24      A.   Yeah.  Well, MAB was a company that Marc -- it

25  was his own -- it was a hundred percent owned by Marc.

**EXHIBIT 12**

Page 45

1    That was his vehicle.  He worked more closely with Dave

2    Brody.  Dave Brody would put up transactions, oil and

3    gas transactions.  That started at Patton Boggs and

4    then later when he joined PetroHunter as general

5    counsel and with Falcon.

6            And then MAB was Marc's exploration private

7    investment company.  You know, I did something, but,

8    you know, I would say Brody had a more active role with

9    Marc through MAB.  And, you know, all the billing that

10   you see in Patton Boggs, et cetera, that -- it will

11   bear that out.  There was probably 20 different

12   projects.  I think his fees with Patton Boggs exceeded

13   $6 million.

14       Q.   Do you mean to say that when Dave Brody was a

15   lawyer at Patton Boggs, his law firm was representing

16   MAB Resources?

17       A.   Yes.

18       Q.   And that's what's reflected in the billing

19   that you sent me?

20       A.   Yes.

21       Q.   But you also had a role at MAB Resources.  I

22   know you told me about Dave Brody's role.  What was

23   your role?

24       A.   Well, I coordinated -- I worked with Richard

25   Reid, who was his tax accountant that did his tax

**EXHIBIT 12**

Page 46

1    returns, and coordinated between Brody, who also issued

2    a tax opinion for Bruner's personal return, and -- you

3    know, just whatever was required.

4          Brody would ask me to coordinate with Marc

5    because Marc was traveling internationally with all

6    these projects into China, Australia, Hungry, Europe,

7    et cetera.  So I was a liaison.  I didn't have any -- I

8    wasn't an officer or director or anything like that of

9    MAB.

10    Q.    I understand.

11          What about Nations (sic) Energy; did you have

12    any role with Nations?

13    A.    Yes.  I still am a Chief Financial Officer and

14    a Director of Nations.  So I guess you could add

15    Nations too, now that I recall.  You asked me CFO.  I

16    became the CFO in June of 2017 until now.

17    Q.    Let me ask you this.  Do you have a personal

18    financial interest in either the success or the failure

19    of any business venture that is affiliated with Marc A.

20    Bruner?

21    A.    No.

22    Q.    Have you ever?

23    A.    Yes.  I had stock options in Gasco, in stock.

24    At Gasco, PetroHunter, and Falcon.

25    Q.    Do you mean stock options in PetroHunter and

**EXHIBIT 12**

Page 66

1       Q.   When did you separate from those shares?

2       A.   Well, the bankruptcy separated it from me.  I

3  didn't sell them.

4       Q.   Did you lose them because of the bankruptcy?

5       A.   Yes.

6       Q.   Now, I'm showing you another document.  It's

7  going to be Exhibit 108.  Can you see 108 in front of

8  you?

9       A.   Yes.

10      Q.   Are you able to read it or do I need to

11 enlarge it?

12      A.   No.  If you could enlarge it just a little

13 bit.

14      Q.   How's that?

15      A.   Oh, that's better.  Okay.

16      Q.   Now, you're familiar with Exhibit 108, aren't

17 you?

18      A.   Yes.

19      Q.   And can you describe what Exhibit 108 is?

20      A.   It was an email to Dave Brody, Bob Telles,

21 Dave Siegel, and Barry Meinster.

22      Q.   And what was the purpose of the email?

23      A.   Okay.  Dave -- I mean, excuse me, David Siegel

24 and Bob Telles -- David Siegel was Chairman of Nation

25 Energy and Bob Telles was Executive Vice President.  At

**EXHIBIT 12**

Page 67

1    the time, which is the date of the memo -- excuse me,

2    of the email, which -- do you have a date there?  The

3    enter search items is blocking.

4        Q.   Oh, sorry.  It's October 31, 2016.

5        A.   Okay.  At that time, Nation Energy had an

6    offering memorandum out and it raised approximately

7    1.4 million of a $5 million offering at that date.

8    Part of the prospectus was that -- excuse me, Sweetpea

9    Petroleum was an acquisition target of Nation Energy,

10   Inc., to acquire the other 50 percent, which it states.

11   Let me just maybe read the memo.

12       Q.   Do you want the attached memo?

13       A.   No, this -- no, this is the memo.  There's no

14   attachment.

15       Q.   Got it.

16       A.   "I have prepared this Memo in my preliminary

17   review of the PetroHunter 7 filing on November 17,

18   2016, regarding Sweetpea Petroleum and the acquisition

19   of PetroHunter's 100 percent shareholders interest in

20   Sweetpea Petroleum."  Okay.  Now, that's also stated in

21   our prospectus as a target in the exhibit.

22            And then, Paltar's position of the other

23   50 percent in EP 136 and 143 and 197 will be governed

24   pursuant to the Terms and Conditions of the JVOA and

25   the Called Sums.  Now, all the parties understood, you

**EXHIBIT 12**

Page 68

1    know, the JVOA and the called sum.  Okay.

2           And then Nation Energy, in conjunction with

3    the prospectus, the strategy was -- I was stating the

4    obvious.  Nation can pursue the acquisition of

5    100 percent of the shareholders interest by PetroHunter

6    by developing a plan combining the claims of MAB

7    Resources lawsuit that Barry Meinster filed against

8    PetroHunter, The Bruner Family Trust unsecured claim of

9    2.6 million plus accrued interest.  And I was doing

10   this off the top of my head.  I didn't know exactly

11   what it was.  It's in excess of, what, 4 or $5 million.

12          David Brody's judgment of 300,000 as a

13   convertible debt holder.  And then I had a personal

14   claim of 25,000, which I later found out with the

15   schedule was 258,000.  And then I was asking Jerry --

16   Barry to check the statement of affairs so that we

17   could validate these numbers.

18          So the whole idea of this was Dave wanted to

19   convert his 300,000, and we all did.  I wanted to

20   collect on my claim.  Nation wanted to acquire the

21   50 percent interest in -- excuse me, the 50 percent

22   interest which they would if they bought a hundred

23   percent of the shareholders interest of EP 136 and 143.

24   So that's the purpose.

25          So I wrote it as the Vice President of Nation

**EXHIBIT 12**

Page 69

1    Energy, Inc., to Dave Siegel and Bob Telles, because we

2    had that strategy, and informing Dave that, you know,

3    we can include -- because we were trying to create a

4    class to present to the bankruptcy an amount of

5    creditors and debt holders and interest holders to the

6    bankruptcy court.

7         And so that was basically an idea and the

8    formation that was embedded in our prospectus that we

9    raised 1.4 million as of the date of this email and

10   later, you know, to raise the balance of the 5 million

11   that happened over the next year or so.

12        So that was -- and so then from that Bob

13   Telles and myself had meetings with Matt Silverman with

14   Sweetpea, Barry had a meeting with -- I think it was

15   either the Trustee or Weinman or both just to alert

16   them that he had an interested client.  And, you know,

17   that -- it was just a concept.

18        At no time did I talk to The Bruner Family

19   Trust or -- I talked with Brody on obviously my claim

20   and there were some MAB Resources.  In fact, I don't

21   believe I even talked to Bruner about it because I knew

22   the MAB Resources claim because I was, as you know,

23   part of the -- you know, part of that lawsuit.  So

24   anyway, that's the issue.

25        You know, the prospectus, et cetera, would

**EXHIBIT 12**

Page 70

1    bear out the fact that Sweetpea is a target for

2    acquisition and it was well-documented.

3        Q.   What was the benefit of sort of accumulating

4    these -- this combination of claims, MAB Resources, The

5    Bruner Family Trust, David Brody, and your personal

6    claims?

7        A.   Well, the whole idea was to create a large --

8    get as many representative parties that had an interest

9    in creating the economic value to those respective

10   parties.

11       Q.   And so the idea here was that Nation Energy

12   would acquire that interest in Sweetpea.  What was

13   Mr. Bruner's -- Marc A. Bruner's interest in Nations

14   Energy?

15       A.   Through Paltar, they owned 85 percent of

16   Nation Energy.

17       Q.   Okay.  Is that the only way -- the only

18   benefit Mr. Bruner would have obtained through this

19   proposed strategy?

20       A.   Yes.

21       Q.   So then what you do is you ask Barry Meinster

22   to get the statement of affairs to get some information

23   about the debtor; correct?

24       A.   Yes.

25       Q.   And then the other thing that you do is you

**EXHIBIT 12**

Page 104

1    Riddle, who was the CEO of Tamboran.  Tamboran stated

2    they would enter into, you know, a business transaction

3    once the bankruptcy and the title of the Sweetpea, the

4    other half, was cleared up.

5         So therefore by -- the simplest way to clean

6    things up was to -- because it had assets.  It had

7    80 million shares of Falcon and it had the minerals,

8    which there was, you know, several buyers for.  It

9    seemed very logical to reorganize and convert Paltar

10   from a 7 to 11 because then the management of -- the

11   management of the JVOA would be simplified as opposed

12   to going through a Trustee that really didn't

13   understand the minerals.

14   Q.   Thank you for that explanation.  I'm just

15   looking for the next thing I want it ask you about.

16        (Deposition Exhibit 27 was marked.)

17   Q.   (BY MR. ROLLIN)  You mentioned a motion to

18   convert.  Do you see Exhibit 27?

19   A.   Yes.

20   Q.   Do you see this is an email from Mr. Merrick

21   to you and other people?

22   A.   Yeah, Dave Brody.  You know, at this time

23   Hogan Lovells obviously is our -- was in the middle of

24   all this with Nations and myself and everything else.

25   Q.   So what he says is, "Marc and Tony" -- that's

**EXHIBIT 12**

Page 105

1    directed to you and to Mr. Marc A. Bruner; correct?

2        A.   Um-hum, yes.

3        Q.   And it says, "Per our recent discussions, I

4    have prepared the initial drafts of the 'Motion to

5    Convert Case to Chapter 11,' and the corresponding

6    L.B.R. 9013 Notice and proposed Order."  Do you see

7    that?

8        A.   Yes.

9        Q.   And then -- and you can see down below there's

10   this draft; right?

11       A.   Correct.

12       Q.   And the first line of the draft says -- after

13   the statute, it says, "MAB Resources, LLC, and," and

14   then he has in brackets, "insert identity of other

15   moving parties here"; right?

16       A.   Right.

17       Q.   Now, if you go back up to the email, in the

18   first line of the second paragraph, he says, "The

19   Motion requires further (what parties/persons will join

20   as part of the movements" -- sorry, "as part of the

21   Movants?)"  Do you see that?

22       A.   Yes.

23       Q.   Okay.  And then he asks for your thoughts.  Do

24   you see that?

25       A.   Yes.

**EXHIBIT 12**

Page 106

1              (Deposition Exhibit 5 was marked.)

2       Q.   (BY MR. ROLLIN)  Okay.  Now, if you look at

3    the actual filed motion -- which I'm going to pull up

4    right now.  This is Exhibit 5.  And you see it's filed.

5    It's got the court blue stamp at the top.

6       A.   Yes.

7       Q.   And here it says -- there's the statute again,

8    and it says, "Pursuant to 11 U.S.C. Section 706(b), (i)

9    Marc A. Bruner as assignee of David E. Brody, the

10   holder of a secured claim; (ii) Marc A. Bruner, MAB

11   Resources, LLC, Bruner Family Trust and Carmen Lotito,

12   each of whom is a holder of an unsecured claim; and

13   (iii) Marc A. Bruner, Bruner Family Trust, Bruner

14   Family Trust II, Laura M. Lotito, and BioFiber

15   Technology International, Inc., each of whom is the

16   holder of an equity interest (collectively referred to

17   herein as 'Movants'), jointly move this Court for an

18   Order," and it goes on.  Do you see that?

19      A.   Yes.

20      Q.   Okay.  What I'd like to know is who told

21   Mr. Merrick which of these parties would be a moving

22   party in connection with this motion?

23      A.   I believe I did.

24      Q.   What did you do to confirm that each of these

25   parties wanted to be a moving party?

**EXHIBIT 12**

Page 107

1      A.    Okay.   As it relates to The Bruner Family

2   Trust, I called Marc E. Bruner and stated, look it,

3   Marc entered into an engagement letter with Glenn

4   Merrick in which he's responsible for all legal fees

5   and to the extent we can get this case converted from 7

6   to 11, we have a potential buyer in -- yeah, buyer in

7   Tamboran Resources and that we can get a higher

8   realizable value to all the parties to the bankruptcy,

9   both creditors and shareholders, and preserve the

10  equity increase to the shareholders and, you know,

11  would you be interested in joining our suit.

12       And Marc stated -- Marc E. stated that as long

13  as it doesn't cause me any financial obligations, I'm

14  in agreement with enhancing the value potentially to

15  the Trust, period, so, you know, you could include me

16  into the motion.

17      Q.   So who was the proposed purchaser that you

18  just referred to?

19      A.    Tamboran Resources, Ltd.

20      Q.    Who's Tamboran Resources, Ltd.?

21      A.    Tamboran is the entity that currently owns

22  Sweetpea now.  Siegel went and made a deal with them.

23  He was aware about the negotiations.  He participated

24  in Australia with Tamboran previously.

25      Q.    So does this mean that you supported that

**EXHIBIT 12**

1      Q.   Do you recall having a conversation with

2   Marc E. Bruner about The Bruner Family Trust opposing

3   that sale to TS Capital?

4      A.   I don't recall.  Sorry, I don't.

5      Q.   Let's look at another document here.

6           MR. MEYER:  Is it a good time for a break?  I

7   don't want to break if you're in the middle of

8   something.

9           MR. ROLLIN:  No, it's always a good time for a

10  break.  That's fine.

11          (Discussion off the record.)

12          (Recess taken from 1:06 to 1:26 p.m.)

13     Q.   (BY MR. ROLLIN)  Mr. Lotito, I wanted to talk

14  a little bit about the claim that Mr. Bruner acquired

15  from Mr. Brody.  You know about that; right?

16     A.   Yes.

17     Q.   Okay.  There was a point in -- did there come

18  a point in time where you believed that that claim was

19  secured?

20     A.   Well, yes.

21     Q.   Can you tell me about that?

22     A.   Well, as a Board of Director of PetroHunter,

23  the minutes and I believe the documents state that the

24  shares of Sweetpea are to be secured -- would secure,

25  excuse me, a debenture note, you know, the full --

**EXHIBIT 12**

Page 110

1    there's several debenture holders, of which David Brody

2    was one of them.

3        Q.    In your view, was there benefit to the -- I'm

4    referring now to the effort to acquire Sweetpea from

5    the debtor, whether by Nations or by Paltar.  Was there

6    a benefit to having, within that group of claims that

7    supported that purchase, a secured claim?

8        A.    Well, there wouldn't be a benefit to the

9    unsecureds.  As a matter of fact, the bankruptcy

10   Trustee legally reviewed that point of the security and

11   the failure -- and there's an email from one of the

12   debenture holders, Christian Russenberger, who's a

13   Swiss investor of Global, he's a creditor as well as he

14   was a Director, and he complained that Dave Brody -- it

15   was his responsibility as the chief general counsel of

16   PetroHunter to have perfected professionally the

17   recording of UCC statements and all the necessary

18   documents to secure that claim in the courts.

19          And so the lack of it -- according to the

20   Trustee, the failure of filing the UCCs as a secured

21   creditor, the Court -- and the Trustee I think

22   petitioned the Court and they found that because of

23   that failure, it's an unsecured claim.

24       Q.    But before that, you had a view that it was a

25   secured claim.  And my question was whether you thought

**EXHIBIT 12**

Page 111

1   that the fact -- or at least the view that it was a

2   secured claim was beneficial to the effort for either

3   Nations Energy or Paltar to acquire Sweetpea from the

4   debtor?

5            MR. MEYER:  Form and foundation.

6       Q.   (BY MR. ROLLIN)  You can answer.

7       A.   Okay.  You know, I really didn't think about

8   it in those terms.  I was thinking more of the Joint

9   Venturing Operating Agreement.  There was a lot of

10  controversy between Sweetpea and Paltar and the

11  progress of payments, the called sums, et cetera.

12           And so I just looked at it from an operating

13  standpoint that it would simplify that agreement --

14  well, we could then modify that operating agreement and

15  get on with the development, because it was impeding

16  the development in going forward.

17           So I really didn't think about it until, you

18  know, the fact came up of the failure of recording the

19  UCC.  You know, by then it was too late, I assume.  But

20  I always thought it was a secured claim until it

21  wasn't.  And the Trustee determined it wasn't.

22      Q.   Yeah, I apologize because I don't have your

23  expertise.  So can you try to maybe dumb it down a

24  little bit and explain why in connection with the JVOA

25  the fact -- or the view that that claim was secured

**EXHIBIT 12**

Page 112

1  would be beneficial and to whom?

2          MR. MEYER:  Form and foundation.

3      A.  Well, it would only be beneficial to the

4  debenture holder because they had the security.  I

5  mean, an unsecured claim is just a general entity; a

6  secured claim would mean that those claim holders, upon

7  default of PetroHunter on its debenture, they could

8  move towards the collateral, which were the shares of

9  Sweetpea.

10     Q.  (BY MR. ROLLIN)  And is that claim holder

11  initially David Brody and then later Marc A. Bruner?

12     A.  Whomever is the legal owner of the debenture,

13  they have the rights -- well, on paper they had the

14  rights.  From a practical legal standpoint, they didn't

15  because of the failure.

16     Q.  I think I understand what you're saying.  I'm

17  trying to get specificity around this case.

18          Is that claimant, that debenture holder, first

19  David Brody and then by virtue of the transfer of his

20  claim to Marc A. Bruner, is it then Marc A. Bruner?

21     A.  Well, I don't know.  I'd have to go back to

22  see when the Trustee -- he moved on it quickly because

23  obviously he has to manage secured claims differently

24  than unsecured.  And so therefore we have to go back

25  into the record and see if the Trustee made his

**EXHIBIT 12**

Page 113

1    position and the Court supported it prior to entering

2    into the transaction or not.  So let's go back and look

3    at the facts.

4        Q.   I see what you're saying.

5             So it would be -- the person with an advantage

6    by holding a secured claim would be David Brody if he

7    was the holder or it would be Marc A. Bruner if he was

8    the holder, at least at the time that they thought it

9    was secured before the judge's ruling?

10       A.   No, I think that -- to answer your question, I

11   recall an email from Hartsell disclosing the fact that

12   it was an unsecured claim, now that you speak about it.

13   So Bruner -- so there was no advantage from that

14   perspective because he was buying an unsecured claim,

15   or getting assigned or whatever he was doing.

16       Q.   Is that before --

17       A.   So yeah.  So that point is clarified by an

18   email from Hartsell to Bruner.

19       Q.   Do you remember approximately when that is,

20   that email is?

21       A.   It was prior to closing the deal.  And that

22   would have been -- August 22 I believe the Court -- it

23   was recorded in the court.

24       Q.   Sorry, I'm just making a note.

25       A.   It's okay.

**EXHIBIT 12**

Page 114

1      Q.    Who did Hartl send that email to, that --

2      A.    He sent it to me as well as Marc and Dave

3   Brody.

4      Q.    Okay.  So it was sometime before Bruner bought

5   the claim from Brody --

6      A.    Yeah, it was -- Hartl was making a disclosure,

7   in my opinion.

8      Q.    Okay.  But Bruner went forward with the deal

9   anyway, he wanted the claim anyway?

10     A.    Yeah, because he was thinking of it in the

11  context that they were going to be successful in

12  getting the 7 converted to 11 also.

13     Q.    So how would having the claim help Marc A.

14  Bruner?

15     A.    Well, it would help him, I guess, to the

16  extent that if it went to 11, he could realize the full

17  amount of the note primarily from an economic

18  standpoint.

19     Q.    Didn't it also give him the opportunity to be

20  a claimant in the bankruptcy case in his personal

21  capacity as opposed to through MAB or some other

22  entity?

23          MR. MEYER:  Form and foundation.

24          MR. JONES:  Same objection.

25     A.    You know, I don't know.  You'd have to ask

**EXHIBIT 12**

Page 130

1           (Technical difficulties.  Pause in the

2    proceedings.)

3        A.    The Trust attorney is Patton Boggs.  Now,

4    Barry just filed -- was asked to file the claim, which

5    is what we saw from the register, as close -- because

6    you had a time frame that you had to file your claim;

7    otherwise, the Court wouldn't recognize your claim,

8    okay.

9           And then Hartl was -- so to answer your

10   question, at this date this is David Brody's attorney.

11   The purpose of this meeting was to put together the

12   resources to make a bid on the stock.  So, you know,

13   Brody would have been a beneficiary to that

14   transaction.

15       Q.    (BY MR. ROLLIN)  Was there a Patton Boggs

16   attorney that did anything in the bankruptcy court for

17   The Bruner Family Trust?

18       A.    Not that I'm aware of.

19       Q.    All right.  The lawyers that did things for

20   The Bruner Family Trust in the bankruptcy are Barry

21   Meinster; correct?

22       A.    I'm sorry, for the Trust?

23       Q.    Yes.  For the Bruner Family Trust, the lawyers

24   who did -- took action on behalf of The Bruner Family

25   Trust are Barry Meinster; correct?

**EXHIBIT 12**

Page 131

1    A.   Yes.

2    Q.   Glenn Merrick; correct?

3    A.   Yes.

4    Q.   And at least for some time Ted Hartl; correct?

5    A.   Well, yeah.  For filing the claim, yeah.  As

6    far as Barry, Barry just filed the claim too.  Hartl

7    and Barry really had the same job.  It was just the

8    timing difference.  Barry filed the initial claim and

9    Lindquist filed the rejected claim and, you know,

10   verified it with the Trustee.

11   Q.   Okay.  Who at this meeting, that's reflected

12   in this Exhibit 155, was there on behalf of you?

13   A.   I don't believe we had this meeting.

14   Q.   Were there any meetings involving the

15   attorneys for the various members of the interest group

16   that was assembled to try to persuade the Trustee to

17   sell Sweetpea to either Nations Energy or Paltar?

18        MR. MEYER:  Form.

19   A.   Were there any meetings?  What do you mean?

20   Q.   (BY MR. ROLLIN)  Any meetings in which --

21   let's make it simpler.  Were there any meetings in

22   which Ted Hartl, on behalf of Dave Brody, and Barry

23   Meinster, on behalf of Tony Lotito, met to advance the

24   objective of purchasing Sweetpea?

25   A.   I believe Barry had a meeting with Weinman and

**EXHIBIT 12**

Page 132

1    the Trustee regarding that.

2        Q.   Okay.  And when Barry was there, was there

3    anybody else --

4        A.   Not that I --

5        Q.   -- representing that interest group?

6        A.   Not -- I don't know.  There could have been.

7        Q.   You were not present?

8        A.   I was not present.

9        Q.   Setting aside the concept of a physical

10   meeting, were there other forms of communications; for

11   example, phone calls, in which Barry Meinster met with

12   anybody in order to help advance the objective of

13   buying Sweetpea?

14       A.   I don't know.

15       Q.   I'm going to showing you another document from

16   your production.  We'll mark in 156.

17            (Deposition Exhibit 156 was marked.)

18       Q.   (BY MR. ROLLIN)  Do you see this is an email

19   from Dave Brody to you on June 14 of 2020?

20       A.   Yes.

21       Q.   Did you look at this when you were collecting

22   documents to send over?

23       A.   Yes.

24       Q.   Now, this is Dave Brody asking you for your

25   help in trying to facilitate getting Marc to pay him

**EXHIBIT 12**

Page 133

1    for the claim; right?

2        A.    Well, I wouldn't say pay, just communicate

3    with him to contact Brody regarding getting paid.

4        Q.    And did you contact --

5        A.    I never made any demands on Bruner to pay it.

6        Q.    Did you contact Mr. Bruner about it?

7        A.    I attempted to.  I can't recall if I did or

8    not.

9              (Deposition Exhibit 157 was marked.)

10       Q.    (BY MR. ROLLIN)  This also comes from your

11   production.  And this is an email from you to

12   Mr. Bruner on April 3, 2019; correct?

13       A.    Yes.

14       Q.    And you see you wrote to him -- there's an

15   attachment here which is a letter that I wrote to

16   Mr. Bruner.  Do you remember that?

17       A.    Yes.

18       Q.    And do you see what you write to Mr. Bruner,

19   after having received a copy of that letter from me,

20   was, "Marc - Please take note of David Brody's

21   comments.  He wants to settle without a lawsuit.  Said

22   he would take a note for the $25,000.  I do not know

23   where he may be getting his information about Beetaloo

24   Partner, LLC?  I wonder if Siegel has a mole somewhere.

25   Give Dave a call and discuss.  Tony."

**EXHIBIT 12**

Page 134

1            That's what you wrote to Mr. Bruner; right?

2       A.   Yes.

3       Q.   And you are noting that Dave Brody is trying

4  to settle the dispute without having to file a lawsuit;

5  correct?

6       A.   Correct.

7       Q.   Did you get any response at all from

8  Mr. Bruner to this email?

9       A.   I can't recall.  I don't know.  I don't think

10  so.  I don't know.  I just don't know.

11       Q.   Okay.

12       A.   He didn't respond to 99 percent of my emails.

13       Q.   Okay.  I understand.  I'm just asking you if

14  something happened.

15       A.   Yeah.

16       Q.   Now, that reference to Beetaloo comes from

17  this paragraph on page 2 of my letter.  It says, "It is

18  Dave's understanding from various third parties that

19  you are planning on contributing $15 million worth of

20  your Fortem stock to Beetaloo Basin Partners."

21       A.   Um-hum.

22       Q.   As we talked about at the beginning of the

23  deposition, that was true; right?

24       A.   What do you mean?  I don't understand your

25  question.

**EXHIBIT 12**

Page 139

1    And tell me where to scroll and I'm happy to.

2        A.    Yes, that's -- yes.

3        Q.    What control, if any, did you have in the

4    called sum notices?

5        A.    I worked with Kym -- the partner, Kym

6    Livesley, in Australia and with Nations and also

7    with -- with Nations, with Lisa Simpkins.  She was the

8    controller there.  At that date of the called sum --

9    you can scroll it up so I can make sure.

10       Q.    Tell me where to stop.

11       A.    Yeah, I just want to see the -- okay, keep

12   going up, please.  There's different areas.  Yeah, that

13   was the amount of the -- the called sum is to Nations.

14   Or excuse me.  Hold it up, please, again.  It's to --

15   who's it addressed to, Sweetpea.

16       Q.    Right there, Sweetpea.

17       A.    Okay.  Yeah, we were just notifying the

18   Trustee.  And Matt Silverman, he's in charge of Bayless

19   and he was the key -- and this is -- yeah, this is

20   after the bankruptcy.  So Matt also represented

21   Sweetpea along with the Trustee.  So those are the two

22   interested parties related to the -- this particular

23   called sum.

24       Q.    I understand.

25             So because PetroHunter was in bankruptcy and

**EXHIBIT 12**

Page 157

1    Creditors Who May Have Secured Claims, and then he

2    attaches Schedule E and the F, Creditors Who Have

3    Unsecured Claims.  Do you see that?  Do you see that he

4    sent all of this to you?

5        A.   Yes.

6        Q.   Okay.  And then he says, "Please let me know

7    if you are able to identify from the attached any

8    others to join in such a motion."  Do you see that?

9        A.   Yes.

10       Q.   Did you at any point identify any creditors

11   who may be willing to join in a motion to replace the

12   Chapter 7 Trustee?

13       A.   No, I haven't, no.

14       Q.   You didn't have any role in that?

15       A.   No.

16       Q.   Now I'm showing you Exhibit 2.  Do you see

17   Exhibit 2?

18       A.   Yes.

19       Q.   Exhibit 2 is an objection to the sale of

20   certain debtor assets.  Do you see that?

21       A.   Yes.

22       Q.   And you see you're one of the people who is

23   objecting to the sale; right?

24       A.   Right.

25            MR. MEYER:  Will you scroll up again, please.

**EXHIBIT 12**

Page 158

1           MR. ROLLIN:  Yes.

2      Q.   (BY MR. ROLLIN)  And you see there are other

3  people that are also objecting to the sale; correct?

4      A.   Yes.

5      Q.   What role did you play in identifying to

6  Mr. Merrick the other parties who would be objecting to

7  the sale, if any?

8      A.   Okay.  I made the phone call to Marc E. Bruner

9  with the -- and Marc E. gave me the approval subject to

10  that he didn't have any financial obligation.  He would

11  support the conversion -- or the objection here in the

12  sale of the -- as well as myself, my wife.  And

13  BioFiber is a company that I control.  So that's the

14  answer.

15      Q.   Thank you.

16           (At this time, Mr. Mark entered the room.)

17           MR. JONES:  Just for the court reporter real

18  quick, the other fellow sitting here is Joey Mark from

19  Moye White.  He'll be filling in for me if I have to

20  leave as we get in and around 3:00, just for the

21  reporter's sake.

22           THE REPORTER:  Thank you.

23      Q.   (BY MR. ROLLIN)  Mr. Lotito, in the time that

24  you've known Mr. Brody and Mr. Bruner, are you aware --

25  and I want you to draw a distinction between entities

**EXHIBIT 12**